**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| TRITEK INTERNATIONAL INC., *et al.*,[1] | ) | Case No. 23-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF GRANT LAZARUK IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Grant Lazaruk, hereby declare under penalty of perjury:

1.      I submit this declaration (this "Declaration") in my capacity as the Governor, Chief Executive Officer ("CEO") and President of HyLife Foods Windom, LLC ("Windom"), and President of each of Tritek International Inc. ("Tritek") and Canwin Farms, LLC ("Canwin," and collectively with Windom and Tritek, "Debtors"). I have a Bachelor of Science degree in Agriculture from the University of Manitoba. Before joining Debtors' group of companies, HyLife Group Holdings Ltd. ("HyLife"), in 1997, I worked in commercial banking at the Royal Bank of Canada for nineteen (19) years. During my tenure at HyLife, I have been involved in all aspects of the business, including operations, marketing, finance, and hedge management. I have served as CEO since 2010.

2.      On the date hereof (the "Petition Date"), Debtors each filed voluntary petitions (the "Chapter 11 Petitions") under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") commencing these chapter 11 cases (these "Chapter 11 Cases"). I submit

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Tritek International Inc. (7919); HyLife Foods Windom, LLC (5391); and Canwin Farms, LLC (3973). Debtors' mailing address is 2850 Highway 60 East, Windom, MN 56101.

this declaration (this "Declaration") in support of the Chapter 11 Petitions and certain other "first day" motions designed to maximize the value of Debtors through the commencement of these Chapter 11 Cases (each, a "First Day Pleading" and collectively, the "First Day Pleadings").[2]  I believe that the First Day Pleadings are (a) necessary to enable Debtors to operate in chapter 11 while maximizing productivity and Debtors' value, (b) a critical element in achieving a successful landing in and journey through chapter 11, (c) essential to maximizing the value of Debtors' estates and maintaining their operations while they conduct a value-maximizing marketing process for their assets and pursue confirmation of a plan and (d) in the best interests of Debtors, their estates and their creditors.  Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above.

3.       Except as otherwise indicated, all statements set forth in this Declaration are based upon:  (a) my personal knowledge, (b) information supplied to me by other members of Debtors' management or Debtors' professionals that I believe in good faith to be reliable, (c) my review of relevant documents or (d) my opinion based upon my experience in the agribusiness industry and knowledge of Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of each Debtor.

4.       This Declaration is divided into three parts.  ***Part I*** provides an overview of Debtors, their businesses, their capital structure, and their prepetition indebtedness.  ***Part II*** describes the circumstance surrounding the commencement of these Chapter 11 Cases and what Debtors view as the path forward.  ***Part III*** discusses the First Day Pleadings.

---

[2]  Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the relevant First Day Pleading.

### I.     OVERVIEW OF DEBTORS' BUSINESSES AND FINANCIAL AFFAIRS

5.     Debtors are three entities that are part of the HyLife vertically integrated operation for the raising, production and sale of pork products.  The HyLife enterprise, with headquarters in Manitoba, Canada, has, since 1994, become a global company with over 4,000 employees and facilities across Canada, the United States, Mexico, China, and Japan.  HyLife is one of the largest producers of pork in Canada and one of the top 40 pork producers worldwide by volume, exporting pork products to over 20 countries.  It has two main divisions – live hog production and pork processing.

6.     HyLife, Debtors' ultimate parent company, was founded in 1994 in Southeast Manitoba by the Vielfaure brothers and Don Janzen, who worked together to achieve one common mission – create the most efficient, integrated operating structure for the production of hogs. Operations were expanded into the United States in 1998, and in 2008, HyLife purchased a processing plant in Neepawa, Manitoba to process all commercial hogs into pork products sold around the world.

7.     HyLife acquired Windom from the Taylor Corporation ("Taylor") in approximately May 2020.  Taylor, through GAT Farms, LLC ("GAT Farms"), operated a pork processing plant at the Facility (defined below) since approximately 2016.  Today, just three (3) years later, Windom is a state of the art, professionally managed pork processing facility in Windom, Minnesota with the ability to process high volumes of pork product to service premium domestic and international end markets (the "Facility").  Spanning 226,737 square feet, the Facility currently employs approximately 1,000 employees, approximately 450 of whom are foreign workers (who are lawfully employed in the United States through the H-2B and TN visa programs), and has the capacity to process approximately 5,600 hogs per day.  The Facility comprises eight processing

lines, with overall production capacity of 415 hogs per hour, running 15.5 hours per day. The Facility's capabilities include high grade hog processing, cooling and packaging. As of the Petition Date, the Facility runs two shifts. Once Debtors enter the chapter 11 process and in an effort to preserve liquidity, Debtors will downsize their operations. The Facility is expected to implement cost savings measures that will reduce the number of hogs that are processed beginning on or about the week of May 8, 2023.

8.     Windom sources its hogs from a mix of HyLife's farms, including from Canwin, as well as from third party farmers, growers and brokers, and serves primarily the U.S., Canadian, Japanese, Korean and Chinese markets. Its secondary and tertiary markets include Mexico, Columbia, Chile, the Philippines, Southeast Asia and Australia. In 2022, the Facility sold approximately 325 million pounds of pork. In fiscal year 2022, its sales volume exceeded $370 million.

