**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------------x
                                          :   Chapter 11
In re:                                    :   Case No. 23-10520 (TMH)
                                          :
TRITEK INTERNATIONAL, INC., et al.,¹      :   (Jointly Administered)
                                          :
          Debtors.                        :   Hearing Date: October 5, 2023 at 10:00 a.m.
                                          :   Objections Due: September 28, 2023 at 4:00 p.m.
                                          :
                                          :   D.I. 442
-------------------------------------------------------------x
```

### OBJECTION OF THE UNITED STATES TRUSTEE TO CONFIRMATION OF THE SECOND AMENDED OF TRITEK INTERNATIONAL INC. AND ITS AFFILIATED DEBTORS

Andrew R. Vara, the United States Trustee for Region 3 ("U. S. Trustee"), through his counsel, files this objection (the "Objection") to confirmation of the Second Amended of Tritek International Inc. and its Affiliated Debtors (the "Plan") [D.I. 442], and in support of his Objection, states:

### PRELIMINARY STATEMENT

1. Debtors' Plan is unconfirmable. The Plan strips numerous non-debtor parties of their direct claims against other non-debtors without their affirmative consent. The parties that are deemed by their silence to consent to give such releases include creditors in voting classes who do not return a ballot, including those creditors who never received the solicitation package, or did not receive it timely, and unimpaired claimants, including holders of administrative claims

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Tritek International Inc. (7919); HyLife Foods Windom, LLC (5391); and Canwin Farms, LLC (3973). Debtors' mailing address is 2850 Highway 60 East, Windom, MN 56101.

and priority tax claims, who were not even provided the ability to opt-out of giving releases that are far broader than their unimpaired claims.

2.      The Plan also cannot be confirmed due to the scope of the claims the Debtors will be releasing. Counsel for the Committee indicated in a recent letter to the Court that, based upon the investigation it had undertaken, "the Debtors' estates may have valuable claims against the Debtors' D&Os." *See* D.I. 414, p. 2. Yet the Plan provides that the Debtors shall release all claims against their current and former directors, officers, employees, professionals, non-debtor affiliates, and many other Released Parties.[2] Such releases are especially concerning because they make no exception for known or unknown claims of fraud, willful misconduct, gross negligence or criminal acts. It is unclear what consideration, if any, will be provided to the Debtors' estates in exchange for such broad releases.

3.      The Plan also includes an impermissibly broad exculpation clause that protects numerous non-fiduciaries and fails to include the necessary temporal scope.

4.      For these reasons, set forth in further detail below, the Plan should not be confirmed.

## JURISDICTION, VENUE AND STANDING

5.      This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334. This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. § 157(a, b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012. Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

---

[2]    All capitalized terms not defined herein have the definitions set forth in the Plan.

6.      Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog"). Specifically, the U.S. Trustee is charged with "monitoring the progress of cases under title 11 and taking such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress." 28 U.S.C. § 586(a)(3)(G).

7.      Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in Chapter 11 cases and to comment on such plans and disclosure statements.

8.      The U.S. Trustee has standing to be heard with respect to the Motion pursuant to 11 U.S.C. § 307.

## STATEMENT OF FACTS

9.      On April 27, 2023 (the "Petition Date"), the Debtors commenced these chapter 11 cases by filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").[3]

10.     On June 15, 2023, the U.S. Trustee appointed an Official Committee of Unsecured Creditors.

---

[3]     For background leading up to the filing of these chapter 11 cases and in support of the first day relief, the Debtors relied upon the Declaration of Grant Lazaruk in Support of Chapter 11 Petitions and First Day Pleadings (the "Lazaruk Declaration") [D.I.13].

11.     On July 20, 2023, the Debtors filed their *Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International Inc. and its Affiliated Debtors* (the "Combined Disclosure Statement and Plan") [D.I 296].

12.     Also on July 20, 2023, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving the Combined Disclosure Statement and Joint Chapter 11 Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing the Solicitation and Tabulation Procedures; (III) Approving the Form of Ballots and Solicitation Materials; (IV) Establishing the Plan Confirmation Schedule; and (V) Granting Related Relief* (the "Solicitation Procedures Motion")[D.I. 297], which sought approval of (i) the Combined Disclosure Statement and Plan on an interim basis and (ii) certain procedures concerning the solicitation of votes on the Plan.

13.     The Solicitation Procedures Motion requested approval of ballots for use in soliciting votes from Class 3 (pre-petition loan claims) and Class 4 (general unsecured claims). *See* Exs. 2-A, and 2-B to D.I. 297-2.  These proposed ballots provided that creditors could opt out of giving third-party release in favor of non-debtors if the creditor voted to accept the Plan. Any creditor in a voting class who voted to reject the Plan would not be deemed to consent to give third-party releases, even if they did not check the opt-out box.  However, any party in a voting class who did not return a Ballot, or did so after the Voting Deadline, would be deemed under the Plan to have consented to release their direct claims against numerous non-debtors parties.