9.     Canwin is a contract grower operation established in 2020, following HyLife's acquisition of Windom. While Canwin is a South Dakota entity, its administrative activities occur in La Broquerie, Manitoba, Canada. Canwin previously purchased approximately 2,000 pigs (both weaned and feeder) per week from various HyLife entities and farms through sale and distributorship agreements for the purpose of growing them to market weight to then sell to Windom and certain third parties for processing. Management has since made the decision to wind down Canwin's operations and stop all new purchases of pigs. This process began prepetition and continues currently. Being a contract grower operation, Canwin does not own any physical assets with the exception of the grower pigs, as it contracts with vendors for the supply of goods and services, including, among other things, feed supply, nurseries and barns, transportation, vaccinations, labor, and materials. It is estimated that Canwin contracts with approximately 15-

20 finishing barns and approximately 30 nursery barns located throughout South Dakota. Once the hogs reach market weight, Canwin arranges for transportation to Windom and a number of third party processing facilities.

10.     Once the hogs are processed in the Facility, the pork products are ready to be sold to Windom's customers. Windom's pork products are not branded with the Windom or HyLife label once they reach retailers. Rather, the pork products are sold to processing companies for further processing or refining, distributors and wholesalers.[3]

11.     The method of sale of Windom's pork products depends on the customer. Sales to domestic customers (customers in North America) are made either by Windom directly or through one of Windom's affiliates, HyLife Foods LP ("HyLife Foods"). In the case of direct sales by Windom, Windom invoices the customer directly and delivers the product using a third party transportation provider. In the case of sales through HyLife Foods, Windom first sells the product to HyLife Foods, which in turn sells it to customers throughout North America as a broker or distributor. International sales (sales outside of North America) are carried out through another affiliate, HyLife Foods International Ltd. ("HFIL"). Pork products sold internationally are first sold to HFIL, and then by HFIL to the international customer. When product is shipped internationally, Windom contracts with a third party transportation provider to deliver the product to a cooling port, where it remains until loaded into a container and shipped to its destination. Once the container is loaded on to a shipping vessel, title to the pork product transfers to HFIL, and once it arrives in its country of destination and clears customs, the customer arranges for the

---

[3]     By way of an example, Windom sells its pork belly products to Hormel for processing into bacon, which is then sold to retailers and ultimately consumers under the Hormel label.

product to be transported to its ultimate destination.  Total time in transit, from the time the product leaves the Facility to the time it reaches the customer, is approximately 21-25 days.

12.     Historically, Tritek was in the business of providing sales and related logistics, information systems, and administrative services for Windom in connection with its international and domestic sales.  While, as described above, Windom manages the majority of its domestic sales in-house and outsources its international sales to HFIL, Windom, HFIL and other HyLife affiliates historically relied on Tritek to coordinate the logistics and administration of those sales.  Tritek provided the abovementioned services to Windom and other HyLife entities pursuant to service support agreements.  All services rendered by Tritek were charged to the appropriate HyLife entity.  Historically, Tritek employed four individuals, all of whom worked remotely.  As of the date hereof, Tritek does not have any employees.  Tritek does not have and has never had a physical office, and except for approximately $45,738.00 in cash in one of its bank accounts, Tritek has no assets as of the date hereof.

**B.     Debtors' Corporate Structure**

13.     Windom, a Minnesota Limited Liability Company, is the direct subsidiary of Skyline International Incorporated ("Skyline") and the indirect subsidiary of HyLife.  Prior to March 27, 2023, Skyline owned a 75% membership interest in Windom, while the remaining 25% was owned by GAT Farms.  On March 27, 2023, Skyline purchased GAT Farms' 25% interest in Windom and as of the date hereof, owns 100% of the membership interests of Windom.

14.     Skyline owns 100% of the membership interests of Tritek, a Delaware corporation, and Canwin, a South Dakota Limited Liability Company, which are both ultimately owned by HyLife.

15.    HyLife has two shareholders. CPF Canada Holdings Corp, a Canadian corporation ("CPF"),[4] is the majority shareholder with a 50.1% interest in HyLife.  Itochu Corporation, a Japanese corporation ("Itochu," and together with CPF, the "Investors"), owns the remaining 49.9% interest in HyLife.

16.    A simplified illustration of Debtors' organizational structure is immediately below:



A complete illustration of Debtors' organizational structure is attached hereto as **Exhibit A**.

**C.    Debtors' Prepetition Obligations**

*i.    Windom and Canwin Secured Debt*

17.    Prior to the filing of these Chapter 11 Cases, certain Debtors were parties to (i) that certain Credit Agreement, dated as of May 6, 2020 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Credit

---

[4]    CPF is ultimately owned by Charoen Pokphand Foods PCL, a Thai public company.

Agreement"),[5] by and among Windom and Canwin,[6] as borrowers (together, the "Prepetition Borrowers"), Compeer Financial, PCA and Compeer Financial, FLCA, as co-administrative agents (together, the "Prepetition Agent"), and the other financial institutions party thereto from time to time as lenders (collectively, the "Prepetition Lenders," and collectively with the Prepetition Agent, the "Prepetition Secured Parties") and (ii) various Term Notes, dated as of May 6, 2020, various Delayed Draw Term Notes, dated as of May 6, 2020, and various Revolving Notes, dated as of May 6, 2020 (collectively, the "Prepetition Promissory Notes," and collectively with all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the Prepetition Secured Parties, including, without limitation, any and all security agreements, guaranties, control agreements, UCC financing statements, mortgages executed and/or delivered in connection therewith or related thereto, each as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Loan Documents").