14.     Attached as Exhibit 3 to the Solicitation Procedures Motion was a "Deemed-to-Accept Notice," which indicated it was to be served on "Unimpaired Classes Deemed to Accept the Plan."  *See* D.I. 297, Ex. 3.   That notice included a box to check for the recipient to indicate they did not wish to give release to non-debtors.  For the opt-out to be effective, the notice (with

the opt-out box checked), had to be returned to the Debtors' claims agent so that it was received by the Voting Deadline.  *See id.*  It appears that the Deemed-to-Accept Notice was to be served only on creditors in Class 1 (holding Priority Non-Tax Claims) and Class 2 (holding Other Secured Claims).  There is nothing to indicate that the Deemed-to-Accept Notice, with the opt-out option, was to be served on unimpaired parties whose claims were unclassified, such as those holding Administrative Claims or Priority Tax Claims.

15.     On August 14, 2023, the U.S. Trustee filed an objection to the Solicitation Procedures Motion, which included certain objections related to the third-party releases in the Plan.  *See* D.I. 341.

16.     On August 18, 2023, this Court held a hearing on the Solicitation Procedures Motion.  The Court granted the Solicitation Procedures Motion, but reserved all third-party release issues for confirmation. After the conclusion of the hearing, this Court entered the *Order (I) Approving The Combined Disclosure Statement And Joint Chapter 11 Plan On An Interim Basis For Solicitation Purposes Only; (II) Establishing The Solicitation And Tabulation Procedures; (III) Approving The Form Of Ballots And Solicitation Materials; (IV) Establishing The Plan Confirmation Schedule; And (V) Granting Related Relief* (the "Solicitation Procedures Order").  *See* D.I. 370.

17.     The Combined Disclosure Statement and Plan has been amended a number of time, the latest being the Second Amended of Tritek International Inc. and its Affiliated Debtors [D.I. 442], filed on September 8, 2023.

***Relevant Plan Provisions***

18.     The third-party releases provision in the Plan (the "<u>Third-Party Releases</u>") states:

<u>**Consensual Third-Party Releases by Certain Parties**</u>.  As of the Effective Date, ***for good and valuable consideration, the adequacy of which is hereby confirmed***, the Releasing Parties shall be deemed to forever release, waive and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action and liabilities ***of any nature whatsoever in connection with or related to Debtors***, the Chapter 11 Cases, or the combined Disclosure Statement and Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, ***known or unknown***, foreseen or unforeseen, then existing or hereafter arising, in law, equity, ***or otherwise that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Effective Date*** (including prior to the Petition Date), other than the rights of Holders of Allowed Claims to enforce the obligations under the Confirmation Order and the Plan; *provided*, *however*, that nothing in this section shall operate as a release, waiver or discharge of any causes of action or liabilities unknown to such Entity as of the Petition Date arising out of gross negligence, willful misconduct, fraud, or criminal acts of any such Released Party as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Section 14.1(c), which includes by reference each of the related provisions and definitions contained in this Plan, and further, ***shall constitute the Bankruptcy Court's finding that each release described herein is***: (1) ***by virtue of the opt-out procedure, fully consensual***; (2) ***in exchange for the good and valuable consideration provided by the Released Parties***; (3) a good-faith settlement and compromise of claims released; (4) ***fair, equitable, and reasonable***; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the releases described herein.

Plan at § 14.1(c) (emphasis added).

19.     The Releasing Parties are defined under the Plan as follows:

**"Releasing Parties"** shall mean: (a) ***all Holders of Claims or Interests who are Unimpaired unless they (i) select the option set forth on the Non-Voting Status Notice to not grant the releases set forth in Section 14.1(c) of the Plan or (ii) File a written objection*** to the releases set forth in Section 14.1(c) of this Plan by the objection deadline established by the Solicitation Procedures Order, (b) the DIP Lenders, (c) the Prepetition Lenders, (d) the Prepetition Agent, (e) ***all Holders of Claims or Interests in a Voting Class unless they (i) submit a Ballot by the Voting Deadline that does not vote to accept the Plan; (ii) submit a Ballot by the Voting Deadline that accepts the Plan but select the option set forth on the Ballot to not grant the releases set forth in***

***Section 14.1(c) of this Plan, or (iii) File a written objection*** to the releases set forth in Section 14.1(c) of this Plan by the objection deadline established by the Solicitation Procedures Order, and (g) with respect to each of the foregoing, their Related Par-ties; provided, however, any Person whose solicitation package is returned as undeliverable and for whom the Debtors are not able identify and complete service on a new mailing ad-dress shall not be a Releasing Party.

Plan at § 1.127 (emphasis added).