18.    Pursuant to the Prepetition Credit Agreement, the Prepetition Promissory Notes, and the other Prepetition Loan Documents, the Prepetition Lenders agreed to make certain loans and other financial accommodations to, *inter alia*, fund Debtors' business operations, including through (i) a term loan in the principal amount of $70,000,000 (the "Prepetition Term Loan"), (ii)

---

[5]    Prior to the Petition Date, the Credit Agreement was amended pursuant to that certain (i) First Amendment to Credit Agreement dated as of October 9, 2020, (ii) Second Amendment to Credit Agreement dated as of February 24, 2021, (iii) Third Amendment to Credit Agreement dated as of June 11, 2021 (iv) Fourth Amendment to Credit Agreement dated as of December 29, 2021, and (v) Fifth Amendment to Credit Agreement dated as of December 1, 2022. The Prepetition Borrowers, Agent, and Lenders also entered into that certain Forbearance Agreement dated as of November 9, 2021, pursuant to which, among other things, the Prepetition Secured Parties agreed to forbear from exercising certain default-related rights and remedies for a temporary period of time.

[6]    Canwin joined the Prepetition Credit Agreement, the Prepetition Security Agreement and the other Prepetition Loan Documents (each as defined below) as a Prepetition Borrower pursuant to that certain Joinder Agreement dated as of December 18, 2020, by and among the Prepetition Borrowers, the Prepetition Agents, and the Prepetition Lenders.

delayed draw term loans in the aggregate principal amount of up to $20,000,000 (the "Prepetition Delayed Draw Term Loans"), and (iii) revolving loans in the aggregate principal amount of up to $26,000,000 (the "Prepetition Revolving Loans").

19.     As of the Petition Date, the Prepetition Borrowers are liable to the Prepetition Lenders under the Prepetition Loan Documents in the total aggregate principal amount of $108,700,000, including (i) $69,400,000 on account of the Prepetition Term Loan, (ii) $17,000,000 on account of the Prepetition Delayed Draw Term Loans, (iii) $20,000,000 on account of the Prepetition Revolving Loans, and (iv) $2,300,000 on account of outstanding letters of credit, *plus* interest and other fees, costs, and expenses owed by the Prepetition Borrower under the Prepetition Loan Documents (as defined below) (collectively the "Prepetition Obligations").

20.     To secure the Prepetition Debt, each of the Prepetition Borrowers granted the Prepetition Agent, for the benefit of the Prepetition Secured Parties, a security interest in all of their personal property, wherever located, whether then owned or thereafter acquired, including, without limitation, the following (all as defined in the Prepetition Loan Documents): all Accounts and other rights to payment whether or not earned by performance, and including, without limitation payment for property or services sold, leased, rented, licensed or assigned; Goods; Farm Products; Fixtures; Chattel Paper; Inventory; Equipment; Instruments; Investment Property; Farm Products; Documents; Deposit Accounts; Commodity Accounts; Commercial Tort Claims; Securities Accounts; Money; Letter of Credit Rights; General Intangibles; Payment Intangibles; Software; Supporting Secured Obligations; and the Proceeds and Products of the foregoing, and all books and records pertaining to the foregoing (collectively, the "Prepetition Personal Property Collateral").

21.     Additionally, pursuant to that certain Mortgage, Security Agreement, Assignment of Rents and Leases, and Fixture Financing Statement dated as of May 6, 2020 (the "Mortgage"), Windom also granted the Prepetition Agent, for the benefit of the Prepetition Secured Parties, a mortgage against certain real property located in Cottonwood County, Minnesota, and certain other property interests related thereto (collectively, the "Prepetition Real Property Collateral," and together with the Prepetition Personal Property Collateral, the "Prepetition Collateral").[7]

22.     On April 17, 2023, the Prepetition Agent delivered to the Prepetition Borrowers a default notice, pursuant to which, among other things, the Prepetition Agent advised the Prepetition Borrowers of the acceleration of the Prepetition Term Loan and other obligations under the Prepetition Credit Agreement.  As of the Petition Date, the Prepetition Secured Parties are not in the process of exercising any other rights or remedies under the Prepetition Loan Documents.

*ii.     Tritek Secured Debt*

23.     Although Tritek is not an obligor or grantor under the Prepetition Loan Documents, Tritek pledged substantially all of its assets to secure loans made to certain of Debtors' affiliates. Specifically, pursuant to that certain Security Agreement dated as of September 23, 2019, Tritek and certain other non-debtors pledged substantially all of their assets to secure the obligations of non-Debtor HyLife and non-Debtor HyLife Ltd. (together, the "HyLife Borrowers") under that certain Credit Facility Agreement by and among the HyLife Group Borrowers, as borrowers, Royal Bank of Canada, as administrative agent, and certain financial institutions party thereto as lenders.

---

[7]   Each term as used in this paragraph has the meaning ascribed thereto in the applicable Prepetition Loan Documents. Notwithstanding anything to the contrary contained in this paragraph, the security interests created by the applicable Prepetition Loan Documents does not extend to, and the term "Prepetition Collateral" shall not include, any "Excluded Property."

24.     Additionally, pursuant to that certain Guarantee Agreement and that certain Security Agreement, each dated as of September 22, 2022, Tritek guaranteed, and pledged substantially all of its assets to secure, certain subordinated loans made to the HyLife Borrowers under that certain Loan Agreement dated as of September 22, 2022, by and among the HyLife Group Borrowers, as borrowers, and Export Development Canada, as the secured party.

*iii.     Investor Equity Contributions*

25.     Debtors have historically obtained additional funding for their operations through equity contributions made indirectly by the Investors.  Since January 1, 2023, the Investors have made various equity contributions totaling approximately $29,500,000 to fund Debtors' chapter 11 preparations and operations during such preparations.[8]  Because of their critical prepetition contributions, Debtors were able to operate while they simultaneously prepared for these Chapter 11 Cases.