20.     The Plan defines the Released Parties as follows:

"**Released Parties**" shall mean (a) Debtors and the Estates, (b) the Prepetition Agent, (c) the Prepetition Lenders, (d) the DIP Lenders, (e) the Committee and each of its members, (f) Liquidating Trustee, and (g) ***with respect to each of the foregoing, their Related Parties***, provided, however, that Released Parties shall exclude any of the foregoing parties who are not Releasing Parties.

Plan at § 1.126 (emphasis added).

21.     The Plan defines Related Parties as follows:

"**Related Parties**" shall mean, with respect to any Person or Entity, (w) such Person's or Entity's current and former direct or indirect subsidiaries, affiliates, parents, predecessors, successors, and assigns; (x) with respect to each of the foregoing in clause (w), their current and former directors, managers, officers, partners (general and limited), equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns; (y) with respect to each of the foregoing in clause (w) and (x), each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, designees, trustees, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals or representatives, and any other fiduciaries to such Person or Entity with any involvement related to the Debtors; and (z) with respect to each of the foregoing in clauses (w) through (y), such Person's or Entity's respective heirs, executors, estates, servants, and nominees, each of (w) through (z) in their capacity as such to the extent such Releasing Party is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law.

Plan at § 1.125.

22.     The releases to be given by the Debtors in the Plan (the "<u>Debtor Releases</u>") are as follows:

**Releases by Debtors**.  Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, *for good and valuable consideration*, each of the Debtors, on their own behalf and as a representative of their respective Estates, shall, and shall be deemed to, *completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action*, obligations, suits, judgments, damages, debts, rights, remedies and liabilities *of any nature whatsoever*, whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, *known or unknown*, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be *based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date* (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective Assets, the Estates, or the Chapter 11 Cases, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Released Parties.

Plan at § 14.1(b) (emphasis added).

23.     Unlike the Third-Party Release, the Debtor Release does not make any exceptions for known or unknown claims of fraud, intentional misconduct, gross negligence, or criminal acts.  Therefore, if the Plan is confirmed, all such claims held by the Debtors against any of the Released Parties, including all of the Debtors current and former officers, directors, employees, affiliates and professionals, will be released.

24.     The Plan includes the following exculpation provision:

**Exculpation and Limitation of Liability**.  Notwithstanding any other provision of the Plan, the *Exculpated Parties* shall not have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or Affiliates, or any of their successors or assigns, *for any act or omission relating to, in any way, or arising from* (i) the Chapter 11 Cases, (ii) formulating, negotiating or implementing the combined Disclosure Statement and Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the combined Disclosure Statement and Plan; (iii) the Sales; (iv) *any other postpetition act* taken or omitted to be taken in connection with or in contemplation of the restructuring, sale or liquidation of Debtors; (v) the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan or (vi) the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases,

indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability. The Confirmation Order shall serve as a permanent injunction against any Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to Section 14.1(a) of the Plan.

Plan at § 14.1 (a) (emphasis added).

25. The Plan defines Exculpated Parties as follows: **"Exculpated Parties"** shall mean, in each of their capacities as such, (a) Debtors, (b) the Committee and each of its members, and (c) with respect to (a) and (b), ***each of their respective Related Parties***. Plan at § 1.53 (emphasis added).

## ARGUMENT

### I. The Plan is Not Confirmable Because it Includes Non-Consensual Third-Party Releases.

#### A. The Third-Party Releases Are Not Consensual With Respect to Certain Groups of Claimants

26. The Third-Party Releases in the Plan, which strip certain claimants of their direct claims against numerous non-debtors, will be imposed on the following categories of parties, without their affirmative consent: (i) all creditors in voting classes who do not return a ballot on the Plan that is received by the Voting Deadline; and (ii) unimpaired claimants, some of whom will not even have the ability to opt out.

27. Creditors who are in voting classes who do not vote on the Plan shall have their direct claims against non-debtors extinguished, regardless of the reason they did not vote. Those reasons may include that such creditors (a) never received the solicitation package, or received it

late, due to mail errors or delays,[4] or (b) received it timely, and completed it and returned it to the balloting agent, but through no fault of their own, the ballot never reached the balloting agent, or was received late. Creditors in voting classes who *do* timely receive the solicitation package may not understand it and may not have the time or financial resources to engage counsel and would never imagine that their *direct* claims against *non-debtors* could be extinguished through the bankruptcy of these Debtors.