## II.    **EVENTS LEADING UP TO THE CHAPTER 11 CASES AND PATH FORWARD**

**A.    Events Precipitating the Filing of These Chapter 11 Cases.**

26.     The COVID pandemic, which commenced shortly before the acquisition of the Facility, greatly impacted the processing and production of pork across the United States, with effects resonating throughout the pork supply chain.  These effects included labor shortages, logistical restraints, market disruptions, and unfavorable foreign exchange pricing.  Due to the unfortunate timing of HyLife's acquisition of Windom in May 2020, Windom has incurred operating losses since its inception.  On average, Debtors have incurred, and continue to incur, losses of approximately $6-7 million per month.

---

[8]    Since 2020, the Investors have contributed approximately $200 million indirectly to Debtors.

27.     Debtors had previously sought out potential strategic alternatives.  In 2022, in an effort to address the continuing losses Debtors were experiencing, HyLife engaged PricewaterhouseCoopers Corporate Finance LLC to undertake a marketing and sales process of Debtors.  The marketing process commenced in August 2022 but did not yield any bidders at that time.  Katten Muchin Rosenman LLP was engaged as legal advisor in December 2022 and PricewaterhouseCoopers LLP was engaged as financial advisor in January 2023 to advise Debtors in connection with a restructuring in an effort to maximize value for Debtors and its stakeholders.

28.     In February 2023, Debtors' management team, together with Debtors' legal and financial advisors, determined that a chapter 11 process that would culminate in a section 363 sale was likely to be the best and most value maximizing path forward.  To that end, Debtors and their advisors decided to resume the prepetition marketing process as part of an effort to explore all potential strategic alternatives, including sales and capital markets solutions.  On February 28, 2023, Debtors engaged investment banker Intrepid Investment Bankers LLC ("Intrepid") to assist in exploring all potential strategic options to prepare Debtors for a smooth landing in chapter 11. Immediately, Intrepid started reaching out to potential buyers, both strategic and financial, with the goal of securing a party to serve as a stalking horse bidder (a "Stalking Horse Bidder"). Interested parties have been participating with the understanding that the sale of Debtors' assets would occur in a section 363 context.

29.     As of the date hereof, Debtors and their investment bankers have contacted over 115 potentially interested parties as part of this prepetition process, entered into 38 nondisclosure agreements, held one management presentations, and conducted two site visits.  Potential investors and/or acquirors also had access to a virtual data room with over one gigabyte of information.

30.     The extensive prepetition marketing process yielded a number of serious expressions of interest and has paved the way for Debtors to commence a chapter 11 process and pursue a sale of their assets pursuant to section 363 of the Bankruptcy Code.  Although Debtors do not have a stalking horse bidder as of the date hereof, they anticipate that a competitive bidding process will ensue, and to that end, will be seeking approval of appropriate bidding procedures in connection therewith.

**B.     Goals for These Chapter 11 Cases**

31.     As noted above, since the latter part of 2022, Debtors have undertaken a process to explore and consider viable alternatives and, more recently, have been working diligently to facilitate a smooth transition into chapter 11.  Due to an extensive prepetition marketing and sale process, Debtors believe they are well-positioned to enter chapter 11 and pursue a sale of substantially of their assets pursuant to section 363 of the Bankruptcy Code, followed by an orderly wind down of Debtors' business through a chapter 11 plan of liquidation.  Debtors and their advisors are continuing their marketing and outreach efforts and engaging with parties that have expressed interest in Debtors' assets to encourage them to participate in the chapter 11 sale process with hopes of identifying a strategic or market participant to serve as a Stalking Horse Bidder or other bidder in these Chapter 11 Cases.  Debtors believe that the measures taken prepetition have substantially increased the likelihood of successful post-petition marketing and sale process.

32.     In conjunction with their exploration of strategic alternatives, Debtors have established and maintained consistent communication with key stakeholders, including the Prepetition Secured Parties.  Debtors have used this dialogue, which has involved substantial diligence, ongoing discussion and interaction among key stakeholders, to keep its creditor

constituencies apprised (to the extent practicable) of the status of its marketing process to consummate a value-maximizing transaction.

33.     The value of Debtors' business is keyed to its workforce and the continuing operations of Debtors' business.  We believe that continuing the business as a going concern while undertaking further marketing efforts is essential to be able to realize the full value of the business, even if a sale is for all or less than all of the assets. After considering all of these facts and circumstances, Debtors made the determination that an expedited, in-court process would best preserve and maximize the value of their business for the benefit of all stakeholders.  The Chapter 11 Cases offer Debtors the best opportunity to increase creditors' recoveries and preserve jobs under the circumstances.

### III.     FIRST DAY PLEADINGS[9]

34.     Contemporaneously with the filing of the Chapter 11 Cases, Debtors filed the First Day Pleadings seeking relief related to the administration of the Chapter 11 Cases and Debtors' vendors, employees, operations, and cash and financing needs.  Debtors respectfully request that the proposed relief described in each of the First Day Pleadings be granted as critical to maximizing the value of their estates.  A description of the relief requested in and the facts supporting each of the First Day Pleadings is set forth below.

**A.     Motion of Debtors for an Order Directing the Joint Administration of Debtors' Chapter 11 Cases ("Joint Administration Motion")**

35.     Debtors respectfully request the joint administration of the Chapter 11 Cases.  For the reasons discussed in the Joint Administration Motion, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights

---

[9]   Capitalized terms used in this Section III but not defined herein shall have the meanings given to them in the applicable First Day Pleading.

of any party in interest.  Moreover, joint administration will be more efficient, convenient for the Court, and cost-effective for all parties in interest.