28. The Debtors also did not seek to obtain affirmative consent to release claims against non-debtors held by any unimpaired claimants. Creditors who hold unimpaired claims in Classes 1 and 2 were to be served with a Deemed-to-Accept Notice, which included a box to check to opt-out of giving third-party releases. However, such notice was subject to the same potential mail errors and delays as the solicitation packages. Moreover, claimants holding unclassified Administrative or Priority Tax Claims were not served with such notices, and therefore were not even given the ability to opt-out of granting releases. While unimpaired creditors will be paid in full on certain claims they hold against the Debtors, the scope of the release of their direct claims against non-debtors is far broader than the claims upon which they will be paid under the Plan. Such release covers any "causes of action and liabilities of any nature whatsoever *in connection with or related to Debtors*, . . . whether matured or unmatured, *known or unknown*." *See* Plan, § 14.1(c). So, for example, a taxing authority whose priority claim against the Debtors will be paid in full under the Plan (as required by the Code) could later be subject to an argument by a non-debtor Released Party that it has no obligation to pay taxes in

---

[4] The Plan does carve out of the definition of Releasing Parties those creditors in voting classes whose solicitation package are returned as undeliverable and for whom the Debtors are not able to identify and complete service on a new mailing address. Plan § 1.127. However, mail errors do not always result in mail being returned to the sender. For example, a package that is correctly addressed but delivered to the wrong address would not be returned to the sender.

connection with revenue received from transactions with the Debtors because, under the Plan, the taxing authority has been deemed to release the Released Party for all claims "of any nature whatsoever in connection with or related to Debtors." Plan, § 14.1 (c).

29.     In sum, there will be no affirmative consent to Third-Party Releases given by numerous persons and entities on whom such releases will be imposed.  Such releases are therefore non-consensual.

30.     Some Courts in this District have determined that third party releases of non-debtors should be allowed only to the extent the releasing parties have given affirmative consent. *See In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011).  In *Washington Mutual* the Court held that "any third party release is effective only with respect to those who *affirmatively consent* to it by voting in favor of the Plan and not opting out of the third party releases."  *Id.* at 355 (emphasis added).  Moreover, the Court clarified that merely having an opt out mechanism is not enough, holding that an "opt out mechanism is not sufficient to support the third party releases . . . particularly with respect to parties who do not return a ballot (*or are not entitled to vote in the first place*). *Failing to return a ballot is not a sufficient manifestation of consent* to a third party release." *Id.* (emphasis added; citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999)).

31.     In *Emerge Energy Services LP*, Case No. 19-11563, 2019 Bankr. LEXIS 3717 (Bankr. D. Del, Dec. 5, 2019), the Court ruled that consent to a third-party release "cannot be inferred by the failure of a creditor or equity holder to return a ballot or Opt-Out Form."  *Id.* at *52.  The Court reached this conclusion even though the opt-out forms provided conspicuous notice of how to opt-out and the consequences of not doing so.  The Court also rejected the Debtor's argument that inferring consent from "silence" should be approved as typical,

customary, and routine. *Id.* The Court held that it could not, "on the record before it find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations." *Id.* at *53.

32.     The Debtors may try to distinguish this case from *Emerge* based on the argument that *Emerge* dealt with creditors and shareholders who were receiving no distribution under the plan. However, the Court's decision in *Emerge* was not stated to be limited to such a factual situation. To the contrary, the Court's recognition that failure to return a notice can be due to "carelessness, inattentiveness, or mistake," rather than constituting the manifestation of an intent to agree to a third party release, would be applicable regardless of whether a creditor or interest holder was to receive a distribution under a plan. Similarly, the Court in *Emerge* indicated that it "has concluded that a waiver cannot be discerned through a party's silence or inaction unless specific circumstances are present." *Id.* at *54-55. The Court clarified that, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as such circumstances. *Id.* at *55. Those statements would appear to apply whether a creditor or shareholder is to receive a distribution under a plan or not.[5]

---

[5]     Although not a reported decision, the Court's ruling in *In re Kettner Investments, LLC*, Case No. 20-12366 (KBO), on February 15, 2022 [D.I. 298, Tr. 50:23-54:11] indicates that the *Emerge* ruling was not limited to situations in which the parties deemed to give releases are to receive nothing under the plan. In *Kettner*, the Court denied confirmation of a proposed plan of reorganization because it deemed third-party releases to be given by creditors and interest holders in ***unimpaired*** classes, as well as by related parties to such creditors, without obtaining their affirmative consent.

33.     Other decisions from Courts in this District are in accord with *Washington Mutual* and *Emerge*. *See In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party); *In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan); *Zenith*, 241 B.R. at 111 (noting the release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan).

34.     Not all decisions from this District have required affirmative consent for third party releases. In *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013), this Court reached a different conclusion than that of *Washington Mutual* and *Emerge*, and the other cases cited above, concerning the need for affirmative consent to third party releases, although the Court pointed out that "the third party release provision does not apply to any party that is deemed to reject the Plan." *Id.* at 305. In *In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del 2010), the Court held that affirmative consent was not required, but only as to releases being given by unimpaired classes who were "being paid in full." *Id.* at 144. In *In re Mallinckrodt PLC,* 639 B.R. 837 (Bankr. D. Del. 2022), this Court allowed third-party releases to be imposed on mass tort claimants without the opportunity to opt out, as well as on certain other classes of creditors and equity holders who were provided the ability to opt out, holding that the imposition of such releases were permissible under *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000) because of the mass tort context of the case. *See id.* at 873, 88. In another mass torts case, *In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504 (Bankr. D. Del. 2022), this Court approved an opt-out process for third-party releases

but noted that the definition of parties giving such releases ***did not include any "claimant who abstains from voting."*** 642 B.R. at 674, 678 (emphasis added).