**B.    Motion of Debtors for an Order (I) Authorizing Debtors to Redact Certain Personally Identifiable Information for Individual Creditors; and (II) Granting Related Relief (the "<u>Redaction Motion</u>")**

36.    Through the Redaction Motion, Debtors respectfully request authority to redact certain personally identifiable information, in particular email addresses and home addresses, but not the names, of Debtors' individual creditors, as well as individual interest holders.  Debtors seek this relief due to the privacy and safety concerns that would arise if such information were disclosed in Debtors' court filings.  As described in the Redaction Motion, if the email addresses and home addresses of Debtors' individual creditors and interest holders were to be made public, such information could be used, among other things, to perpetrate identity theft or locate survivors of domestic violence or stalking who have otherwise taken steps to conceal their whereabouts.

37.    Accordingly, I believe that the relief sought in the Redaction Motion is in the best interests of Debtors' estates, their creditors, and all other parties in interest.

**C.    Application of Debtors for Order (I) Authorizing the Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent to Debtors; and (II) Granting Related Relief ("<u>Claims Agent Retention Application</u>")**

38.    Through the Claims Agent Retention Application, Debtors are respectfully requesting the appointment of Donlin, Recano & Company, Inc. as claims and noticing agent in the Chapter 11 Cases.  Although Debtors have not yet filed their schedules of assets and liabilities, they anticipate there will be in excess of 200 parties in interest to be noticed.  In view of the number of anticipated notice parties, Debtors submit that the appointment of a claims and noticing agent is necessary and in the best interests of both Debtors' estates and their creditors.

**D.** **Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting Junior Liens and Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection to Prepetition Secured Parties; (V) Scheduling a Final Hearing; and (V) Granting Related Relief (the "DIP Motion")**

39.     Through the DIP Motion, Debtors are respectfully requesting entry of interim and final orders (i) authorizing Debtors to obtain postpetition debtor in possession financing; (ii) granting junior liens and administrative claims; (iii) authorizing the use of "cash collateral" (as defined in section 363 of the Bankruptcy Code); (iv) granting adequate protection to the Prepetition Secured Parties; (v) scheduling a final hearing; and (vi) granting related relief.

40.     Debtors have insufficient cash to operate their business and continue paying their debts as they come due.  Debtors require immediate access to liquidity to ensure that they can continue operating in these Chapter 11 Cases while they continue conducting a sale and marketing process for their assets.  Without prompt postpetition financing and access to cash collateral, Debtors do not have sufficient cash to operate their business, pay employee wages, or pay other critical business expenses, causing immediate and irreparable harm to the value of Debtors' estates to the detriment of all stakeholders.  Thus, if Debtors' proposed postpetition financing is not approved, Debtors will have to shut down and liquidate immediately.

41.     Debtors' management, board and professionals reviewed restructuring alternatives in detail over the past several months and explored alternative sources of capital and financing, none of which yielded a result that would allow Debtors to operate outside of chapter 11.

42.     Prior to the Petition Date, Debtors, in consultation with their financial advisor, PricewaterhouseCoopers LLP, reviewed and analyzed Debtors' projected cash needs and prepared a 13-week cash flow projection outlining Debtors' postpetition cash needs. Debtors believe that the budget attached to the proposed interim order on the DIP Motion, and the projections set forth

therein, provide an accurate reflection of their financing requirements over the identified period, will allow them to meet their obligations, and are reasonable and appropriate under the circumstances.

43.     In connection with their preparation of the budget, Debtors, with the assistance of their investment banker, Intrepid, also considered and solicited potential sources of financing that would provide the liquidity necessary to fund these Chapter 11 Cases. No lender was willing to provide an alternative or better proposal to Debtors' proposed postpetition financing that would support a restructuring of Debtors' business.

44.     Ultimately, Debtors received an offer from the Investors to provide the postpetition financing necessary to fund Debtors' operations during the Chapter 11 Cases on a subordinated basis.  Moreover, the Investors' proposal also gained the support and consent of the Prepetition Secured Parties, ensuring consensual use of cash collateral in exchange for certain adequate protection provisions.  These negotiations were conducted at arm's length and in good faith.

45.     The proposed postpetition financing and proposed use of cash collateral would enhance Debtors' ability to minimize disruption to their business and instill confidence in their various creditor constituencies, including customers, employees, vendors and service providers.

46.     Accordingly, Debtors have concluded that the benefits of accessing the proposed postpetition financing and use of cash collateral outweigh the modest burdens and expenses imposed by the financing arrangement.

**E.     Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management Systems, Bank Accounts and Business Forms and (B) Implement Changes to their Cash Management Systems in the Ordinary Course of Business; (II) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b); and (III) Granting Related Relief (the "Cash Management Motion")**

47.     Through the Cash Management Motion, Debtors are respectfully requesting entry of interim and final orders (i) authorizing, but not directing, Debtors, in their sole discretion, to (a) continue using their Cash Management Systems, Bank Accounts, and Business Forms (each as defined in the Cash Management Motion) and (b) implement changes to their Cash Management Systems in the ordinary course of business; (ii) granting Debtors a 30-day extension to comply with the requirements of section 345(b) of the Bankruptcy Code; and (iii) granting related relief.