35.     Requiring affirmative consent from creditors to release their direct claims against non-debtors is the only way to ensure there is true consent, rather than consent assumed by silence, which could be caused by factors such as "carelessness, inattentiveness, or mistake," as recognized by this Court in *Emerge,* 2019 Bankr. LEXIS 3717 at * 53, or caused by a package being misdelivered, or other post-office failures, delays, or unforeseen issues.   In a recent decision, the District Court for the Eastern District of Virginia vacated an order of the Bankruptcy Court confirming a plan which deemed consent to third party releases from parties who did not return opt-out forms.  *See Joel Patterson v. Mawah Bergen Retail Grp., Inc.*, No. 3:21CV167 (DJN), 2022 WL 135398 (E.D. Va. Jan. 13, 2022).  The Court found that:

> [T]he Bankruptcy Court erred both factually and legally in finding the Third-Party Releases to be consensual.  Failure to opt out, without more, cannot form the basis of consent to the release of a claim. Whether the Court labels these "nonconsensual" or based on "implied consent" matters not, because in either case ***there is a lack of sufficient affirmation of consent***.

*Id.* at *31 (emphasis added).

36.     Several decisions from the Bankruptcy Court for the Southern District of New York have reached the same conclusion.  In *In re Chassix Holdings*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015), the court held that third party releases must be limited to those who voted to accept the plan, or affirmatively elected to provide releases.  Creditors in voting classes who failed to return a ballot, as well as unimpaired creditors, would not be deemed to have consented to give third party releases.  *Id.* at 79-80.  In *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr, S.D.N.Y. 2017), the court held that, under principles of New York contract law, a creditor could not be deemed to consent to third party releases merely by failing to object to the plan, even when the disclosure statement made it clear that such a consequence would result.

37.     Under the holding of *Washington Mutual, Emerge Energy*, and the other cases cited above, the Debtor' Third-Party Releases render the Plan unconfirmable because they release direct claims against non-debtor parties held by the following parties without their affirmative consent of creditors in voting classes who do not return a ballot for whatever reason, and unimpaired claimants, some of whom are not even being provided with the ability to opt-out of giving releases. Releases from all such persons and entities are simply not consensual, and therefore should not be allowed.

38.     The Third-Party Release provision of the Plan also includes a statement that entry of the Confirmation Order "shall constitute the Bankruptcy Court's finding that each release described herein is . . . in exchange for the good and valuable consideration provided by the Released Parties." Plan § 14.1 (c). No evidence has yet to be introduced regarding the nature or amount of any consideration provided by any of the non-debtor Released Parties to any of the non-debtor Releasing Parties.

**B. The Plan Does Not Meet the Requirements for Non-Consensual Releases**

39.     In *Continental*, 203 F.3d 203 (3d Cir. 2000), the Third Circuit surveyed cases from various circuits as to when, if ever, a non-consensual third-party release is permissible. The Court acknowledged that a number of Circuits do not allow such non-consensual releases under any circumstances. *See id.* at 212. Other Circuits, the Court found, "have adopted a more flexible approach, albeit in the context of extraordinary cases." *Id.* at 212-13 (citing Second Circuit cases where releases were upheld for "widespread claims against co-liable parties" and a Fourth Circuit mass tort case). "A central focus of these three reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties. Substantial debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities

15

and made these reorganizations feasible." *Id.* at 213; *see also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005) (noting a third party release may be granted "only in rare cases").

40.     The Third Circuit in *Continental* ultimately determined that the proposed releases in that case, which enjoined shareholder lawsuits against debtors' directors and officers, did "not pass muster under even the most flexible test for the validity of non-debtor releases." 203 F.3d at 214.  Therefore, the Court determined that it "need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration." *Id.* at 214, n. 11.   However, the Court did describe the "hallmarks of permissible non-consensual releases" to be "fairness, necessity to the reorganization, and special factual findings to support these conclusions." *Id.* at 214.

41.     The Third Circuit Court of Appeals referenced *Continental* in *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019), as one of the precedents, along with *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011), regarding nonconsensual third party releases.  The Third Circuit indicated that these decisions "set forth *exacting standards* that must be satisfied if such releases and injunctions are to be permitted."  945 F.3d at 139 (emphasis added).