48.     Although Debtors are part of a vertically integrated operation for the production of pork products, as described in Section I, above, in the ordinary course of business, each of Debtors maintains its own, independent cash management system to manage the flow of cash.    Debtors use their Cash Management Systems in the ordinary course of business to collect, disburse, and transfer funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  Currently, Debtors collectively maintain a total of eight (8) active bank accounts, which are maintained at Compeer, RBC, CIBC, and WSFS.  Given the economic and operational scale of Debtors' businesses, any disruption to the Cash Management Systems would have an immediate adverse effect on Debtors' businesses and operations to the detriment of their estates and numerous stakeholders.  Accordingly, to minimize the disruption caused by these Chapter 11 Cases and to maximize the value of Debtors' estates, Debtors requested authority, but not direction, to continue to utilize their existing Cash Management Systems during the pendency of these Chapter 11 Cases, subject to certain terms as described in the Cash Management Motion.

49.     Additionally, Debtors seek authority to continue to enter into Intercompany Transactions consistent with past practices and necessary for the payment of Debtors' ordinary course expenses.

**F.    Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; and (II) Granting Related Relief (the "Wages Motion")**

50.    Through the Wages Motion, Debtors are respectfully requesting entry of interim and final orders (i) authorizing, but not directing, Debtors, in their sole discretion, to (a) pay Prepetition Employee Obligations and related expenses arising under or related to Compensation and Benefits Programs, and (b) continue their Compensation and Benefits Programs in effect as of the Petition Date (and as may be amended, renewed, replaced, modified, revised, supplemented, and/or terminated from time to time in the ordinary course of business) and pay related administrative obligations; and (ii) granting related relief.

51.    As of the Petition Date, Debtors employ approximately 1,000 Employees, the vast majority of which are full-time Employees.  The Employees perform a wide variety of functions, which are critical to the preservation of value and the administration of Debtors' estates.  In many instances, the Employees include personnel who are intimately familiar with Debtors' facilities, processes, systems, and overall business.  Many of the Employees have developed intimate knowledge of Debtors' operations, as well as relationships with the customers, suppliers and other key counterparties that are essential to Debtors' business.  These Employees cannot be easily replaced and, without their continued, uninterrupted services, Debtors' business operations will be halted immediately and the administration of the estates materially and irreparably impaired.

52.    Debtors believe that, as of the Petition Date, the aggregate amount of employee-related obligations is approximately $1,700,000 (which includes approximately $1,170,000 in wages, approximately $300,000 in payroll taxes, approximately $200,000 in healthcare benefits, and approximately $30,000 in certain ordinary bonus payments).  The various components of Debtors' employee-related obligations are described in further detail in the Wages Motion.

53.     Debtors are not seeking to make any payments to employees in excess of the statutory priority cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, but it is possible that payments to the Employees could ultimately exceed the cap when all of the accrued benefits programs are included.  Debtors, however, view each of their benefits programs as critical components of their Employees' total compensation packages.  Debtors' employees are essential to the continued operation and success of their business, and the failure to make payments due to them could ultimately result in the loss of employees during this critical restructuring period.

**G.     Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Critical Suppliers, Logistics Claimants, PASA Claimants and Section 503(b)(9) Claimants; and (II) Granting Related Relief (the "Critical Vendors Motion")**

54.     Through the Critical Vendors Motion, Debtors are respectfully seeking entry of interim and final orders (i) authorizing, but not directing, Debtors, in their sole discretion, to pay Critical Suppliers, Logistics Claimants, PASA Claimants and Section 503(b)(9) Claimants in an aggregate amount not to exceed $3,200,000 on an interim basis and $3,750,000 on a final basis; (ii) approving the form of agreement which may be utilized by Debtors; and (iii) granting related relief.

55.     In their day-to-day operations, Debtors heavily rely on a number of suppliers and service providers.  Because Debtors' primary product is hogs grown for consumption, Debtors rely on vendors such as suppliers of hogs, feed for the hogs, the manufacturers and servicers of equipment for their facilities, the suppliers of the custom-made packaging materials they use to ship both unprocessed and processed products to their customers, and transportation carriers used to transport Debtors' pork products to their customers.

56.     Debtors interact with numerous different vendors.  A number of these vendors are essential to Debtors' business that require frequent deliveries and quick turnover of goods sold.

These vendors possess claims that are or may (i) be entitled to possessory liens for goods in transit, (ii) give rise to a statutory trust for goods delivered to Debtors, and/or (iii) be entitled to priority under section 503(b)(9) of the Bankruptcy Code.  Due to the nature of Debtors' business that requires frequent deliveries and quick turnover of goods sold, a very significant amount of the creditors affected by this Motion will fall into more than one of the foregoing categories.

57.     Debtors propose to undergo a stringent analysis, in connection with their advisors, to determine which vendors fall into these categories and the extent to which each vendor is critical to the ongoing operations of Debtors' business.  Debtors propose to undertake a reconciliation of such claims, and in their discretion and in accordance with their business judgement, determine which of these claims should be currently satisfied and whether or not the payment of such claims should be contingent on the extension of favorable business terms.

58.     Recognizing that payment of prepetition claims of certain vendors is extraordinary relief, Debtors, with the assistance of myself and Debtors' advisors, reviewed their books and records, consulted operations management and purchasing personnel, reviewed contracts and supply agreements, and analyzed applicable laws, regulations, and historical practices to identify the limited number of vendors that are critical to the continued and uninterrupted operation of Debtors' business—the loss of which could materially harm Debtors' business, shrink their market share, reduce their enterprise value, and impair going-concern viability.

59.     I submit that the requested relief will allow Debtors to continue to operate and preserve the value of their estates by paying certain prepetition claims of certain vendors that are critical to Debtors' business enterprise.  Accordingly, Debtors seek authority, but not direction, to pay prepetition claims of certain Critical Suppliers, Logistics Claimants, PASA Claimants, and

Section 503(b)(9) Claimants, on a case-by-case basis, a total of up to $3,200,000 in the aggregate, on an interim basis, and a total of up to $3,750,000 in the aggregate, on a final basis.