42.     In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), the Court held that a clause in the plan which released claims of any creditors or equity holders against the senior lenders for any act or omission in connection with the bankruptcy cases and reorganization process required factual showings under *Continental* – that the releases were necessary for the reorganization and were given in exchange for fair consideration. *Id.* at 607. The Court elaborated that "necessity" under *Continental* requires a showing: (a) that the success

of the debtors' reorganization bears a relationship to the release of the non-consensual non-debtor parties and (b) that the non-debtor parties being released from liability have provided "a critical financial contribution to the debtors' plan" in exchange for the receipt of the release. *Id.* at 607. A financial contribution is considered "critical" if without the contribution, the debtors' plan would be infeasible. *Id.* Fairness of a release is determined by examining whether non-consenting non-debtors are receiving reasonable consideration in exchange for the release. *Id.* at 608; *see also Spansion,* 426 B.R. at 144.

43. The *Genesis* Court found that the senior lenders had made a financial contribution to the plan, which allowed the debtors to make the 7.34% distribution to the unsecured creditors, who otherwise would be "out of the money." *Id.* at 608. Ultimately, though, the Court found that such contribution was not enough, because "even if the threshold *Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied by these facts . . . . [the] financial restructuring plan under consideration here would not present the *extraordinary circumstances* required to meet even the most flexible test for third party releases." *Id.* (emphasis added).

44. In the present cases, there is nothing in the record to indicate the presence of "extraordinary circumstances," or that that the high threshold necessary for approval of non-consensual third-party releases has been met with respect to each of the non-debtor parties that would be the recipients of these non-consensual releases. As to the first *Continental* requirement, it is unclear what, if any, "necessity to the reorganization" there is to be had from the release of direct claims held by non-debtors against other non-debtors.[6] As to the second

---

[6] All claims that are derivative of those of the Debtors will be released through the *Debtor* release in section 14.1 (b) of the Plan, so the Third-Party Release is not necessary for that purpose.

*Continental* requirement, that the releases be given "in exchange for fair consideration," the Debtors must establish what, if any, "critical financial contribution" was made by each and every recipient of the Third-Party Releases, and how such contribution benefits those parties on whom the non-consensual releases are being imposed.

45.     Thus, unless the Debtors introduce admissible evidence to establish both the "exchange for fair consideration" and "necessity to the reorganization" elements specified in *Continental,* the Plan cannot be confirmed with the inclusion of the non-consensual third-party releases. *See Continental*, 203 F.3d at 214 and n. 11.

46.     As to the Debtors' current and former directors and officers, who are among the beneficiaries of the Third-Party Releases, the Third Circuit Court of Appeals and this Court have already determined that they are not entitled to such releases. *See PWS Holding,* 228 F.3d at 245-46  ("§ 524(e) makes clear that a discharge in bankruptcy does not extinguish claims by third parties against guarantors or directors and officers of the debtor for the debt discharged in bankruptcy."); *Continental,*  203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D & Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability"); *Wash. Mut.*, 442 B.R. at 354 ("[T]here is no basis for granting third party releases of the Debtors' officers and directors, even if it is limited to their post-petition activity. The only 'contribution' made by them was in the negotiation of the Global Settlement and the Plan. Those activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated); they are insufficient to warrant such broad releases of any claims third parties may have against them. . . .").

47.     The same logic is also applicable to Third-Party Releases of the Debtors' professionals who, like the Debtors' directors and officers, will be protected by the exculpation provision.  *See Wash. Mut.,* 442 B.R. at 354.

48.     The non-consensual Third-Party Releases in these cases also release all non-debtor affiliates of the Debtors, through the Related Parties clause of the definition of Released Parties.  *See* Plan §§ 1.125 and 1.126.  The Court in *Washington Mutual* disallowed releases in favor of non-debtor affiliates because no evidence had been offered as to who the affiliates were, or why they should get a discharge without filing their own bankruptcy cases.  442 B.R. at 354.  The same is true here.

49.     The Debtors have the burden of establishing whether any of the *Continental/Genesis* factors have been met for each of the non-debtors who are the beneficiaries of non-consensual Third-Party Releases.   The Debtors should not be allowed the unfettered discretion to force creditors and administrative claimants to release nondebtors from liability, because a permanent injunction limiting the liability of nondebtor parties is a rare thing that should not be considered absent a showing of "extraordinary circumstances."  *See Continental*, 203 F.3d at 212; *In re Tribune Company,* 464 B.R. 126, 178 (Bankr. D. Del. 2011) (interpreting *Continental* to allow non-consensual releases only in "extraordinary cases."); *Genesis*, 266 B.R. at 608.  Because an evidentiary predicate is necessary to approve the Third-Party Releases, the U.S. Trustee reserves argument on this issue until the record at the confirmation hearing is closed.

## II.     <u>The Debtors Releases Are Impermissibly Broad Under Applicable Law</u>

50.     The Plan provides for the Debtors and their estates to provide broad releases of all of the Released Parties, which include the pre and post-petition lenders, the Debtors' present and former directors and officers, employees, agents, representatives, advisors, members, and

professionals. The release covers not just actions and omissions relating to the bankruptcy cases, but also include any act or omission that took place prior to the Petition Date "in connection with or related to any of the Debtors, their respective Assets, the Estates, or the Chapter 11 Cases." Plan, § 14.1 (b).