**H.    Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue their Customer Programs and Honor Prepetition Obligations Related thereto; and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>")**

60.    Through the Customer Programs Motion, Debtors are respectfully seeking entry of interim and final orders (i) authorizing, but not directing, Debtors, in their sole discretion, to continue, renew, replace, modify, implement, revise and/or terminate Customer Programs in the ordinary course of business and to honor prepetition obligations related thereto; and (ii) granting related relief.

61.    In order to attract new customers and to reward and provide incentives to existing customers, Debtors administer, in the ordinary course of business, a number of Customer Programs, which include Customer Credits, Customer Refunds, and Customer Returns, all of which are designed to maximize customer satisfaction and loyalty, improve profitability, and generate goodwill for Debtors and their products by creating a positive and mutually beneficial connection among Debtors and their customers.  As of the Petition Date, approximately $560,000 in Customer Credits have been issued and remain outstanding.

62.    Maintaining customer loyalty, support, and goodwill is critical to Debtors and their efforts to maximize the value of their estates.  Ensuring a positive relationship with customers is particularly important while Debtors operate in chapter 11 and market their business and assets for a potential going-concern sale.  To that end, the Customer Programs stimulate goodwill, maintain loyalty, increase sales, and allow Debtors a competitive advantage over their competitors. Debtors' ability to continue the Customer Programs and to honor obligations thereunder in the

ordinary course of business is necessary to maintain and create value for the benefit of Debtors' estates.

63.     I believe that continuing to administer the Customer Programs without interruption during the pendency of the Chapter 11 Cases will help preserve Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of Debtors' creditors and benefit their estates.  In contrast, if Debtors are unable to continue the Customer Programs postpetition, they risk alienating certain customers (who might then initiate business relationships with Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects maximizing the value of their estates.  Debtors' Customer Programs are essential marketing strategies for attracting and retaining customers.

**I.     Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (C) Maintain the Surety Bonds; (II) Modifying the Automatic Stay with Respect to the Workers' Compensation Program Pursuant to Sections 105(a), 362, 363(b), 507(a), and 541 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004; and (III) Granting Related Relief (the "<u>Insurance Motion</u>")**

64.     Through the Insurance Motion, Debtors are respectfully seeking entry of interim and final orders (i) authorizing, but not directing, Debtors, in their sole discretion, to (a) maintain their existing insurance policies and pay all obligations arising thereunder or in connection therewith, (b) renew, supplement, modify or purchase insurance coverage, and (c) maintain, continue and renew their surety bonds; (ii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code with respect to the Workers' Compensation Program; and (iii) granting related relief.

65.     In the ordinary course of their business, Debtors maintain multiple Insurance Policies administered by Insurance Carriers.  These Insurance Policies provide coverage for,

among other things, workers' compensation liability, property damage liability, directors and officers liability, commercial general liability, commercial automobile liability and various excess liability.  In the aggregate, Debtors' premiums under these Insurance Policies total $1,425,000 per annum, some of which are paid up front in whole and some of which are paid in monthly installments.  Debtors seek authority to honor prepetition obligations related to their Insurance Policies, to extend or reduce those Insurance Policies, or to enter into new insurance policies, as applicable, in the ordinary course of business.

66.     The maintenance of the Insurance Policies is necessary for Debtors to continue to operate during the course of these Chapter 11 Cases and required by certain contractual obligations and applicable state law.  If Debtors do not honor their prepetition obligations under the Insurance Policies, Debtors' coverage may lapse and they may need to obtain alternative insurance coverage at an increased cost.  Indeed, were coverage to lapse, Debtors may be unable to obtain alternative replacement insurance at all at a critical juncture in the Chapter 11 Cases. Without insurance coverage, Debtors would be immediately exposed to potentially catastrophic liability to the detriment of their creditors.

**J.      Motion of Debtors for Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Fees; and (II) Granting Related Relief (the "<u>Tax Motion</u>")**

67.     Through the Tax Motion, Debtors are respectfully seeking entry of interim and final orders (i) authorizing, but not directing, Debtors, in their discretion, to remit and pay (a) Taxes and Fees, including any penalties and interest thereon, to various federal, state, county, and city taxing and licensing Authorities, those obligations subsequently determined upon audit to be owed for periods prior to the Petition Date and those amounts paid prior to the Petition Date which have not yet cleared; and (ii) granting related relief.

68.     As of the Petition Date, Debtors estimate that the aggregate amount of taxes accrued, but not yet due, to the Authorities is approximately $215,000. This amount is composed entirely of current tax obligations, and which are not in respect of "catch-up" payments. By the Tax Motion, Debtors seek authority to pay all prepetition Taxes and Fees owed to the Authorities in the ordinary course of business, subject to the imposition of interim and final caps as discussed in the Tax Motion. Debtors believe that payment of the Taxes and Fees, including any prepetition amounts, is necessary to avoid immediate and irreparable harm. A list of Authorities to whom Debtors' pay taxes is set forth immediately below:

| Tax Type | Jurisdiction | Taxing Authority |
|---|---|---|
| Property | State | Cottonwood County Auditor/Treasurer |
| Income | State | Minnesota Department of Revenue |
| Income | Federal | U.S. Department of Treasury |
| Franchise | State | Texas Comptroller of Public Accounts<br><br>California Franchise Tax Board |
| Sale and Use | State | Minnesota Department of Revenue |
| Excise | Federal | U.S. Department of Treasury |

69.     Debtors seek payment of the Taxes and Fees to avoid potential business disruptions that could arise as a result of a failure to pay the Taxes and Fees. For the above reasons, I believe relief is in the best interests of Debtors' estates, their creditors, and all other parties in interest, and will enable Debtors to continue to operate their business in chapter 11 without interruption.