51. Pursuant to this Court's decision in *Tribune,* 464 B.R. 126 (Bankr. D. Del. 2011), and *Wash. Mut.,* 442 B.R. 314 (Bankr. D. Del. 2011), among others, the five factors set forth in *Zenith,* 241 B.R. 92, 110 (Bankr. D. Del 1999) and *In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 937-38 (Bankr. W. D. Mo. 1994) should be considered to determine whether, notwithstanding § 524(e) of the Code, a plan may provide for releases by debtors of non-debtor entities. *See Tribune* 464 B.R. at 186; *Wash. Mut.*, 442 B.R. at 346; *Spansion,* 426 B.R. at 142-43, n. 47; *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004). Those factors are as follows:

    a.   identity of interests between debtor and non-debtor releasee, so that a suit against the non-debtor will deplete the estate's resources (e.g., due to a debtor's indemnification of a non-debtor);

    b.   substantial contribution to the plan by non-debtor;

    c   necessity of release to the reorganization;

    d.   overwhelming acceptance of plan and release by creditors; and

    e.   payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*Tribune* 464 B.R. at 186 (citing *Wash. Mut.*, 442 B.R. at 346 (citing *Zenith*, 241 B.R. at 110)).

"The factors are neither exclusive nor conjunctive requirements, but simply provide guidance

in the Court's determination of fairness." *Tribune* 464 B.R. at 186 (citing *Washington Mutual*, 442 B.R. at 346).

52.     The Debtors have the burden to establish whether the *Zenith/Master Mortgage* factors have been met as to each of the non-debtors who are the beneficiaries of the Debtor Releases.  This burden may be particularly hard for the Debtors to meet in these cases because, unlike the Third-Party Releases, the Debtor Release has no exception for known or unknown claims of actual fraud, willful misconduct, criminal acts or gross negligence.  The lack of such exceptions is objectionable for at least three reasons.  First, non-debtor parties who are to receive a release from the Debtors should not be released from claims as to which a debtor could not be discharged under section § 523(a) of the Bankruptcy Code.  *See* 11 U.S.C. § 523(a)(2, 4, 6) (barring claims of fraud and willful misconduct from discharge).

53.     Second, the Debtors are releasing, among others, all of their current and former directors, officers and employees from all claims, whether known or unknown.  If, for example, it is later learned that a current or former officer or employee of one the Debtors misappropriated Debtor funds at any time up to the Effective Date, it appears that any claim based on such misappropriation would be released under the Plan.

54.     Third, the Debtor Release releases claims against certain fiduciaries of the estate, such as those of the Debtors' directors and officers who served during these cases, and professionals the Debtors retained in these cases.  All such fiduciaries are entitled to an exculpation, but such exculpation must carve out claims of intentional misconduct and gross negligence, as the Exculpation provision here does.  However, because the Debtor Release does not have carve-outs for intentional misconduct and gross negligence, these estate fiduciaries would obtain immunity from such claims even though such immunity is not permitted under the

holding of the Third Circuit in *PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000). As recognized

by this Court in *Washington Mutual*, parties who are fiduciaries of the estate are receiving

exculpations, and therefore receipt by such parties of releases are "unnecessary, duplicative and

***exceed the limits of what they are entitled to receive***" under the exculpations. *Washington Mut.*,

442 B.R. at 350 (emphasis added).

55.     Similarly, in *In re Tribune Company, 464 B.R. 126 (Bankr. D. Del. 2011),* this

Court rejected the release by the debtors of their Related Persons, which, as here, included all the

debtors' "current and former officers, directors, employees, attorneys, advisors and

professionals." 464 B.R. at 187. Applying the *Zenith/Master Mortgage* factors, the Court held:

> There is no basis in the record to support any finding that any "substantial
> contribution" has been made by the Debtors' Related Persons or that a release is
> necessary to the reorganization. Despite acceptance by a majority of creditors, I
> cannot conclude that the Plan's release of the Debtors' Related Persons, based on
> this record, would be fair.

*Id*. at 188.

56.     In *Genesis Health*, the Court also rejected the debtors' releases of their officers,

directors, employees and professionals, holding that:

> [T]he release of the debtors' pre-petition claims against the officers, directors,
> employees and professionals of the debtors is beyond the ***post-petition focus*** of the
> *PWS Holding Corporation* [228 F.3d 224 (3d Cir. 2000)] release clause. . . . As in
> *Zenith*, the officers and directors of the debtors no doubt made meaningful
> contribution to the reorganization by designing and implementing the operational
> restructuring of the companies, and negotiating the financial restructuring with parties
> in interest. However, the officers, directors and employees have been otherwise
> compensated for their contributions, and the management functions they performed
> do not constitute contributions of "assets" to the reorganization.