**K.     Motion of Debtors for Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services; (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services; (III) Establishing Procedures for Determining Requests for Further Adequate Assurance of Payment; and (IV) Granting Related Relief (the "<u>Utilities Motion</u>")**

70.     Through the Utilities Motion, Debtors are respectfully seeking entry of interim and final orders (i) determining adequate assurance of payment for future Utility Services; (ii) prohibiting Utility Providers from altering, refusing, or discontinuing Utility Services; (iii) establishing procedures for determining requests for further adequate assurance of payment; and (iv) granting related relief.

71.     In connection with the operation of their business and management of their properties, Debtors historically obtain water, sewer service, electricity, waste disposal, natural gas, telecommunication, and other similar services from a number of Utility Providers.  Debtors cannot operate their business in the absence of continuous and uninterrupted utility services.   The temporary or permanent discontinuation of the utility services would irreparably disrupt Debtors' operations and, as a result, fundamentally undermine Debtors' efforts in these Chapter 11 Cases. Accordingly, it is essential that the Utility Providers continue to provide uninterrupted services to Debtors.

72.     On average, Debtors pay approximately $400,000 each month for Utility Services, calculated as a historical average payment for the twelve months prior to the Petition Date.  Debtors intend to pay postpetition obligations to the Utility Providers in a timely manner.  Cash held by Debtors, cash generated in the ordinary course of business, and cash available to Debtors under any postpetition financing facility will provide sufficient liquidity to pay Debtors' Utility Services obligations in accordance with their prepetition practices.  To provide additional assurance of payment, Debtors propose to deposit $200,000 into a segregated account, which represents an amount equal to approximately one-half of Debtors' average monthly cost of Utility Services.

73.     Debtors submit that the Adequate Assurance Deposit, together with the deposits paid by Debtors before the Petition Date that are currently held by certain of the Utility Providers

and Debtors' ability to pay for future utility services in the ordinary course of business, constitutes sufficient adequate assurance of future payment to the Utility Providers.

*    *    *

74.   Debtors have narrowly tailored the First Day Pleadings to meet their goals of: (i) continuing their current operations in chapter 11 with as little disruption as possible; (ii) maintaining the confidence and support of their key partner, customer and employee constituencies; and (iii) establishing procedures for the efficient administration of the Chapter 11 Cases.

75.   I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers, employees, and advisors. I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

76.   It is my belief that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of Debtors' efforts to maximize their creditors' recoveries. It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims or continue selected prepetition programs—those First Day Pleadings seeking relief related to Debtors' obligations to their employees, insurers, vendors, customers, working interest holders, and taxing authorities—the relief requested is essential to the maintenance of Debtors' operations and necessary to avoid immediate and irreparable harm to Debtors' estates and creditors.

77.   The success of the Chapter 11 Cases depends upon Debtors' ability to continue their operations without disruption while they negotiate a resolution with key creditor

constituencies.    The relief requested in the First Day Pleadings is a critical component of maintaining business as usual in order to negotiate a path forward for the Chapter 11 Cases.

### IV.    <u>CONCLUSION</u>

78.    For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

*[Remainder of page left blank intentionally]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 27, 2023
         Windom, Minnesota

/s/
Grant Lazaruk
Chief Executive Officer
HyLife Foods Windom, LLC

## Exhibit A

### Organizational Chart

# HyLife Group of Companies

## Organization Structure and Ownership





**NOTES**

(1) Realtek was incorporated in AB on August 28, 2007 and owns 50% of HyPlace Ltd. which was incorporated in AB on Aug 29/07. HyPlace owns 85% of 1346403 Alberta Ltd., and 35% of Mountain View Village GP Ltd (previously 1310468 Alberta Ltd.) which owns land for development in Alberta

(2) Groupe Cérès has 10 subsidiaries not listed above with corresponding effective ownership %. Nutrition Athena Inc. (90%), Premix Goliath Inc. (67.5%), Shakespeare Mills Inc. (45%), Emerson Dairy Consulting Inc. (45%), 2684020 Ontario (45%), CBCo (33.3%), plus they acquired Nutrition Partners Inc (45%), Nutripartenaire Inc (45%), Poultry Partners Inc. (45%), and an option on FarmHouse (45%) in October 2020

(3) Chardonnay is owned 100% by Cabernet and is owned 100% by BPS effective April 30, 2018, and BPS also owned 50% of Avoir as of June 2, 2016 and increased to 56.2% in May 2017 after completion of Avoir's purchase of the Mundi/Salvatierra plant. In 2020 Avoir sold the Apeseo plant

(4) Skyline International purchased 75% of the partnership interest in Prime Pork, LLC on May 22, 2020, and renamed it HyLife Foods Windom, LLC. On March 27, 2023, Skyline International purchased the other 25% interest in HyLife Foods Windom, LLC making it 100% owned. In July 2020, Skyline also created a new company called Canwin Farms, LLC which planned for expansion of Farm production assets in the USA

(5) On June 27, 2020, the former HSM company changed its name to Bordeaux Farms and purchased 100% of the Shiraz land, barn and livestock assets from Cabernet Farms and is continuing live production operations of those facilities.

**LEGEND**

—— Total Consolidated Holdings

■ Corporations

● Limited Partnerships