*Genesis Health,* 266 B.R. at 606–07 (emphasis added).

57.     Because an evidentiary predicate is necessary to approve the Debtor Releases, the

U.S. Trustee reserves argument on this issue until the record at the confirmation hearing is

closed, but believes that the Plan cannot be confirmed unless, at a minimum, exceptions are added to the Debtor Release for known and unknown claims arising from fraud, intentional misconduct, criminal acts and gross negligence.

### III. The Proposed Exculpation Provision Is Overly Broad.

58.     The exculpation provision is overbroad, and inconsistent with controlling case law.  It shields numerous parties that are not themselves estate fiduciaries, but are merely related to an estate fiduciary, and it is not temporally limited to the period between the Petition Date and the Effective Date of the Plan, as it must be.

59.     The Plan's definition of Exculpated Parties is inconsistent with controlling case law because it is not limited to estate fiduciaries.  In *In re PWS Holding Corp.*, the Third Circuit considered whether an official committee of unsecured creditors could be exculpated, and held that 11 U.S.C. § 1103(c) implies both a fiduciary duty and a limited grant of immunity to members of the unsecured creditors' committee.  228 F.3d 224, 246 (3d Cir. 2000).  This Court has repeatedly interpreted *PWS* as requiring a party's exculpation to be based upon its status as an estate fiduciary.  *See Indianapolis Downs*, 486 B.R. at 304; *Tribune*, 464 B.R. at 189; *Wash. Mut.*, 442 B.R. at 350-51; *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 WL 5509031, at *12 (Bankr. D. Del. Nov. 10, 2011).

60.     Contrary to the limits set forth in *PWS* and cases interpreting it, the Plan definition of Exculpated Parties extends beyond estate fiduciaries to include all of the "Related Parties" of the Debtors, the Committee and each of its members.  Plan, § 1.53.  The term Related Parties is defined to cover at least 40 categories of persons and entities in multiple layers, including "current and former direct or indirect subsidiaries, affiliates, parents, . . . current and former directors, managers, officers, partners (general and limited), equity holders," and vague

and general categories such as "agents," consultants," and "representatives." Yet every current and former employee of the Debtors is not an estate fiduciary, let alone every current and former employee of the Debtors' non-debtor *affiliates*. Nor is every employee of every member of the Creditors' Committee an estate fiduciary, or the law firms that represent the individual members of the Creditors' Committee. None of them qualify for exculpation.

61. The Plan cannot be confirmed unless its definition of Exculpated Parties is limited to: (i) the Debtors; (ii) the directors and officers of the Debtors who served between the Petition Date and the Effective Date of the Plan; (iii) the Creditors' Committee; (iv) the members of Creditors' Committee, in their capacity as such; (v) the individuals who sat on the Creditors' Committee, in their capacity as such; and (vi) the professionals retained in these cases by the Debtors or the Creditors' Committee. *See Wash. Mut*., 442 B.R. at 350-51 ("[An] exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers.").

62. The temporal scope of the Exculpation provision in section 14.1 (a) of the Plan is also overly broad in two ways. First, it is not stated to be limited to actions and omissions taking place during the bankruptcy cases, and could be interpreted to extend back to pre-petition activity that cannot be covered by a plan exculpation.[7] *See Wash. Mut*., 442 B.R. at 350 (exculpations cover "actions in the bankruptcy case," not before the case was filed) (citing *PWS,* 228 F.3d at 246). In considering the U.S. Trustee's objection to the temporal scope of the exculpation clause in *Mallinckrodt,* 639 B.R. 837, this Court recently held that exculpation "only

---

[7]  Subsection (iv) of the Exculpation references "other postpetition act[s]," but that phrase does not appear to modify the remainder of the Exculpation provision. *See* Plan, § 14.1 (a).

extends to conduct that occurs between the Petition Date and the effective date," and ordered the debtors to strike contrary language from the exculpation provision. *Id.* at 883.

63.     The temporal scope of the Exculpation also has no end date, and therefore could be interpreted to provide a prospective exculpation that extends past the Effective Date. Exculpation clauses should not extend past the effective date of a plan, to avoid exculpating actions that have not yet occurred and are as of yet unknown.  *See id.*

64.     For these reasons, the Plan should not be confirmed unless the Exculpation is modified as indicated above.

### **RESERVATION OF RIGHTS**

65.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

WHEREFORE, for all the above-stated reasons, the United States Trustee respectfully requests that Court deny confirmation of the Plan, and grant such other relief as this Court deems fair, appropriate, and just.

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 & 9**

Dated: September 27, 2023

By:/s/ *Richard L. Schepacarter*
Richard L. Schepacarter
Juliet Sarkessian
Trial Attorneys
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 fax
Richard.Schepacarter@usdoj.gov
Juliet.M.Sarkessian@usdoj.gov