**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TRITEK INTERNATIONAL INC., *et al.*,[1] | Case No. 23-10520 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 442** |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF AN ORDER
CONFIRMING THE SECOND AMENDED JOINT PLAN OF DEBTORS UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated:  October 2, 2023
           Wilmington, Delaware

Jerry L. Hall (admitted *pro hac vice*)
Michael E. Comerford (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
50 Rockefeller Plaza
New York, NY 10020
Telephone: (212) 940-8800
Facsimile:  (212) 940-8776
Email:  jerry.hall@katten.com
            michael.comerford@katten.com


Allison E. Yager (admitted *pro hac vice*)
Kenneth N. Hebeisen (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile:  (312) 902-1061
Email:  allison.yager@katten.com
            ken.hebeisen@katten.com

Respectfully submitted,

*/s/ L. Katherine Good*
Jeremy W. Ryan (No. 4057)
L. Katherine Good (No. 5101)
R. Stephen McNeill (No. 5210)
Maria Kotsiras (No. 6840)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
            kgood@potteranderson.com
            rmcneill@potteranderson.com
            mkotsiras@potteranderson.com

*Counsel to Debtors
and Debtors in Possession*

---

[1]       The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Tritek International Inc. (7919); HyLife Foods Windom, LLC (5391); and Canwin Farms, LLC (3973).  Debtors' mailing address is 2850 Highway 60 East, Windom, MN 56101.

# TABLE OF CONTENTS

RELIEF REQUESTED ..................................................................................................................... 1

PRELIMINARY STATEMENT ..................................................................................................... 2

BACKGROUND ............................................................................................................................. 6

    I.      General Background of the Chapter 11 Cases ....................................................... 6

    II.     The Solicitation Process and Voting Results. ....................................................... 9

    III.   Confirmation Hearing Notice. .............................................................................. 11

    IV.   Objections. ............................................................................................................ 11

ARGUMENT ................................................................................................................................. 12

    I.      THE DEBTORS COMPLIED WITH THE SOLICITATION
         PROCEDURES ORDER. ...................................................................................... 12

         A.     The Combined Disclosure Statement and Plan Contains Adequate
              Information. ............................................................................................. 12

         B.     The Debtors Complied with The Requirements Set Forth in the
              Solicitation Procedures Order. ................................................................ 16

             1.     The Debtors complied with the notice requirements set
                   forth in the Solicitation Procedures Order. ................................ 16

             2.     The Ballots used to solicit Holders of Claims entitled to
                   vote on the Plan complied with the Solicitation Procedures
                   Order. ......................................................................................... 16

             3.     The Debtors' solicitation period complied with the
                   Solicitation Procedures Order. .................................................... 17

             4.     The Debtors' voting tabulation procedures complied with
                   the Solicitation Procedures Order. .............................................. 17

             5.     Solicitation of the Plan complied with the Bankruptcy Code
                   and was in good faith. ................................................................. 18

    II.     THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129 OF
         THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED ..................... 19

         A.     The Plan Complies with the Applicable Provisions of the
               Bankruptcy Code (§ 1129(a)(1)). ........................................................... 19

             1.     The Plan Satisfies the Classification Requirements of
                   Section 1122 of the Bankruptcy Code. ....................................... 19

             2.     The Plan Satisfies the Mandatory Plan Requirements of
                   Section 1123(a) of the Bankruptcy Code. .................................... 21

                  a.     Designation of Classes of Claims and Interests and
                       Specification of Unimpaired Classes (§ 1123(a)(1)–
                       (2)). .............................................................................. 21

|  | b. | Treatment of Impaired Classes (§ 1123(a)(3))..................22 |
|  | c. | Equal Treatment within Classes (§ 1123(a)(4))................22 |
|  | d. | Means for Implementation (§ 1123(a)(5)) .......................22 |
|  | e. | Issuance of Non-Voting Securities (§ 1123(a)(6))............23 |
|  | f. | Directors and Officers (§ 1123(a)(7)) ..............................23 |

3. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code......................................23

    a. Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code. .............23

    b. The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code..............24

    (i) The Debtor Release Is Appropriate.......................25

        (1) The Prepetition Agent and DIP Lenders.......................................................26

        (2) Directors and Officers................................27

    (ii) The Third-Party Release Is Appropriate as a Consensual Release. ..............................28

    (iii) The Exculpation Provision Is Appropriate. ..........38

    (iv) The Injunction Provision Is Appropriate. .............40

B. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).................................................41

1. The Debtors Complied with Section 1125 of the Bankruptcy Code. ...................................................................41

2. The Debtors Complied with Section 1126 of the Bankruptcy Code. ...................................................................41

C. The Plan Is Proposed in Good Faith (§ 1129(a)(3)). ................................43

D. The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4))....................44

E. The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ........................................45

F. The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).............................................................................................46

G. The Plan is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).............................................................................................46

H. The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code ..............................................48

I.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). ..................................................................49

J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)). ..............................................................50

K.     The Plan Is Feasible (§ 1129(a)(11)). .....................................................50

L.     All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ...............52

M.    All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)). ..................................................................................52

N.     Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan. ..................................................................................................53

O.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code...................................................53

     1.     The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)). .....................................................................54

     2.     The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii))...................55

P.     The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(c)–(e)). ....................................................55

Q.     Modifications to the Plan. .........................................................................56

R.     Good Cause Exists to Waive the Stay of the Confirmation Order. ...........58

III.    The Unresolved Objections Should Be Overruled.................................................59

A.     The U.S. Trustee's Objection [Docket No. 474]. .....................................59

B.     Dakota Plains Objection [Docket No. 470]. ..............................................60

C.     The Fire Group's Objection [Docket No. 478]..........................................61

D.     Informal Comments from the Texas Comptroller .....................................61

CONCLUSION..........................................................................................................................62

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>                                                                                                   <u>**Page(s)**</u>

*Alex and Ani, LLC,*
    Case No. 21-10918 (CTG) (Bankr. D. Del. Aug. 20, 2021),
    Hr.'g Tr. 9:21-25, 10:1-3 .................................................................................35

*Bank of Am. Nat. Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship,*
    526 U.S. 434 (1999).................................................................................47, 54

*Beal Bank, S.S.B. v. Jack's Marine, Inc., (In re Beal Bank, S.S.B.),*
    201 B.R. 376(E.D.Pa.1996) .............................................................................57

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.*),
    764 F.2d 406 (5th Cir. 1985) ............................................................................43

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship*
    *(In re T-H New Orleans Ltd. P'ship),*
    116 F.3d 790 (5th Cir. 1997) ............................................................................43

*First Fid. Bank v. McAteer,*
    985 F.2d 114 (3d Cir. 1993)...............................................................................29

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),*
    10 F.3d 944 (2d Cir. 1993) ................................................................................20

*Indianapolis Downs* in *In re Arsenal Intermediate Holdings, LLC,*
    2023 Bankr. LEXIS 752 (Bankr. D. Del. Mar. 27, 2023)...........................30, 40

*In re 203 N. LaSalle St. Ltd. P'ship,*
    190 B.R. 567 (Bankr. N.D. Ill. 1995) ...............................................................54

*In re 500 Fifth Ave. Assocs.*,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993).............................................................20

*In re AAC Holdings, Inc.*, Case No. 20-11648 (JTD)
    (Bankr. D. Del. Aug. 31, 2020) .........................................................................36

*In re Abeinsa Holding, Inc.*,
    562 B.R. 265 (Bankr. D. Del. 2016) ..................................................................35

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143 (3d Cir. 1986)...............................................................................43

*In re Adelphia Commc'ns. Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...........................................................47

*In re After Six, Inc.*,
    1994 WL 46471 (Bankr. E.D. Pa. 1994) .......................................................29

*In re Aleris Int'l, Inc.*, No. 09-10478 (BLS),
    2010 WL 3492664, (Bankr. D. Del. May 13, 2010) ...............................51, 54, 57

*In re Ambanc La Mesa L.P.*,
    115 F.3d 650 (9th Cir. 1997) .................................................................53, 54

*In re Am. Solar King Corp.*,
    90 B.R. 808 (Bankr.W.D.Tex.1988) ...........................................................57

*In re Apex Oil Co.*,
    118 B.R. 683 (Bankr. E.D. Mo. 1990)..........................................................45

*In re Armstrong World Indus., Inc.*,
    348 B.R. 136 (D. Del. 2006)................................................................19, 54

*In re Arrowmill Dev. Corp.*,
    211 B.R. 497 (Bankr. D.N.J. 1997) .............................................................29

*In re Arsenal Intermediate Holdings, LLC*,
    2023 Bankr. LEXIS 752, (Bankr. D. Del. Mar. 27, 2023)..........................37, 38

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) .......................................................54

*In re Beyond.com Corp.*,
    289 B.R. 138 (Bankr. N.D. Cal. 2003). ........................................................45

*In re Burns & Roe Enters., Inc.*,
    2009 WL 438694 (D.N.J. Feb. 23, 2009) .....................................................56

*In re Capmark Fin. Grp. Inc.*,
    2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ...........................................51

*In re Carestream Health, Inc.*, No. 22-10778 (JKS)
    (Bankr. D. Del. Sept. 28, 2022) {Docket No. 185].........................................30

*In re Cent. Jersey Airport Servs., LLC*,
    282 B.R. 176 (Bankr. D.N.J. 2002) .............................................................29

*In re Century Glove, Inc.*,
   1993 WL 239489 (D. Del. Feb. 10, 1993) ................................................................43, 47

*In re Century Glove, Inc.*,
   1993 U.S. Dist. LEXIS 2286 (D.Del. Feb. 10, 1993) ......................................................57

*In re Chapel Gate Apartments, Ltd.*,
   64 B.R. 569 (Bankr. N.D. Tex. 1986)...................................................................44

*In re Chassix Holdings, Inc.*,
   533 B.R. 64 (Bankr. S.D.N.Y. 2015) ....................................................................36

*In re Cloud Peak Energy, Inc.*,
   Case No. 19-11047 (KG), (Bankr. D. Del. Dec. 5, 2019)..................................................36

*In re Clovis Oncology, Inc.*, Case No. 22-11292 (JKS),
   Hr'g Tr. 12-16 (Bankr. D. Del. June 9, 2023) ..................................................................35

*In re Colt Holding Co.*,
   No. 15-11296 (LSS) (Bankr. D. Del. Dec. 16, 2015) ...................................................28, 30

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ....................................................................54

*In re Dex One Corp.*,
   No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013)........................................................58

*In re Drexel Burnham Lambert Grp. Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992).................................................................20, 45

*In re Drexel Burnham Lambert Grp., Inc.*,
   960 F.2d 285 (2d Cir. 1992)...............................................................................40

*In re Emerge Energy Servs. LP*,
   2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019)...........................................................36

*In re Enron Corp.*,
   326 B.R. 497 (S.D.N.Y. 2005)............................................................................40

*In re Exide Techs.*,
   303 B.R. 48 (Bankr. D. Del. 2003) .....................................................................25

*In re EV Energy Partners, L.P.*,
   No. 18-10814 (CSS) (Bankr. D. Del. 2018) ..............................................................28, 30

*In re Federal–Mogul Global Inc.*,
   2007 Bankr.LEXIS 3940 (Bankr.D.Del.2007) .................................................57

*In re First Guaranty Mort. Corp.*,
   No. 22-10584 (CTG), (Bankr. D. Del. Nov. 11, 2022) [Docket No. 671].......................30

*In re Fizzics Grp., Inc.*,
   Case No. 19-10545 (KBO) ......................................................................33, 36

*In re Flintkote Co.*,
   486 B.R. 99 (Bankr. D. Del. 2012) ...........................................................51

*In re Freymiller Trucking, Inc.*,
   190 B.R. 913 (Bankr. W.D. Okla. 1996) ......................................................54

*In re Future Energy Corp.*,
   83 B.R. 470 (Bankr. S.D. Ohio 1988)..........................................................44

*In re Gatehouse Media, Inc.*,
   No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) .....................................58

*In re Geokinetics Inc.*,
   No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) .....................................58

*In re Glob. Safety Textiles Holdings LLC*,
   2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) ......................................56

*In re GSE Envtl., Inc.*,
   No. 13-11126 (MFW) (Bankr. D. Del. July 25, 2014) ...................................58

*In re Heritage Org., L.L.C.*,
   375 B.R. 230 (Bankr. N.D. Tex. 2007)........................................................20

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013) .....................................................30, 40

*In re Insys Therapeutics, Inc.*,
   Case No. 19-11292 (KG) (Bankr. D. Del. Jan. 17, 2020).................................36

*In re Int'l Wireless Commnc's Holdings, Inc.*,
   1999 Bankr. LEXIS 1853 (Bankr. D. Del. Mar. 26, 1999)..............................29

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987)....................................................................20

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...............................................................54

*In re Lapworth*,
    No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ......................41

*In re Lason, Inc.*,
    300 B.R. 227 (Bankr. D. Del. 2003) ...............................................................47

*In re Legacy FSRD*,
    Case No. 22-11051 (JKS), Hr'g Tr. 41:10-15
    (Bankr. D. Del. Feb. 22, 2023) [Docket No. 332] ............................................35

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003) ...............................................................54

*In re Lisanti Foods, Inc.*,
    329 B.R. at 503, *aff'd*, 241 F. App'x 1 (3d Cir. 2007 ......................................44

*In re Mallinckrodt PLC*,
    2022 WL 404323 (Bankr. D. Del. Feb. 8, 2022.................................................30

*In re Master Mortg. Inv. Fund, Inc.,* 1
    68 B.R. 930 (Bankr. W.D. Mo. 1994).............................................................25

*In re Melinta Therapeutics Inc.*,
    Case No. 19-12748 (LSS), Hr'g Tr. 120:1-14, (Bankr. D. Del. Apr. 2, 2020).................30

*In re Monroe Well Serv., Inc.*,
    80 B.R. 324 (Bankr. E.D. Pa. 1987) ...............................................................29

*In re Neff*,
    60 B.R. 448 (Bankr. N.D. Tex. 1985) *aff'd,* 785 F.2d 1033 (5th Cir. 1986) ...................47

*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002). ...............................................................43

*In re PES Holdings, LLC*,
    No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018)....................................28, 30

*In re Physiotherapy Holdings, Inc.*,
    No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) ........................................58

*In re Premier Int'l Holdings, Inc.*,
    2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ........................................19

*In re Prussia Assocs.*,
   322 B.R. 572 (Bankr. E.D. Pa. 2005) ...............................................................51

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)...............................................................38, 40, 43

*In re RCS Capital Corp.*,
   Case No. 16-10223 (MFW) (Bankr. D. Del. May 5, 2016)................................32

*In re River Village Assoc.*,
   181 B.R. 795 (Bankr. E.D. Pa. 1995) ..............................................................13

*In re Rusty Jones, Inc.*,
   110 B.R. 362 (Bankr. N.D. Ill. 1990) ...............................................................45

*In re Sea Garden Motel & Apartments*,
   195 B.R. 294, 305 (D. N.J. 1996) ....................................................................51

*In re SFP Franchise Corp.*,
   Case No. 20-10134 (JTD) (Bankr. D. Del. Aug. 24, 2020 .........................28, 29

*In re SGR Winddown Inc.*,
   Case No. 19-11973 (MFW) (Bankr. D. Del. May 12, 2020)..............................32

*In re Sherwood Square Assoc.*,
   107 B.R. 872 (Bankr. D. Md. 1989) .................................................................45

*In re Source Home Entm't, LLC*,
   No. 14-11553 (KG) (Bankr. D. Del, Feb. 20, 2015) .........................................58

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) ......................................................25. 28. 38

*In re Starry Group Holdings, Inc.*, Case No. 23-10219 (KBO)
   (Bankr. D. Del. Mar. 30. 2023)........................................................................33

*In re Stratford Assocs. Ltd. P'ship*,
   145 B.R. 689 (Bankr. D. Kan. 1992) ...............................................................45

*In re Sun Country Dev., Inc.*,
   764 F.2d at 408) ...............................................................................................43

*In re SunEdison, Inc.*,
   576 B.R. 453 (Bankr. S.D.N.Y. 2017)...............................................................36

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ..................................................................19

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984)................................................................45

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), on reconsideration,
    464 B.R. 208 (Bankr. D. Del. 2011) ............................................................51

*In re U.S. Truck Co.*,
    47 B.R. 932 (E.D. Mich. 1985), *aff'd,* 800 F.2d 581 (6th Cir. 1986) ..............51

*In re Verso Corp.*, No. 16-10163 (KG)
    (Bankr. D. Del. June 23, 2016) ....................................................................39

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ..................................................25, 28, 38

*In re WCI Cmtys., Inc.*,
    2012 WL 1981713 (Bankr. D. Del. June 1, 2012) ........................................30

*In re Wiersma*,
    227 Fed. Appx. 603 (9th Cir. 2007) ............................................................19

*In re Worldcom, Inc.*,
    No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ..................41

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ..................................................................43. 51

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ..................................................25, 28, 29

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)......................................................................20, 53

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) ......................................................................51

*Lupyan v. Corinthian Colleges, Inc.*,
    761 F.3d 314 (3d Cir. 2013) ......................................................................37

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988)......................................................................13

*Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*,
    761 F.2d 1374 (9th Cir. 1985......................................................................51

*Rosenthal v. Walker*,
    111 U.S. 185 (1884) ........................................................................................ 37

**Rules and Statutes**

Fed. R. Bankr. P. 3016(c). .................................................................................... 13

11 U.S.C. §§ 101–1532 .......................................................................................... 1

11 U.S.C. § 101(51D)(B). ...................................................................................... 56

11 U.S.C. § 328(a) ................................................................................................. 44

11 U.S.C. § 330(a)(1)(A) ....................................................................................... 44

11 U.S.C. § 1122(a). .............................................................................................. 19

11 U.S.C. § 1123(a)(4) ........................................................................................... 22

11 U.S.C. § 1123(a)(5) ........................................................................................... 22

11 U.S.C. § 1123(a)(6) ........................................................................................... 23

11 U.S.C. § 1123(a)(7) ........................................................................................... 23

11 U.S.C. § 1123(b)(1). .......................................................................................... 24

11 U.S.C. § 1123(b)(2). .......................................................................................... 24

11 U.S.C. § 1123(b)(3). .......................................................................................... 24

11 U.S.C. § 1123(b)(6). .......................................................................................... 24

11 U.S.C. § 1125 .................................................................................................... 12

11 U.S.C. § 1125(a)(1). .......................................................................................... 12

11 U.S.C. § 1125(e) ............................................................................................... 18

11 U.S.C. § 1126(a) ............................................................................................... 42

11 U.S.C. § 1126(f). ............................................................................................... 42

11 U.S.C. § 1129(a)(2) ........................................................................................... 41

11 U.S.C. § 1129(a)(3) ........................................................................................... 43

11 U.S.C. § 1129(a)(4) ........................................................................................... 44

11 U.S.C. § 1129(a)(5) ........................................................................................... 45

11 U.S.C. § 1129(a)(6) ........................................................................................... 46

11 U.S.C. § 1129(a)(7) ........................................................................................... 46

11 U.S.C. § 1129(a)(8) ........................................................................................... 48

11 U.S.C. § 1129(a)(9) ........................................................................................... 49

11 U.S.C. § 1129(a)(10) ......................................................................................... 50

11 U.S.C. § 1129(a)(11).................................................................................50, 51

11 U.S.C. § 1129(a)(12).......................................................................................52

11 U.S.C. § 1129(a)(13).......................................................................................52

11 U.S.C. 1129(a)(14) through 1129(a)(16)...........................................................53

11 U.S.C. § 1129(b)..............................................................................................53

11 U.S.C. § 1129(b)(1).........................................................................................53

11 U.S.C. § 1129(b)(2)(B)(i).................................................................................55

11 U.S.C. § 1129(b)(2)(B)(ii)................................................................................55

11 U.S.C. § 1129(d)..............................................................................................56

11 U.S.C. § 1129(e)..............................................................................................56

## Other Authorities

7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2018)...........................................46

H.R. Rep. No. 95–595, at 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963............................13

## RELIEF REQUESTED

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully submit this memorandum of law (the "Memorandum") in support of confirmation of the *Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International, Inc. and its Affiliated Debtors* [Docket No. 442] (the "Combined Disclosure Statement and Plan" or the "Plan" as modified, amended, or supplemented from time to time),[2] pursuant to sections 1125, 1126, and 1129, respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). The Debtors filed their proposed order confirming the Plan (the "Confirmation Order") contemporaneously with the filing of this Memorandum.

This Memorandum, final approval of the Disclosure Statement, confirmation of the Plan, and entry of the Confirmation Order, are supported by, *inter alia*, the following documents:

1) The Plan;

2) *Motion of Debtors for Entry of an Order (I) Approving the Combined Disclosure Statement and Joint Chapter 11 Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing the Solicitation and Tabulation Procedures; (III) Approving the Form of Ballots and Solicitation Materials; (IV) Establishing the Plan Confirmation Schedule; and (V) Granting Related Relief* [Docket No. 297] (the "Solicitation Procedures Motion");

3) *Order (I) Approving the Combined Disclosure Statement and Joint Chapter 11 Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing the Solicitation and Tabulation Procedures; (III) Approving the Form of Ballots and Solicitation Materials; (IV) Establishing the Plan Confirmation Schedule; and (V) Granting Related Relief* [Docket No. 370] (the "Solicitation Procedures Order") entered on August 18, 2023;

4) *Notice of (I) Approval of First Amended Combined Disclosure Statement and Joint Chapter 11 Plan on an Interim Basis for Solicitation Purposes Only, and (II) the Hearing to Consider (A) Final Approval of the First Amended Combined Disclosure Statement, and (B) Confirmation of the Chapter 11 Plan of Liquidation* [Docket No. 387] (the "Confirmation Hearing Notice").

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

5)     *Notice of Filing of Plan Supplement for Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International, Inc. and its Affiliated Debtors* [Docket No. 458], filed on September 20, 2023 (the "First Plan Supplement");

6)     *Notice of Filing of the Amended Plan Supplement for Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International, Inc. and its Affiliated Debtors*, filed substantially contemporaneously herewith (the "Amended Plan Supplement" and together with the First Plan Supplement the "Plan Supplement" which materials in the Plan Supplement are defined in the Plan and as may be modified, supplemented, and/or amended from time to time); and

7)     the following documents, which have been filed or will be filed in support of confirmation of the Plan and entry of the Confirmation Order:

a.     *Declaration of Grant Lazaruk in Support of Confirmation of the Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International, Inc. and its Affiliated Debtors* (the "Lazaruk Declaration");

b.     Declaration of John Burlacu of Donlin, Recano & Company, Inc. Regarding the Solicitation and Tabulation of Votes Cast on First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International Inc. and its Affiliated Debtors (the "Voting Report"); and

c.     the affidavits or other proofs of service of notices with respect to the Confirmation Hearing and solicitation of voting on the Plan (the "Solicitation Service Filings") (discussed further below).

In further support of confirmation of the Plan, and in response to the objections thereto, the Debtors respectfully state as follows.

## PRELIMINARY STATEMENT

Prior to entering Chapter 11, the Debtors were experiencing the adverse effects of the COVID pandemic.  The pandemic greatly impacted the processing and production of pork across the United States, with effects resonating throughout the pork supply chain.  These effects included labor shortages, logistical restraints, market disruptions, and unfavorable foreign exchange pricing causing the Debtors to incur substantial operating losses monthly.  Under the direction of the Debtors' management team and with the help of their advisors, the Debtors developed a strategy to address their severe liquidity pressures by, *inter alia*, attempting to raise additional financing

and marketing the Debtors' businesses for sale.  The Debtors entered these chapter 11 cases (the "Chapter 11 Cases") to effectuate a going-concern sale and simultaneously achieve an orderly and efficient wind down and liquidation of their business and other remaining assets.  The Debtors determined a sale was necessary to address the severe liquidity pressures and generate the highest possible recoveries in the most efficient and expeditious manner possible.

The Debtors' postpetition marketing and sale process yielded successful bids and the Court approved sales to AgriSwine Alliance, Inc., Premium Iowa Pork, L.L.C. and the Prepetition Agent (the "Sale Transactions").[3]  Following the approval of the Sale Transactions, the Debtors prepared a liquidating chapter 11 plan that would create a liquidation trust to address liquidation of remaining litigation assets, reconcile claims and distribute proceeds to creditors. The Plan effectuates a liquidation of the Debtors' remaining assets for the benefit of creditors and the provision of distributions to Beneficiaries of the Liquidating Trust pursuant to the Plan.  The Debtors or the Liquidating Trustee will pay or provide for payments of Claims pursuant to the Plan as follows, among other provisions:[4]

    a.  the Liquidating Trustee will pay Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims in full;

    b.  each Holder of an Other Secured Claim (Class 2) will receive, in full and final satisfaction and release of and in exchange for such Allowed Class 2 Claim, (i) return of the collateral securing such Allowed Other Secured Claim; (ii) Cash equal to the amount of such Allowed Other Secured Claim; or (iii) such other treatment which the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing, *provided*, however, that with respect to the secured guaranties of Tritek International, Inc. described in Section 3.1(b)(ii)(B) of the Plan, such guaranties shall be reinstated to the same extent as they existed prior to the Petition Date;

---

[3]  *See* Docket No. 197, 229 & 230.

[4]  To the extent that there is any inconsistency between this summary of the Plan and the Plan itself, the Plan controls.

158913310v4

c.  each Holder of a Prepetition Loan Claim (Class 3), to the extent that the Other Secured Claims have been Paid in Full, shall (i) receive such Holder's *pro rata* share of the Sale Distribution Proceeds; (ii) retain all payments made, or receive any amounts owing, to the Holder pursuant to the Final DIP Order; (iii) retain all other payments made, or receive any amounts owing, to the Holder by the Debtors pursuant to the Bankruptcy Code or any order of the Bankruptcy Court; and (iv) receive the proceeds from the Sales or disposition of any Prepetition Collateral or any other collateral securing the Allowed Prepetition Loan Claim as such collateral is defined in the Final DIP Order;

d.  each Holder of a General Unsecured Claim (Class 4) shall receive such Holder's *pro rata* share of the GUC Distribution Pool; *provided*, *however*, that the proceeds of any Avoidance Actions shall be distributed only to the Holders of General Unsecured Claims of the Debtor(s) on behalf of whose estate, whether in the name of the Debtor or any party acting on behalf of the Debtor, the respective Avoidance Action(s) is asserted. Furthermore, as described in the Global Settlement, neither the Prepetition Secured Parties nor the Lessor shall receive distributions as Class 4 Holders of General Unsecured Claims. The Prepetition Secured Parties and the Lessor shall not be entitled to participate in any distributions from the GUC Distribution Pool, except for the following: The Prepetition Secured Parties shall receive a distribution of 50% of every $1 by which the Remaining Amount exceeds $2.65 million (with all other Holders of General Unsecured Claims receiving a *pro rata* distribution of the first $2.65 million of the Remaining Amount and 50% of every $1 by which the Remaining Amount exceeds $2.65 million). Additionally, the Prepetition Secured Parties shall receive a distribution of 50% of every $1 of Litigation and Settlement Proceeds received by the Debtors' estates prior to the Effective Date as a result of any litigation or settlement relating to Claims or Causes of Action against GAT Farms, LLC, Greg Strobel, an individual d/b/a Strobel Farms, Strobel Farms, LLC, Greg Strobel Farms, LLC, Fast Development, Inc., and/or Pemberton Grain, LLC (with all other Holders of General Unsecured Claims receiving a *pro rata* distribution of 50% of every $1 of Litigation and Settlement Proceeds received by the Debtors' estates prior to the Effective Date relating to Claims or Causes of Action against such persons and entities);

e.  Holders of Intercompany Claims (Class 5) will receive no Distribution on account of their Intercompany Claims;

f.  Interests in the Debtors (Class 6 will be extinguished as of the Effective Date and the owners thereof will receive no Distribution on account of such Interest.

The Plan provides for the orderly and efficient winddown of these Chapter 11 Cases and distribution of remaining assets to the Debtors' creditors. The Plan reflects broad agreements between he Debtors, Committee and Prepetition Lenders.

The Debtors have received formal objections and informal comments to the Plan and Confirmation Order and have worked consensually with the objecting and commenting parties to

resolve the majority of objections, comments, and requests. The remaining outstanding objections should be overruled.

The Debtors believe that the Plan provides creditors with the best return that can be achieved in these Chapter 11 Cases. Although the Plan effects a liquidation of the Debtors' remaining assets and a chapter 7 liquidation would achieve the same general goal, the Debtors believe that the Plan provides a greater potential recovery to Holders of General Unsecured Claims than would a chapter 7 liquidation. Further, a chapter 7 liquidation would add additional expenses and delays associated with distributions to creditors, as discussed in the Combined Plan and Disclosure Statement. However, as explained in the Plan, Holders of General Unsecured Claims are projected to recover, for HyLife Foods Windom: 11%-14% of the amount of their claims and for Canwin Farms, LLC: $0-100% of their claims. There are no Holders of General Unsecured Claims against Tritek International Inc.: $0.00, based on a preliminary waterfall analysis and subject to claim objections and incremental recoveries by the Liquidating Trust.

The exact amounts of distributions are not reasonably calculable at this time. These recoveries will depend on, among other things, the viability of any Retained Causes of Action, the creditworthiness of any defendants of such Retained Causes Action, and the cost to investigate and bring causes of action on behalf of the Liquidating Trust.

Lastly, the Plan complies with all applicable provisions of the Bankruptcy code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). As demonstrated herein, the Plan satisfies all of the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

158913310v4

Moreover, the Debtor Releases, Third Party Releases (defined below) and exculpation and injunction provisions contained in the Plan are necessary and appropriate to the success of the Plan and should be approved.

Together, this Memorandum, the Plan, the Disclosure Statement, the Plan Supplement, the Lazaruk Declaration, the Voting Report, and the Solicitation Service Filings, along with the other filings and records in these Chapter 11 Cases, reflect that the Plan complies with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, and provide the legal and evidentiary bases necessary for this Court to confirm the Plan and approve the Disclosure Statement on a final basis.

## **BACKGROUND**

### I.     **General Background of the Chapter 11 Cases**

1.     On April 27, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.  The Committee was appointed on June 15, 2023.[5]

---

[5] *See* Docket No. 238.

2. A detailed description of the Debtors and their business, and the facts and circumstances surrounding the Chapter 11 Cases, is set forth in the *Declaration of Grant Lazaruk in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration").[6]

3. A key event of these Chapter 11 Cases was the approval of the Sale Transactions, pursuant to which the Debtors sold substantially all of their assets. Postpetition, the Debtors engaged in arm's-length, good-faith negotiations with interested parties regarding a potential sale of all or substantially all of their assets. These negotiations culminated in an auction and the execution of purchase agreements between the Debtors and AgriSwine Alliance, Inc., Premium Iowa Pork, L.L.C. and the Prepetition Agent (collectively, the "Purchase Agreements").[7]

4. On June 2, 2023, the Bankruptcy Court entered an order approving the Hog Asset Sale[8] and on June 11, 2023, the Bankruptcy Court entered orders approving the Facility Asset Sale[9] and the Real Property Asset Sale.[10] The Hog Asset Sale closed on June 2, 2023. The Facility Asset Sale closed on June 16, 2023.[11] The closing of the Residential Duplex portion of the Real Property Asset Sale occurred on June 22, 2023.[12] The closing of the Real Estate Parcels portion of the Real Property Asset Sale occurred on July 6, 2023.[13]

---

[6] Docket No. 13

[7] *See* Docket Nos. 197, 229 & 230.

[8] Docket No. 197.

[9] Docket No. 229.

[10] Docket No. 230.

[11] Docket No. 246.

[12] Docket No. 282.

[13] *Id.*

158913310v4

5.     To identify the value maximizing path forward for the estate postpetition, the Debtors identified certain burdensome contracts and leases to be rejected rather than cause the Debtors' estates to potentially accrue administrative expenses in the form of payments under those contracts and leases.  To date, the Debtors have filed five omnibus rejection motions (the "Rejection Motions").[14]

6.     On July 20, 2023, the Debtors filed the Solicitation Procedures Motion.  On August 18, 2023, the Court entered the Solicitation Procedures Order, approving, among other things, the proposed procedures for solicitation of the Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").  On August 23, 2023 the Debtors filed the *Notice of Filing of the Solicitation Version of the First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International, Inc. and Its Affiliated Debtors*.[15]

7.     On August 15, 2023, the Debtors filed the Motion to Approve Stipulation *Among the Debtors, the Prepetition Secured Parties, the Lessor, and the Official Committee of Unsecured Creditors Pursuant to Federal Rule of Bankruptcy Procedure 9019* (the "Stipulation").[16] On August 30, 2023 the Court entered an order approving the stipulation among the Debtors, the Committee and Prepetition Agent.[17]  The Stipulation resulted in the filing of the Second Amended Combined Disclosure Statement and Plan.

---

[14]  *See* Docket Nos. 58, 236, 268, 269, & 295

[15] Docket No. 380.

[16] Docket No. 348.

[17] Docket No. 406.

8.      On September 20, 2023 and October 2, 2023, the Debtors filed the Plan Supplement, which included the (a) Liquidating Trust Agreement, and (b) Retained Causes of Action.

**II.      The Solicitation Process and Voting Results.**

9.      In accordance with the Solicitation Procedures Order, on or before August 25, 2023, the Debtors caused their Voting Agent to distribute the Solicitation Packages to Holders of Claims entitled to vote on the Plan—*i.e.*, the Holders of Claims in Classes 3 and 4 (collectively, the "Voting Classes")—in accordance with sections 1125 and 1126 of the Bankruptcy Code.[18]   In addition, the Debtors caused the Voting Agent to serve the Confirmation Hearing Notice and Deemed-to-Accept Notice and Deemed-to-Reject Notice attached as Exhibit 1, 3 and 4 to the Solicitation Procedures Order on Holders that were presumed to accept or deemed to reject the Plan pursuant to section 1126(f) of the Bankruptcy Code.[19]

10.      In compliance with the Bankruptcy Code and the Solicitation Procedures Order, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.  Holders of Claims and Interests were not entitled to vote if their rights were (a) unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code) or (b) impaired and such Holders were not entitled to receive any distribution under the Plan (in which case such Holders were conclusively deemed to reject the Plan pursuant

---

[18]    *See Affidavit/Declaration of Service of Solicitation Packages with Respect to the First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International Inc and Its Affiliated Debtors* [Docket No. 441].

[19]    *See Id.*

158913310v4

to section 1126(g) of the Bankruptcy Code).  The following chart details which classes of Claims and Interests were entitled to vote on the Plan:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Prepetition Loan Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

11.     The Debtors solicited votes on the Plan only from Holders of Claims in Voting Classes.  The deadline for all Holders of Claims entitled to vote on the Plan to cast their Ballots was September 28, 2023, at 5:00 p.m. (prevailing Eastern Time) (the "Voting Deadline") unless extended by the Debtors in writing and the deadline to object to confirmation of the Plan and final approval of the Disclosure Statement was September 28, 2023 at 5:00 p.m. (prevailing Eastern Time) (the "Confirmation Objection Deadline").  As reflected in the Voting Report, Class 3 (Prepetition Loan Claims) and Class 4 (General Unsecured Claims) voted to accept the Plan.[20] Accordingly, at least one Impaired Class voted in favor of accepting the Plan.

12.     Because the Plan meets the requirements of section 1129(b) of the Bankruptcy Code as described below, the Court should confirm the Plan over the Classes that were deemed to reject the Plan and approve the procedures for objecting and opting-out of Third-Party Releases.

---

[20]     *See* Voting Report, Exhibit A.

### III. Confirmation Hearing Notice.

13.     As set forth in the Solicitation Procedures Order, the Court scheduled the confirmation hearing on the adequacy of the Disclosure Statement and Confirmation of the Plan for October 5, 2023, at 10:00 a.m. (prevailing Eastern Time) (the "Confirmation Hearing").  On or before August 25, 2023, the Debtors, in accordance with the Solicitation Procedures Order, caused the Voting Agent to serve the notice of the Confirmation Hearing Notice on all known creditors and all other parties entitled to notice in these Chapter 11 Cases.[21]

14.     The Confirmation Hearing Notice provided, among other things: (a) notice that the Debtors have filed voluntary petitions for relief under the Bankruptcy Code; (b) notice of the Confirmation Hearing to consider the adequacy of the information contained in the Disclosure Statement and Confirmation of the Plan; (c) instructions for obtaining copies of the Combined Disclosure Statement and Plan; (d) notice of the objection deadline and procedures for filing objections to the adequacy of the Disclosure Statement and Confirmation of the Plan; and (e) a summary of the exculpation, release, and injunction provisions set forth in the Plan.

### IV. Objections.

15.     The Debtors received three formal objections and one informal objection to Confirmation of the Plan (collectively, the "Objections") and are working with the objecting parties to resolve, or at least narrow the open issues in advance of the Confirmation Hearing.

16.     To the extent not resolved prior to the Confirmation Hearing, the Debtors believe, for the reasons stated herein, that the objections should be overruled.

---

[21] *See Affidavit/Declaration of Service of Solicitation Packages with Respect to the First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International Inc and Its Affiliated Debtors* [Docket No. 441].

158913310v4

<u>**ARGUMENT**</u>

17.      This Memorandum is organized into three sections. The first section requests a finding that the Debtors complied with the Solicitation Procedures Order.  The second section contains the Debtors' "case in chief" that the Plan satisfies section 1129 of the Bankruptcy Code and, accordingly, requests that the Court confirm the Plan.  Lastly, the third section specifically addresses the unresolved objections filed with respect to the Plan.

**I.      THE DEBTORS COMPLIED WITH THE SOLICITATION PROCEDURES ORDER.**

   **A.      The Combined Disclosure Statement and Plan Contains Adequate Information.**

18.      Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed chapter 11 plan must provide "adequate information" regarding that plan to holders of impaired claims and interests entitled to vote on the plan.[22]   Specifically, section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.[23]

19.      Whether a disclosure statement contains adequate information is intended by Congress to be a flexible, fact-specific inquiry left within the discretion of the bankruptcy court:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis.  Courts will take a practical approach as to what is necessary under the circumstances

---

[22]   11 U.S.C. § 1125.

[23]   11 U.S.C. § 1125(a)(1).

158913310v4

of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection. There will be a balancing of interests in each case. In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest.[24]

20. The Disclosure Statement is detailed and comprehensive, and satisfies the elements of section 1125 of the Bankruptcy Code. The Disclosure Statement provides information regarding, among other things: (a) the Plan; (b) the Debtors' prepetition indebtedness; (c) the Debtors' business and operations; (d) circumstances surrounding the Chapter 11 Cases; (e) certain risk factors related to the Plan contemplated therein, including the creation of the Liquidating Trust; and (f) federal tax law implications of the Plan. Accordingly, the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code.

21. Further, the Disclosure Statement provides sufficient notice and information regarding the discharge, release, injunction, and exculpation provisions of the Plan. Bankruptcy Rule 3016(c) requires that, if a plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code, the plan and disclosure statement must describe, in specific and conspicuous language, the acts to be enjoined and the entities subject to the injunction.[25] The language in Article XIV.14.1of the Combined Disclosure Statement and Plan describes in detail the entities subject to an injunction under the Plan and the acts that they are enjoined from pursuing, the Debtor Releases, and the Third Party Releases and such language is in bold font, making it

---

[24] H.R. Rep. No. 95–595, at 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6365; *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (observing that "adequate information will be determined by the facts and circumstances of each case"); *see also In re River Village Assoc.*, 181 B.R. 795, 804 (Bankr. E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement.").

[25] Fed. R. Bankr. P. 3016(c).

conspicuous to any reader. Accordingly, the Disclosure Statement satisfies Bankruptcy Rule 3016(c).

22.     After the Debtors filed the Solicitation Procedures Motion, the Debtors worked with the Office of the United States Trustee (the "U.S. Trustee") to make significant revisions to the Solicitation Procedures Order and the Combined Disclosure Statement and Plan by incorporating the U.S. Trustee's comments. The Court conditionally approved the Disclosure Statement on an interim basis on August 18, 2023, as containing adequate information to authorize the Debtors to commence solicitation.

23.     On September 8, 2023, the Debtors filed a second amended Plan reflecting various agreements among the Debtors, the Prepetition Secured Parties, the Lessor, and the Committee (as defined in the Plan, the "Global Settlement"). Pursuant to the Global Settlement, which is described in detail in the Plan and in the motion seeking approval of the Global Settlement [Docket No. 348], the parties thereto agreed, among other things, that the Committee would hold its potential objections to certain provisions in the Final DIP Order in abeyance, and the Prepetition Secured Parties agreed to support and fund certain modifications to the Plan.

24.     On October 2, 2023, the Debtors filed a third amended Plan a resolution of certain objections to the Plan by the Committee, as well as resolutions of certain claim disputes between the Debtors and certain creditors.

25.     Specifically, as discussed in further detail in the Plan, the Debtors resolved their disputes with the Committee with respect to the releases contained in the Plan (as defined in the Plan, the "Committee Settlement"), whereby the Debtors' directors and officers will fund or cause to be funded (i) an additional $500,000 in cash for the benefit of Holders of Allowed General Unsecured Claims in Class 4 (such contribution, the "D&O Contribution") and (ii) up to 5.0% of

the combined Allowed Professional Fees (as defined in the Final DIP Order) of certain estate professionals up to a maximum cap of $300,000.

26.     The Debtors also resolved certain disputes with Headwaters Development, LLC ("Headwaters"), which will result in, among other things, the resolution of Headwaters Claim Objection and the Headwaters 3018 Motion (each as defined in the Plan), with Headwaters being deemed to have voted in favor of the Plan.

27.     Finally, the Debtors resolved certain disputes with Greg Strobel d/b/a Strobel Farms ("Strobel") with respect to its claim against Windom, whereby, among other things, (i) the Debtors' parent company, HyLife Group Holdings Ltd., will pay $1 million (CAD) of Strobel's claim, (ii) Strobel shall be authorized to seek payment of approximately $837,000 from the PSA Bond (as defined in the Plan), (iii) Strobel will forego any distributions under the Plan as an unsecured creditor, and (iv) Strobel will be deemed to have voted in favor of the Plan.

28.     Each of the foregoing settlements are described in further detail in the Plan. The Debtors believe in their business judgment such settlements are in the best interests of the Debtors, their estates, and all parties in interest, as they will result in the creation of additional value to the Debtors' estates and will avoid the need for the Debtors, the Liquidating Trust, and/or other parties in interest to incur significant time and expense litigating these issues.

29.     No party in interest has requested additional information to cast an informed vote on the Plan. Accordingly, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code and should therefore be approved.

**B.** **The Debtors Complied with The Requirements Set Forth in the Solicitation Procedures Order.**

30.     On August 18, 2023, the Court entered the Solicitation Procedures Order granting the relief requested in the Solicitation Procedures Motion, including, among other things: (a) approving the Solicitation Packages; (b) approving the form and manner of the Confirmation Hearing Notice; and (c) approving certain dates and deadlines with respect to the Combined Disclosure Statement and Plan.  The Debtors complied with the procedures and timeline approved by the Solicitation Procedures Order.[26]

**1.** **The Debtors complied with the notice requirements set forth in the Solicitation Procedures Order.**

31.     The Debtors satisfied the notice requirements set forth in the Solicitation Procedures Order, Bankruptcy Rule 3017, and Local Rule 3017-1.  First, on or before August 25, 2023, the Debtors caused the Voting Agent to distribute the Solicitation Packages to Holders of Claims entitled to vote on the Plan.[27]   Second, the Confirmation Hearing Notice included instructions on how to obtain the Combined Plan and the Disclosure Statement without a fee through the Voting Agent's website and the Court's website.[28]

**2.** **The Ballots used to solicit Holders of Claims entitled to vote on the Plan complied with the Solicitation Procedures Order.**

32.     The forms of Ballots used comply with the Bankruptcy Rules and were approved by the Court pursuant to the Solicitation Procedures Order.  No party has objected to the

---

[26]   *See* Voting Report, ¶ 5.

[27]   *See Affidavit/Declaration of Service of Solicitation Packages with Respect to the First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International Inc and Its Affiliated Debtors* [Docket No. 441].

[28]   *See* Confirmation Hearing Notice [Docket No. 387]; *see also* Voting Report, ¶7.

sufficiency of the Ballots. Based on the foregoing, the Debtors submit that the Ballots complied with the Solicitation Procedures Order and satisfied the requirements of Bankruptcy Rule 3018(c).

### 3. The Debtors' solicitation period complied with the Solicitation Procedures Order.

33. The Debtors' solicitation period complied with the Solicitation Procedures Order, the Bankruptcy Code, and the Bankruptcy Rules. First, the Solicitation Packages, including instructions for accessing electronic or hard-copy versions of the Combined Disclosure Statement and Plan, were transmitted to all Holders of Claims entitled to vote on the Plan.[29] Second, the solicitation period, which lasted from August 25, 2023 through September 28, 2023 at 5:00 p.m. (prevailing Eastern Time), complied with the Solicitation Procedures Order and was adequate under the particular facts and circumstances of the Chapter 11 Cases. Accordingly, the Debtors submit that the solicitation period complied with the Solicitation Procedures Order.

### 4. The Debtors' voting tabulation procedures complied with the Solicitation Procedures Order.

34. The Debtors request that the Court find that the Debtors' tabulation of votes complied with the Solicitation Procedures Order. The Voting Agent reviewed all Ballots received in accordance with the procedures described in the Solicitation Procedures Motion and the Disclosure Statement and subsequently approved in the Solicitation Procedures Order.[30] Accordingly, the Debtors respectfully submit that the Court should approve the Debtors' tabulation of votes confirming that, in Class 3 and Class 4 the requisite majority in amount and number of Claims voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.

---

[29] *See Affidavit/Declaration of Service of Solicitation Packages with Respect to the First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Tritek International Inc and Its Affiliated Debtors* [Docket No. 441].

[30] *See* Solicitation Procedures Order, ¶ 18; *see also* Voting Report, ¶ 11.

35.     As noted above, after the Voting Deadline, the Debtors reached settlements with Headwaters and Strobel, which resolved the treatment of their respective Claims under the Plan. In connection with those settlements, both Headwaters and Strobel agreed to vote in favor of the Plan. The Debtors extended the Voting Deadline for Headwaters, who filed a motion under Bankruptcy Rule 3018, to allow settlement discussions to continue, and Headwaters ultimately voted in favor of the Plan. Strobel had voted its two claims against the Plan prior to the Voting Deadline, but has agreed to change its votes to be in favor of the Plan following the Strobel Settlement. Because the Headwaters Settlement and the Strobel Settlement resolve significant claims against the Debtors' estates and provided for the elimination of sizable claims against the Debtors' estates, the Debtors submit that the vote changes are appropriate and should be authorized by the Court.

### 5.     Solicitation of the Plan complied with the Bankruptcy Code and was in good faith.

36.     Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation or participation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[31]

37.     As set forth in the Lazaruk Declaration, and as demonstrated by the Debtors' compliance with the Solicitation Procedures Order, the Debtors at all times engaged in arm's-length, good-faith negotiations and took appropriate actions in connection with the

---

[31]     11 U.S.C. § 1125(e).

solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code.[32]  Therefore, the Debtors respectfully request that the Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II.  THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED.[33]

### A.  The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

38.  To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[34]  As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.  This Memorandum addresses each requirement in seriatim.

#### 1.  The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

39.  The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[35]  For a classification structure to satisfy section 1122 of

---

[32]  *See* Lazaruk Declaration, ¶ 22.

[33]  *See In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success, and is more than a visionary scheme.") (citing *In re Wiersma*, 227 Fed. Appx. 603, 606 (9th Cir. 2007)) (internal citations omitted).

[34]  *See In re Armstrong World Indus.*, 348 B.R. 111, 120 n.15 (Bankr. D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

[35]  11 U.S.C. § 1122(a).

the Bankruptcy Code substantially similar claims or interests need not be grouped in the same class.[36] Instead, claims or interests placed in a particular class must be substantially similar to each other.[37] Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[38]

40. The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into separate classes, with Claims and Interests in each class differing from the Claims and Interests in each other class in a legal or factual way or based on other relevant criteria.[39] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

   a.   <u>Class 1</u>: Priority Non-Tax Claims;

   b.   <u>Class 2</u>: Other Secured Claims;

   c.   <u>Class 3</u>: Prepetition Loan Claims;

   d.   <u>Class 4</u>: General Unsecured Claims;

   e.   <u>Class 5</u>: Intercompany Claims; and

---

[36] *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (D. Del. 2006).

[37] *Id.*

[38] Courts have identified grounds justifying separate classification, including where members of a class possess different legal rights or there are good business reasons for separate classification. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because the classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case" (internal quotation marks omitted)); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together . . . .").

[39] *See* Plan, Art. II.

f.    Class 6:  Interests;

41.    Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[40]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[41]  Namely, the Plan separately classifies the Claims and Interests because each holder of such Claims or Interests may hold (or may have held) rights in the Debtors' estates legally dissimilar to the Claims or Interests in other Classes.

42.    The classification scheme of the Plan is rational: it generally follows the Debtors' prepetition capital structure by classifying secured Claims separately from unsecured Claims, and Interests separately from Claims.  Further, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests. Namely, the Plan provides the separate classifications described above because each Holder of the applicable Claim or Interest may hold (or may have held) rights in the Debtors' Estates legally dissimilar to the Claims or Interests in the other Classes.  The classification of Claims and Interests in the Plan therefore complies with section 1122 of the Bankruptcy Code.

**2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

43.    Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.  The Plan satisfies each of these requirements.

---

[40] *See* Lazaruk Declaration ¶8.
[41] *See id.*

### a. Designation of Classes of Claims and Interests and Specification of Unimpaired Classes (§ 1123(a)(1)–(2))

44.     For the reasons set forth above, Article II of the Plan properly designates Classes of Claims and Interests and identifies each Class of Claims or Interests that are not Impaired under the Plan.

### b. Treatment of Impaired Classes (§ 1123(a)(3))

45.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this requirement by setting forth the treatment of each Class in Article II that are Impaired.

### c. Equal Treatment within Classes (§ 1123(a)(4))

46.     Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such holders' respective Class.

### d. Means for Implementation (§ 1123(a)(5))

47.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. The Plan satisfies this requirement because Article IX of the Plan, as well as other provisions thereof, provides for the means by which the Plan will be implemented. Among other things, Article IX of the Plan provides for:

      b.     the establishment and terms of a Liquidating Trust;

      c.     the termination of each of the Debtors' directors, officers, members, and managers;

      d.     the wind-up and dissolution of the Debtors; and

      e.     the vesting of the Liquidating Trust Assets in the Liquidating Trust;

48.     The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement. The Debtors believe that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

### e.      Issuance of Non-Voting Securities (§ 1123(a)(6))

49.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities. The Plan is a liquidating plan pursuant to which the Debtor's assets will be liquidated and distributed by the Debtor or the Liquidating Trust, as applicable, in accordance with the terms of the Plan and the Liquidating Trust Agreement. As such, the Plan does not provide for the issuance of non-voting equity securities, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

### f.      Directors and Officers (§ 1123(a)(7))

50.     Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." The Plan satisfies this requirement. Article IX of the Plan provides that the Liquidating Trustee will be the representative of the post-effective date Debtors and the Liquidating Trust, and explains the powers of the Liquidating Trustee. Matthew Dundon will be appointed as the Liquidating Trustee, and the Plan Supplement discloses its identity and compensation. Mr. Dundon's engagement as the Liquidating Trustee is consistent with the interests of Holders of Claims and Interests and with public policy.

### 3. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

#### a. Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code.

51.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[42]

52.     The Plan is consistent with section 1123(b) of the Bankruptcy Code. Specifically, under Article II of the Plan, Classes 1 and 2 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes.[43] On the other hand, Classes 3, 4, 5 and 6 are Impaired since the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[44]

53.     In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article XII of the Plan provides for the rejection of all Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code, except to the extent set forth in the Plan.[45]

---

[42] *See* 11 U.S.C. § 1123(b)(1)–(3), (6).
[43] *See* Plan, Art. II.
[44] *See id.*
[45] *See id.* at Art. XII.

###### b. The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.

54. The Plan also includes certain releases, an exculpation, and an injunction provision. These discretionary provisions are proper because, among other things, they are supported by the Debtors and their key constituents, and are consistent with applicable precedent. Further, these provisions were fully and conspicuously disclosed to all parties in interest through the Confirmation Hearing Notice, which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.

###### (i) The Debtor Release Is Appropriate.

55. Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[46] Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[47] In determining whether a debtor release is proper, courts in Delaware and elsewhere generally may consider the following five factors:

a. whether the non-debtor has made a substantial contribution to the debtor's reorganization;

b. whether the release is essential to the debtor's reorganization;

---

[46] *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *See, e.g., In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (citation omitted); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities).

[47] *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

c.      agreement by a substantial majority of creditors to support the release;

d.      identity of interest between the debtor and the third party; and

e.      whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[48]

However, not all of the above factors need to be satisfied for a court to approve a debtor release.[49]

56.      Article XIV of the Plan provides for releases by the Debtors, as of the Effective Date, of, among other things, certain claims, rights, and causes of action that the Debtors, their respective assets, the Estates, or the Chapter 11 Cases may have against the Released Parties (the "Debtor Release").[50]  The Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan.  The Debtor Release meets the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' estates.

57.      Here, the Released Parties were heavily involved in negotiating and formulating the Plan.  The Debtor Release is necessary, as it represents a key component of the Debtors' Plan.  The Prepetition Agent, Prepetition Lenders and DIP Lenders parties each sought the assurance of finality as part of their willingness to provide significant concessions and funding to facilitate these Chapter 11 Cases, the  Plan and the funding of the Guaranteed Amount as part of the Global Settlement.  The Debtor Release is an essential component of such parties' agreement to support the Plan.

---

[48]  *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re Spansion, Inc.*, 426 B.R. at 143 n.47 (citing the *Zenith* factors).

[49]  *See, e.g.*, *Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

[50]  Article I.1.26 of the Plan defines "Released Parties" as, " (a) Debtors and the Estates, (b) the Prepetition Agent, (c) the Prepetition Lenders, (d) the DIP Lenders, (e) the Committee and each of its members, (f) Liquidating Trustee, and (g) with respect to each of the foregoing, their Related Parties, provided, however, that Released Parties shall exclude any of the foregoing parties who are not Releasing Parties."

26

### (1)    The Prepetition Agent and DIP Lenders

58.    The Prepetition Agent have provided ample consideration in connection with the global settlement that was reached with the UCC.  As part of such settlement, the Prepetition Agent has agreed to fund up to $750,000 to ensure a floor recovery to general unsecured creditors and also agreed to leave certain collateral with the Debtors' estates for the benefit of general unsecured creditors.  Further, pursuant to the Global Settlement, the Prepetition Secured Parties have agreed to not participate in any recovery as unsecured creditors unless the Remaining Amount exceeds $2.65 million. Absent these concessions by the Prepetition Secured Parties, there would be significantly less or potentially no funds to distribute to Holders of General Unsecured Claims. Indeed, the Plan provides for incrementally higher recoveries to Class 4 General Unsecured Claims than what would be provided pursuant to the Liquidation Analysis and absolute priority rule of the Bankruptcy Code.  Meanwhile, the Prepetition Secured Parties in Class 3, who are entitled to be paid in full before any junior class receives a recovery, are estimated to receive less than a 30% recovery on behalf of their otherwise senior claims.

59.    The DIP Lenders funded these chapter 11 cases with $16 million.  This funding is the primary reason that the Debtors' are able to provide a recovery to general unsecured creditors in connection with these cases.  Moreover, the funding provided by the DIP Lenders in addition to being essential to having an administratively solvent estate, also was provided such that the DIP Lenders agreed to give up all rights to such amounts (i.e., liens and claims) in exchange for releases provided pursuant to the DIP Order. [51]  However, as the funding source for these chapter 11 cases and one of the principle reasons why the Plan can be proposed for confirmation, the DIP Lenders

---

[51] *See* Plan, at § 6.3.  The DIP Lenders previously received releases from the Debtors and their Estates pursuant to the Final DIP Order.

158913310v4

have continued to provide valuable consideration, in the form of DIP proceeds, to these estates for the period of time between entry of the final DIP Order and the proposed confirmation and effectiveness of this Plan.

### (2) Directors and Officers

60.     The Directors and Officers have worked tirelessly leading up to these chapter 11 cases and during the cases in an effort to bring the Debtors to this point of confirming a value maximizing chapter 11 plan for the benefit of the estates.  Most recently, the Directors and Officers of the Debtors were instrumental in negotiating a resolution with one of the largest general unsecured creditors in these cases, which resulted in such creditor agreeing to forego any distributions that it might otherwise have been entitled to in these chapter 11 cases and thus providing an incremental benefit to all other unsecured creditors of approximately $900,000 in value. The Directors and Officers have further agreed to fund an additional $500,000 (as defined in the Plan, the "D&O Contribution") for the benefit of general unsecured creditors, as well as certain professional fees in order to maintain compliance with the Debtors' professional fees budget.

61.     Finally, an identity of interest exists between the Debtors and the Released Parties. Each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed.  Like the Debtors, these parties seek to confirm the Plan and implement the transactions contemplated thereunder.

62.     For these reasons, the Debtor Release is justified, is in the best interests of creditors, is an integral part of the Plan, and satisfies key factors considered by courts in determining whether a debtor release is proper.

### (ii) The Third-Party Release Is Appropriate as a Consensual Release.

63. The Third-Party Release should be approved as "consensual" due to the opt-out mechanism in the Ballots, approved by this Court in the Solicitation Procedures Order. Courts in this jurisdiction routinely approve such release provisions as consensual.[52]

64. Courts generally agree that Third-Party Releases can be effectuated where given through affirmative agreement or consent with the third-party covered by the release.[53] The rationale for authorizing such consensual Third-Party Releases is that they represent a quasi-contractual arrangement by which the third-party is opting to release the covered claims in exchange for receiving payment under the proposed bankruptcy plan.[54]

65. Courts, however, have disagreed over what actions constitute consent to a Third-Party Release. Some courts have held that voting in favor of a plan which provides for a Third-

---

[52] *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304–05 (Bankr. D. Del. 2013) (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *Spansion*, 426 B.R. at 144 (same); *Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *Zenith Elecs.*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of the plan); ); *In re Colt Holding Co.*, No. 15-11296 (LSS) (Bankr. D. Del. Dec. 16, 2015) (approving release as consensual where creditor fails to vote or opt-out of release); *In re EV Energy Partners, L.P.*, No. 18-10814 (CSS) (Bankr. D. Del. 2018) (approving third-party releases with objection "opt-out" mechanic); *In re PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018) (same); *In re SFP Franchise Corp.*, Case No. 20-10134 (JTD) (Bankr. D. Del. Aug. 24, 2020) (approving Third-Party Releases as consensual because unimpaired creditors could have objected to plan confirmation).

[53] *See, e.g.*, *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 182 (Bankr. D.N.J. 2002) (noting that voluntary consensual releases are permissible under the Bankruptcy Code); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 334-35 (Bankr. E.D. Pa. 1987) (same).

[54] *See In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) ("[A] Plan is a contract that may bind those who vote in favor of it.") (citation omitted); *In re Int'l Wireless Commnc's Holdings, Inc.*, Case No. 98-2007 (MFW), 1999 Bankr. LEXIS 1853, at *24-25 (Bankr. D. Del. Mar. 26, 1999) (finding that voting creditors are free, as a matter of contract law, to release their claims against third-parties in consideration of their treatment under the plan); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) ("When a release of liability of a nondebtor is a consensual provision, however, agreed to by the effected [sic] creditor, it is no different from any other settlement or contract . . . .").

158913310v4

Party Release is sufficient to constitute consent to the release.[55] Other courts have held that for a release to be consensual, the creditor must have "unambiguously manifested assent to the release of the nondebtor from liability on its debt" and merely voting in favor of a plan is not enough.[56]

66.     The Court has been flexible in recognizing the level of voluntary affirmation needed to establish creditor's consent, and has found that releases may be "deemed consensual" even for creditors who receive adequate notice, abstain from voting, and do not otherwise challenge the Third-Party Releases.[57] Even if a vote in favor of a plan alone is insufficient to manifest consent to a Third-Party Release, the majority view in Delaware is that a party's failure to opt out of the proposed Third-Party Release reflects that party's consent to the release.[58] The Court has gone so far as to state that section 1141 of the Bankruptcy Code requires creditors to "speak up and object to release provisions, like they need to [for] other provisions."[59]

67.     In *In re Indianapolis Downs*, Judge Shannon addressed objections to third party

---

[55] *See, e.g.*, *In re SFP Franchise Corp.*, Case No. 20-10134 (JTD) (Bankr. D. Del. Aug. 24, 2020) (Judge Dorsey approving Third-Party Releases as consensual because unimpaired creditors could have objected to plan confirmation); *Coram Healthcare*, 315 B.R. at 336; *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re After Six, Inc.*, 1994 WL 46471, at *1 (Bankr. E.D. Pa. 1994).

[56] *Arrowmill Dev. Corp.*, 211 B.R. at 507; *see also First Fid. Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993).

[57] *See Indianapolis Downs*, 486 B.R. at 305-06 (Judge Shannon finding releases consensual when (i) a creditor fails to vote and opt-out of release or (ii) the creditor has an unimpaired claim and is deemed to accept the plan)

[58] *See, e.g.*, *In re Colt Holding Co.*, Case No. 15-11296 (LSS) (Bankr. D. Del. Dec. 16, 2015) (Judge Silverstein approving release as consensual where creditor fails to vote or opt-out of release); *In re Mallinckrodt PLC*, 2022 WL 404323, at *25-26 (Bankr. D. Del. Feb. 8, 2022) (Judge Dorsey approving Third-Party Releases as consensual where parties were given the opportunity to opt-out); *In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. 2018) (Judge Sontchi approving Third-Party Releases with objection "opt-out" mechanic); *In re First Guaranty Mort. Corp.*, No. 22-10584 (CTG) (Bankr. D. Del. Nov. 11, 2022) [Docket No. 671] (Judge Goldblatt confirming a chapter 11 plan with opt-out procedures for parties deemed to reject); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) [Docket No. 185] (Judge Stickles confirming a chapter 11 plan with opt-out procedures for parties deemed to reject); *In re WCI Cmtys., Inc.*, Case No. 09-52250 (KJC), 2012 WL 1981713 (Bankr. D. Del. June 1, 2012) (former Judge Carey permitting third-party release as consensual where creditor fails to vote and opt-out of release); *In re PES Holdings, LLC*, Case No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018) (Former Judge Gross approving Third-Party Releases with objection "opt-out" mechanic).

[59] *In re Melinta Therapeutics Inc.*, Case No. 19-12748 (LSS), Hr'g Tr. 120:1-14 (Bankr. D. Del. Apr. 2, 2020).

releases on the basis that they were non-consensual despite the inclusion of an opt-out provision on the ballots.[60]  The Debtors, in turn, argued that the releases were consensual based on a contract theory.[61]  The releases at issue only applied to "holders of claims who (i) affirmatively vote to accept or reject the Plan and do not opt out of granting the releases, (ii) are unimpaired pursuant to the Plan and therefore deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (iii) abstain from voting on the Plan and who do not otherwise submit a Ballot indicating their desire to opt out of the releases."[62]  The release did not apply to any party that was deemed to reject the plan or otherwise opted out.[63]  Judge Shannon found that because the unimpaired parties were being paid in full, they were receiving consideration for the releases, and that the impaired creditors who failed to opt out consented to the third-party releases  because they "were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots."[64]

68.     Recently, Judge Goldblatt followed the rationale of *Indianapolis Downs* in *In re Arsenal Intermediate Holdings, LLC*.[65]  In *Arsenal*, the United States Trustee once again argued that a creditors' failure to exercise an opt-out right does not constitute consent to a third-party release.  Judge Goldblatt disagreed, holding that "in the typical case, so long as the disclosure is prominent and conspicuous, and impaired creditors are given the ability to opt out simply by

---

[60] *Indianapolis Downs*, 486 B.R. at 304.

[61] *Id.*

[62] *Id.* at 304-05.

[63] *Id.* at 305.

[64] *Id.* at 306.

[65] 2023 Bankr. LEXIS 752 (Bankr. D. Del. Mar. 27, 2023).

marking their ballot or by some other comparable device, it is appropriate to infer consent from a creditor's failure to opt out. Releases contained in a plan that permit creditors to opt out may be deemed consensual as to those who do not exercise that option."[66] Starting from the premise that "the functioning of the bankruptcy system generally depends on requiring parties that object to the relief proposed in a plan to come into court to raise their objection,"[67] Judge Goldblatt found that even if the failure to opt out was the result of "carelessness, inattention, or mistake," the failure to return a ballot is at the creditor's own risk.[68] This rationale applies even with respect to released third-parties who may not otherwise be apparent from the caption of the bankruptcy case because the possibility of such releases are permitted, at least under Third Circuit law.[69] Judge Goldblatt, however, noted that despite this general rule, special circumstances may exist in a given case that could require additional special protections for certain creditors.[70] No special circumstances are present here, and none have been alleged.

69. Despite the strong majority view that Third-Party Releases are consensual if they contain a well-disclosed opt-out mechanic, a few Delaware decisions have gone the other way. Judge Walrath has indicated that actual voting is required and failing to opt-out, failure to return a ballot, and simply being unimpaired (non-voting) does *not* constitute consent.[71] Judge Owens

---

[66] *Id.* at *3.

[67] *Id.* at *13.

[68] *Id.* at *19-*20.

[69] *Id.* at *20-*21,

[70] *See id.* at *23-*28 (discussing how in *Arsenal*, one of the Court's prior orders would prevent certain creditors from discovering claims against the releases parties until after the opt-out date, and, as a result, the debtors either needed to rely upon an opt-in mechanism or extend the opt-out date to a later time, consistent with the extended bar date proposed by the debtor).

[71] *See Washington Mut., Inc.*, 442 B.R. at 355 ("[f]ailing to return a ballot is not a sufficient manifestation of consent to a third party release."); *In re RCS Capital Corp.*, Case No. 16-10223 (MFW) (Bankr. D. Del. May 5, 2016) (same);

158913310v4

followed Judge Walrath's *Washington Mutual* decision, holding that waiver cannot be discerned through a party's silence or inaction, *i.e.*, failure to return a ballot or opt-out form, unless specific circumstances are present.[72]

70.     Judge Owens explained that for the court to infer consent from nonresponsive creditors or equity holders, the debtors must show under basic contract principles that "(1) the creditors and equity holders accepted a benefit knowing that the Debtors, as offerors, expected compensation; (2) the Debtors gave the creditors and equity holders reason to understand that assent may be manifested by silence or inaction, and the creditors and equity holders remained silent and inactive intending to accept the offer; or (3) acceptance by the creditors and equity holders can be presumed due to previous dealings between the parties."[73]  In *Emerge*, the plan provided no distributions to unsecured creditors or equity holders, yet those that did not opt-out were deemed to release various third-parties.  The court noted that the failure of a party to affirmatively opt-out could reasonably be carelessness, inattentiveness, or mistake, not necessarily a manifestation of consent.[74]

71.     In later opinions, Judge Owens has relaxed her position somewhat and has approved third-party releases as consensual where they included an opt-out provision, but only for parties that returned a ballot.  In *In re Smartours, LLC*, Case No. 20-12625 (KBO) (Bankr. D. Del. Dec. 10, 2020), she held that if a party fails to vote and fails to return a ballot, then consent cannot be

---

*In re SGR Winddown Inc.*, Case No. 19-11973 (MFW) (Bankr. D. Del. May 12, 2020) (indicating that an opt-out is insufficient to constitute consent, but not ruling on the issue as the lenders were willing to revise the release provisions to only include unimpaired creditors and creditors who returned a ballot but did not check the box to opt-out).

[72] *In re Emerge Energy Servs. LP*, Case No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019).

[73] *Id.*

[74] *Id.*;

discerned; but if a party votes to reject, returns a ballot, and fails to check the opt-out box, then affirmative consent exists.[75] More recently, she approved a disclosure statement and solicitation package that provided for an opt-out release structure where the definition of non-debtor releasing parties included those who voted to reject but failed to check the opt-out box.[76] In reaching that conclusion, Judge Owens overruled the U.S. Trustee's argument that unsecured claimants who opt out of the releases would be hit with an unfair "deathtrap" and excluded from distributions if the company restructures.[77]

72. Here, the Plan defines "Releasing Parties" as

> all Holders of Claims or Interests who are Unimpaired unless they (i) select the option set forth on the Non-Voting Status Notice to not grant the releases set forth in Section 14.1(c) of the Plan or (ii) File a written objection to the releases set forth in Section 14.1(c) of this Plan by the objection deadline established by the Solicitation Procedures Order, (b) the DIP Lenders, (c) the Prepetition Lenders, (d) the Prepetition Agent, (e) all Holders of Claims or Interests in a Voting Class unless they (i) submit a Ballot by the Voting Deadline that does not vote to accept the Plan; (ii) submit a Ballot by the Voting Deadline that accepts the Plan but select the option set forth on the Ballot to not grant the releases set forth in Section 14.1(c) of this Plan, or (iii) File a written objection to the releases set forth in Section 14.1(c) of this Plan by the objection deadline established by the Solicitation Procedures Order, and (f) with respect to each of the foregoing, their Related Parties; provided, however, any Person whose solicitation package is returned as undeliverable and for whom the Debtors are not able to identify and complete service on a new mailing address shall not be a Releasing Party.

Plan, at § 1.127. Thus, the only parties granting Third-Party Releases under the Plan are those

---

[75] *See also In re Fizzics Grp., Inc.*, Case No. 19-10545 (KBO) (approving Third-Party Releases as consensual for only those parties voting on the plan who had an opportunity to opt-out, and insinuating that would not be the case for equity holders who received no recovery under the plan or claimholders who did not return a ballot).

[76] *In re Starry Group Holdings, Inc.*, Case No. 23-10219 (KBO) (Bankr. D. Del. Mar. 30. 2023).

[77] *Id.*

parties who are consenting to them. The DIP Lenders, Prepetition Lenders, and Prepetition Agent are contractually bound to grant the Third-Party Releases as part of the Global Settlement Agreement. All Unimpaired parties will receive the Non-Voting Status Notice and can decline to grant the Third-Party Releases by either opting out of them on such notice or by filing a timely written objection to confirmation. No Unimpaired party has filed an objection to confirmation, and only no Unimpaired parties elected to opt out of the Third-Party Releases.

73. Likewise, the Voting Classes (Classes 3 and 4) had ample opportunity to evaluate and opt out of the Third-Party Release by checking the box on their respective Ballots. Holders of Claims in the Voting Classes could also opt-out of the Third-Party Releases by simply rejecting the Plan or filing a timely written objection to the Third-Party Releases. As reflected in the Voting Report, 12 Holders of Claims in Class 4 voted to reject the Plan, an additional 12 Holders of Claims in Class 4 elected to opt out of the Third-Party Releases, and one Holder of Claims in Class 4 filed objections to the Plan.[78]

74. The fact that some parties have taken action to reject the Third-Party Releases demonstrates the effectiveness of the opt-out process.[79] Moreover, the Ballots, Confirmation Hearing Notice, and Deemed-to-Accept Notice provided clear notice of the Third-Party Release and indicated that parties in Class 3 and 4 and the Unimpaired parties would be deemed to have consented to the Third-Party Release if they did not make the election to opt-out. The Ballots and the Deemed-to-Accept Notice further provided instructions on how to make the opt-out election. Because the Third-Party Releases were conspicuously stated in multiple places, and parties were

---

[78] *See* Voting Report, Exhibit A.
[79] *See, e.g.*, *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 285 (Bankr. D. Del. 2016) (former Judge Carey stating that "Courts in this jurisdiction have upheld plan provisions that provide for third-party non-debtors to release other non-debtors upon the consent of the party affected" and holding that "[o]f the 390 ballots submitted, 191 creditors voted to opt out of the third-party release, indicating that creditors understood the instructions.")

158913310v4

notified about the consequences of failing to opt out of them, the Third-Party Release, has been consented to by each of the Releasing Parties, and therefore, is appropriate and should be approved.[80]

75.     Finally, all the Releasing Parties are receiving consideration under the Plan, so the recent cases declining to approve Third-Party Releases to fully impaired parties unless they affirmatively opt-in do not apply.[81]  The Third-Party Releases were prominently disclosed in the Plan and related documents and notices, only apply to parties who are receiving consideration under the Plan, and only apply to parties who did not opt out by filing an objection, rejecting the Plan, or checking the opt-out box; accordingly, they are full consensual and should be approved.

76.     In his objection, the United States Trustee argues that the minority view requiring parties to opt-in to third-party releases should control.  As set forth above, that position is a clear

---

[80] *See Alex and Ani, LLC*, Case No. 21-10918 (CTG) (Bankr. D. Del. Aug. 20, 2021), Hr.'g Tr. 9:21-25, 10:1-3 (Judge Goldblatt held that "as a general proposition, that parties in interest in a bankruptcy case are affected by what happens in a plan.  That if they have a problem with what's happening to them under the plan, it's incumbent on them to say so, and that so long as the disclosure is sufficiently obviously [*sic*] and conspicuous and the third party has the opportunity to opt-out, it's appropriate to treat their failure to do so as evidence of consent."); *In re Clovis Oncology, Inc.*, Case No. 22-11292 (JKS), Hr'g Tr. 12-16 (Bankr. D. Del. June 9, 2023) (Judge Stickles approving Third-Party Releases as consensual where creditors and interest holder had the ability to opt out of the plan release provision, finding that the notice contained conspicuous and prominent disclaimers and parties that fail to act in response to a judicial process are routinely bound by the results of the process); *In re Legacy FSRD*, Case No. 22-11051 (JKS), Hr'g Tr. 41:10-15 (Bankr. D. Del. Feb. 22, 2023) [Docket No. 332] (Judge Stickles approving the opt-out mechanism as consensual because the Class 4 and 5 ballots, the notice of unimpaired non-voting status, the combined hearing notice, and the publication notice "contained the release language and instructed how to opt out or object to the third-party releases.").

[81] *See, e.g.*, *In re AAC Holdings, Inc.*, Case No. 20-11648 (JTD) (Bankr. D. Del. Aug. 31, 2020) ("Why should the burden be on creditors and shareholders who are getting nothing to respond to say they want to opt out from the releases?"); *In re Fizzics Grp., Inc.*, Case No. 19-10545 (KBO) (insinuating that an opt-out process would not constitute consent for equity holders who received no recovery under the plan or claimholders who did <u>not</u> return a ballot); *In re Cloud Peak Energy, Inc.*, Case No. 19-11047 (KG) (Bankr. D. Del. Dec. 5, 2019) (Judge Gross denying Third-Party Releases imposed upon equity holders who failed to opt-out where they were to receive no distribution under the plan and did not have the opportunity to vote); *Emerge Energy*, 2019 WL 7634308, at *18 n.59 (citing *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015) and *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017)); *But see In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) (Bankr. D. Del. Jan. 17, 2020) (approving Third-Party Releases with "opt-out" mechanic over objection from the U.S. Trustee and SEC for non-responsive claimants and shareholders, noting that the parties that did not return a ballot should be bound because of how prominent the opioid case was and the release as it relates to the shareholders would be approved as essential).

minority, and one of the two judges that have adopted that position has approved third-party releases as consensual on an opt-out basis for parties that have returned ballots but failed to opt-out.  The Third-Party Releases here were prominently disclosed in the Plan, the Confirmation Hearing Notice, and the Ballots, and multiple parties elected to opt out of the Third-Party Releases, which demonstrates the effectiveness of the notice.  Accordingly, the Debtors submit that this Court should adopt the majority view and find that the proposed Third-Party Releases are permissible and appropriate.

77.     The United States Trustee's position that the opt-out mechanism cannot confer consent because the mail might not work is a red herring and contrary to the well-established mailbox rule.[82]  The mailbox rule provides that "if a letter "properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed . . . that it reached its destination at the regular time, and was received by the person to whom it was addressed."[83]  Although the mailbox rule is not absolute, it creates a rebuttable presumption that applies unless the recipient provides evidence sufficient to rebut the presumption that it received the letter.[84]  The presumption is a weak one when standard first class mail is involved; but the United States has not, and cannot, provide any evidence that any party did not receive the applicable ballot or notice of non-voting status.  This presumption is further reinforced by the carveout in the definition of Releasing Parties for creditors in voting classes whose solicitation packages are returned as undeliverable, which the United States Trustee concedes.[85]

---

[82] *See Lupyan v. Corinthian Colleges, Inc.*, 761 F.3d 314 (3d Cir. 2013).

[83] *Idi* at 319 (quoting *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884).

[84] *Id.*

[85] *See* UST Objection, at ¶27 n.4.

78.     Thus, as Judge Goldblatt recently acknowledged in *Arsenal*, the burden is on the creditor itself to show up and provide the required evidence.[86]   Accordingly, the Debtors are entitled to rely upon the mailbox rule for the presumption that parties received the opt-out notices once they were placed in the mail, and that the failure of those parties to opt-out was a consensual action.[87]

79.     The United States Trustee also argues that the holders of unclassified claims cannot have consented to the Third-Party Releases because they were not provided with a Non-Voting Status Notice and thus did not have an opportunity to opt out.  But, the Plan expressly contemplates that any creditor can opt out of the Third-Party Releases by objecting to them.  The unclassified creditors received the Confirmation Notice, which prominently described the Third-Party Releases and provided that any party that was opposed to them could decline to grant them by filing an objection.  Just like the failure to check a box opting out of the Third-Party Releases, a creditor's failure to opt out through objection results in that creditor's consent to the release.[88]  The holders of these claims are being paid in full under the Plan, as required by the Bankruptcy Code, so they have both the financial wherewithal and a strong rationale to preserve their claims against the Released Parties if they believed such claims existed.  The fact that these parties failed to object

---

[86] *In re Arsenal Intermediate Holdings, LLC*, 2023 Bankr. LEXIS 752, at *13 (Bankr. D. Del. Mar. 27, 2023). ([T]the functioning of the bankruptcy system generally depends on requiring parties that object to the relief proposed in a plan to come into court to raise their objection.").

[87] The United States Trustee's unsupported statement that creditors "would never imagine that their direct claims against non-debtors could be extinguished through the bankruptcy of these Debtors" was also expressly rejected by Judge Goldblatt in *Arsenal*.  *See id.* at *21 ("Otherwise put, in this jurisdiction, a creditor may not safely assume that a plan relates only to its dealings with the debtor and not third parties. The creditor that discards the plan and disclosure statement accordingly does run the risk that its rights against third parties — though only with respect to claims related to the debtor — may be prejudiced.").

[88] *In re Arsenal Intermediate Holdings, LLC*, 2023 Bankr. LEXIS 752, at *13 (Bankr. D. Del. Mar. 27, 2023). ([T]the functioning of the bankruptcy system generally depends on requiring parties that object to the relief proposed in a plan to come into court to raise their objection.").

158913310v4

to the Third-Party Releases and are willing to accept full payment from the Debtors gives rise to a strong implication that they consent to those releases. This conclusion is consistent with cases from this jurisdiction finding that third-party releases are binding on unimpaired creditors.[89]

### (iii) The Exculpation Provision Is Appropriate.

80. Exculpation provisions that apply only to estate fiduciaries, and are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[90] Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of a debtor's restructuring.[91]

81. Here, the Plan's definition of Exculpated Parties is narrowly tailored, to include only the (a) Debtors, (b) the Committee and each of its members, and (c) each of their respective Related Parties.[92]

82. The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.

---

[89] *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304–05 (Bankr. D. Del. 2013) (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (same).

[90] *See Wash. Mut.*, 442 B.R. at 350–51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

[91] *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (approving a similar exculpation provision as that provided for under the Plan); *Spansion*, 2010 WL 2905001, at *16 (same).

[92] *See* Plan, Art. I.1.53 (defining "Exculpated Party") and Pan, Art. I.1.25 (defining "Related Parties").

158913310v4

83.     Moreover, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan was negotiated at arm's length and in good faith.  Where such findings are made, parties who have been actively involved in such negotiations should be protected from collateral attack.

84.     Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency.  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Sale Transactions, the Combined Disclosure Statement and Plan and related documents in furtherance of the Confirmation Order.[93]  Accordingly, the Court's findings of good faith vis-à-vis these Chapter 11 Cases should also extend to the Exculpated Parties.

85.     Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful bankruptcy process and Plan, and likely would not have been so inclined to participate in the Plan process without the promise of exculpation.  Exculpation for

---

[93]  *See* Hr'g Tr. 58:18–19, *In re Verso Corp.*, No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) ("[T]he debtors did not do this alone; they did it with the help of many others.").

158913310v4

parties participating in the Plan process is appropriate where plan negotiations could not have

occurred without protection from liability.[94]

86.     Accordingly, under the circumstances, it is appropriate for the Court to approve the

exculpation provision, and to find that the Exculpated Parties have acted in good faith and in

compliance with the law.[95]

(iv)     The Injunction Provision Is Appropriate.

87.     The injunction provision set forth in Article XIV.14.1(d) of the Plan merely

implements the Plan's release and exculpation provisions, in part, by permanently enjoining all

entities from commencing or maintaining any action against, without limitation, the Debtors, the

Estates, and the Liquidating Trustee, the Exculpated Parties, and the Released Parties on account

of or in connection with or with respect to any such claims or interests released or subject to

exculpation.

88.     Thus, the injunction provision is a key provision of the Plan because it enforces the

release, discharge, and exculpation provisions that are centrally important to the Plan.  As such, to

the extent the Court finds that the exculpation and release provisions are appropriate, the Debtors

respectfully submit that the injunction provision must also be appropriate.  Moreover, this

injunction provision is narrowly tailored to achieve its purpose.

**B.     The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).**

89.     The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which

requires that the proponent of a plan comply with the applicable provisions of the Bankruptcy

---

[94] *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[95] *See PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision with willful misconduct and gross negligence exceptions); *In re Indianapolis Downs, LLC*, 486 B.R. at 306 (same).

Code.  The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[96]  As discussed below, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

### 1. The Debtors Complied with Section 1125 of the Bankruptcy Code.

90.  As discussed in Part I of this memorandum, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code.

### 2. The Debtors Complied with Section 1126 of the Bankruptcy Code.

91.  Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan. Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

(a)  The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .

(f)  Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.[97]

---

[96] *See, e.g.*, *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

[97] 11 U.S.C. § 1126(a), (f).

42

92. As set forth above, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Claims in Classes 3 and 4. The Debtors did not solicit votes from Holders of Claims in Classes 1 or 2 because Holders of Claims in these classes are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.

93. Finally, Holders of Claims in Class 5 (Intercompany Claims) and Class 6 (Interests) will receive no distribution on account of their Claims and Interests. Thus, pursuant to section 1126(g) of the Bankruptcy Code, Classes 5 and 6 are deemed to reject the Plan, and pursuant to section 1126(a) of the Bankruptcy Code, only Holders of Claims in Classes 3 and 4 were entitled to vote to accept or reject the Plan.[98]

94. With respect to the Voting Classes, (a) section 1126(c) of the Bankruptcy Code provides that a class accepts a plan where holders of claims holding at least two-third in amount and more than one-half in number of allowed claims in such class vote to accept such plan, and (b) section 1126(d) of the Bankruptcy Code provides that a class accepts a plan where holders of at least two-third in amount of allowed interests vote to accept such plan.

95. As described above, the Classes of Claims voting to accept the Plan did so in sufficient number and by sufficient amounts as required by the Bankruptcy Code.[99] Based upon the foregoing, the Debtors submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.

C. **The Plan Is Proposed in Good Faith (§ 1129(a)(3)).**

96. Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." Although the term "good faith"

---

[98] *See* Plan, Art. II.
[99] *See* Voting Report, Ex. A.

158913310v4

is not defined in the Bankruptcy Code, courts have determined that "[f]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives of the Bankruptcy Code."[100] Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[101] To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[102]

97. The Debtors negotiated, developed, and proposed the Plan in good faith and the Plan satisfies section 1129(a)(3) of the Bankruptcy Code. The Plan was negotiated with the Debtors' Prepetition Agent, the Prepetition Lenders, the DIP Lender, the Committee, and certain other key stakeholders. The Committee has been supportive of the relief proposed in the Plan. As provided in the Lazaruk Declaration, the Plan delivers significant value to creditors and Interest Holders.[103] The Plan was proposed in good faith and not by any means forbidden by law, has a high likelihood of success, and will achieve a result consistent with the objectives of the Bankruptcy Code.[104]

98. Throughout the negotiation of the Plan and these Chapter 11 Cases, the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of all constituents

---

[100]  *In re PWS Holding Corp.*, 228 F.3d at 242 (citation omitted).

[101]  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[102]  *See, e.g.*, *T-H New Orleans*, 116 F.3d at 802 (quoting *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *Century Glove*, 1993 WL 239489, at *4.

[103]  *See* Lazaruk Declaration ¶30.

[104]  *See id.*

158913310v4

with an even hand.  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.

> **D.** **The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

99.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent or by the debtor be subject to approval by the Court as reasonable. Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the court as to their reasonableness.[105]

100.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  The Debtors submit that payment of their professional claims is the only category of payments that fall within the ambit of section 1129(a)(4) of the Bankruptcy Code in these Chapter 11 Cases, and the Debtors may not pay their professional claims absent Court approval.  Further, all such professional claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code.[106]  Article VI of the Plan, moreover, provides that the Debtors' professionals shall file all final requests for payment of the professional claims no later than 30 days after the filing of the Effective Date Notice, thereby providing an adequate period of time for interested parties to review such professional claims.

> **E.** **The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

101.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized

---

[105] *See In re Lisanti Foods, Inc.*, 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").
[106] 11 U.S.C. §§ 328(a), 330(a)(1)(A).

158913310v4

debtors. Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider. Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[107] Section 1129(a)(5)(A)(ii) directs the Court to ensure that the post-confirmation governance of the reorganized debtors is in "good hands," which courts have interpreted to mean: (a) experience in the reorganized debtors' business and industry;[108] (b) experience in financial and management matters;[109] (c) that the debtors and creditors believe control of the entity by the proposed individuals will be beneficial;[110] and (d) does not "perpetuate[] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[111] The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[112]

102. The Debtors have complied with section 1129(a)(5) by providing the identity and other information relating to the Liquidating Trust and Liquidating Trustee in the Plan and the Plan Supplement. The Debtors believe that the appointment of Matthew Dundon as the Liquidating Trustee is "consistent with the interests of creditors and equity security holders and with public policy," and no party in interest has objected to the Plan on these grounds.

---

[107] 11 U.S.C. § 1129(a)(5)(A)(ii).

[108] *See In re Rusty Jones, Inc.*, 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that 1129(a)(5) not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149–50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied section 1129(a)(5)); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 760 (citing *Toy & Sports*, 37 B.R. at 149–50).

[109] *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Sherwood Square Assoc.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

[110] *See In re Apex Oil Co.*, 118 B.R. 683, 704–05 (Bankr. E.D. Mo. 1990).

[111] *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[112] 7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2018).

158913310v4

103.    Therefore, the requirements under section 1129(a)(5)(A) of the Bankruptcy Code are satisfied.

**F.    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

104.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

**G.    The Plan is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

105.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a value of not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes,[113] and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[114]

---

[113]  *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Century Glove*, 1993 WL 239489, at *7; *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[114]  *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) *aff'd*, 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the plan"); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'").

158913310v4

106.     The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.  As set forth in the Lazaruk Declaration,[115] the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis that estimates recoveries for members of each of Impaired Class, which is incorporated herein by reference.  As the Liquidation Analysis, attached as Exhibit C to the Plan, demonstrates, under the Plan, Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims will be paid in full in Cash or otherwise satisfied as provided in the Plan on the Effective Date or as soon thereafter as agreed or as such Claims are Allowed.  Thus, all Holders of such Claims are either in the same or better position in the Chapter 11 Cases than they would be in a chapter 7 liquidation.  Moreover, by virtue of the DIP Lenders' waiver of the right to repayment of the DIP Loan Claims and the Global Settlement, Holders of General Unsecured Claims have the possibility of a recovery, which is higher than the zero recovery they would receive in a chapter 7 liquidation.

107.     Substantially all of the assets of the Debtors' business were wound down through the Sale Transactions.  Although the Plan effects a liquidation of the Debtors' remaining assets and a chapter 7 liquidation would achieve the same general goal, liquidating the Debtors' Estates under the Plan provides the Beneficiaries of the Liquidating Trust with a larger or equal projected recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases.[116]

---

[115] *See* Lazaruk Declaration ¶28.
[116] *Id*. at ¶29.

158913310v4

108.     A chapter 7 liquidation could further delay payments being made to creditors in that, in addition to the reasons described above, Bankruptcy Rule 3002(c) provides that conversion of a chapter 11 case to chapter 7 will trigger a new bar date for filing claims against the Estates. Not only could a chapter 7 liquidation delay distribution to creditors, but it is possible that additional claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Estates, further reducing creditor recoveries.

109.     Accordingly, the Plan provides an equal or better potential recovery for Holders of Claims and Interests as compared to a liquidation under chapter 7 of the Bankruptcy Code. Therefore, the Plan satisfies the "best interests" of creditors test under section 1129(a)(7) of the Bankruptcy Code.

**H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

110.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. Class 3 (Prepetition Loan Claims) and Class 4 (General Unsecured Claims) voted to accept the Plan. Holders of Intercompany Claims (Class 5) and Interests (Class 6) are deemed to have rejected the Plan and, thus, were not entitled to vote. Consequently, while the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to Classes 5 and 6, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

**I.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

111.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments. In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—

administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims. Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the Petition Date, the present value of which equals the allowed amount of the claim.

112.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code. ***First***, Article VI of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim will receive cash equal to the amount of such Allowed Claim. ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of claims specified by 1129(a)(9)(B) are Impaired under the Plan and such Claims have been paid in the ordinary course. ***Third***, Article VI of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Priority Tax Claims shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (i) cash equal to the amount of such Allowed Priority Tax Claim; or (ii) such other treatment as to which Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing as permitted by

section 1129(a)(9)(C) of the Bankruptcy Code.  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

113.      Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.

114.      Here, Classes 3 and 4 are Impaired.  Class 3 and Class 4 have both voted to accept the Plan and are independent of any insiders' votes.  Thus, the Plan has been accepted by one voting class holding Impaired, non-insider claims with respect to each Debtor.  Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.      The Plan Is Feasible (§ 1129(a)(11)).**

115.      Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[117]  To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[118]  Rather, a debtor must provide only a

---

[117] 11 U.S.C. § 1129(a)(11).

[118] *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *W.R. Grace & Co.*, 475 B.R. at 115; *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

reasonable assurance of success.[119]  There is a relatively low threshold of proof necessary to satisfy

the feasibility requirement.[120]  As demonstrated below, the Plan is feasible within the meaning of

section 1129(a)(11) of the Bankruptcy Code.

116.    In determining standards of feasibility, courts have identified the following

probative factors:

a.    the adequacy of the capital structure;

b.    the earning power of the business;

c.    the economic conditions;

d.    the ability of management;

e.    the probability of the continuation of the same management; and

f.    any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[121]

117.    The Plan is feasible.  The completion of the Debtors' liquidation of the estate assets

other than litigation and no further financial reorganization of the Debtors is contemplated.  The

Debtors anticipate having sufficient funds and resources available as of the Effective Date to pay

Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Loan Claims and

expenses that are required to be paid on the Effective Date under the Plan and to fund the remaining

---

[119]  *Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. at 139; *W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation"); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[120]  *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility"); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D. N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

[121]  *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010).

158913310v4

wind-down and distribution functions of the post-effective date Debtors and Liquidating Trustee under the Plan. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

**L.      All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

118.   Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan." Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses. The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XVI.16.6 of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid for each quarter (including any fraction thereof) until these chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

**M.      All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)).**

119.   Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continuation of retiree benefits at levels established by agreement or by court order pursuant to section 1114 of the Bankruptcy Code for the duration of the period that the debtor has obligated itself to provide such benefits. The Debtors do not have any retiree benefit plans within the meaning of section 1129(a)(13) of the Bankruptcy Code.

**N.      Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan.**

120.   Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply. Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code. Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply. Finally, none of

53

the Debtors is a nonprofit corporation, and, therefore, section 1129(a)(16) of the Bankruptcy Code, which relates only to nonprofit corporations, is not applicable in these Chapter 11 Cases.

### O. The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.

121.  Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied. To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[122]

122.  The Plan satisfies section 1129(b) of the Bankruptcy Code. As noted above, the two Impaired Classes entitled to vote (Classes 3 and 4) overwhelmingly voted to accept the Plan. Classes 5 and 6 are fully impaired, non-voting Classes that are deemed to reject the Plan. Notwithstanding the fact that the Classes 5 and 6 are deemed to have rejected the Plan, the Plan is confirmable.

### 1. The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)).

123.  Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[123] In general, courts have held that a plan unfairly

---

[122]  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[123]  *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am. Nat. Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that

discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[124] A threshold inquiry to assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[125]

124. Here, the Plan's treatment of non-accepting impaired class 4 is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale. Claims in Classes 5 and 6 are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.

125. Thus, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code and the Plan may be confirmed notwithstanding the deemed rejection by Classes 5 and 6.

---

"the limits of fairness in this context have not been established."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[124] *See In re Coram Healthcare Corp.*, 315 B.R. at 349 (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *Ambanc La Mesa*, 115 F.3d at 656–57 (same); *Aztec Co.*, 107 B.R. at 589–91 (stating that plan which preserved assets for insiders at the expense of other creditors unfairly discriminated); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

[125] *See In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. at 121).

## 2. The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).

126. A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[126] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[127] Under the Plan, no holder of a Claim or Interest junior to an Impaired Class of Claims or Interests will receive any recovery under the Plan on account of such Claim or Interest. Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

## P. The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(c)–(e)).

127. The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed plan of liquidation.

128. Section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[128] The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[129] Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

---

[126] *See 203 N. LaSalle St. P'ship*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

[127] *See id.*

[128] *See* 11 U.S.C. § 1129(d).

[129] See Lazaruk Declaration ¶42.

129. Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' Chapter 11 Cases is a "small business case."[130] Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

## Q. Modifications to the Plan.

130. Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan. Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder. Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[131]

131. The Debtors have filed their Second Amended Plan, which made technical clarifications and resolves certain formal and informal comments to the First Amended Plan by parties in interest. The modifications are immaterial and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. This Court has stated that further disclosure and

---

[130] *See* 11 U.S.C. § 1129(e). A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,490,925[] (excluding debt owed to 1 or more affiliates or insiders)." 11 U.S.C. § 101(51D)(B).

[131] *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

158913310v4

resolicitation of votes on a modified plan is only required when the modification materially *and* adversely affects parties who previously voted for the plan. *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *32 (Bankr. D. Del. May 13, 2010); *see also In re Federal–Mogul Global Inc.,* 2007 Bankr.LEXIS 3940, *113 (Bankr.D.Del.2007) (additional disclosure under section 1125 is not required where plan "modifications do not materially and adversely affect or change the treatment of any Claim against or Equity Interest in any Debtor"); *Beal Bank, S.S.B. v. Jack's Marine, Inc., (In re Beal Bank, S.S.B.),* 201 B.R. 376, 380 n. 4 (E.D.Pa.1996) (further disclosure and solicitation not required under section 1127(b) and (c) where modifications to the plan were immaterial); *In re Century Glove, Inc.,* 1993 U.S. Dist. LEXIS 2286, at *12 (D.Del. Feb. 10, 1993) (upholding bankruptcy court's finding that section 1127 did not require further disclosure and resolicitation of votes on plan modification that altered the treatment to only one creditor when "the modification at issue did not materially and adversely impact any creditor that voted for the Plan"); *In re Am. Solar King Corp.,* 90 B.R. 808, 823–24 (Bankr.W.D.Tex.1988) ( "Further disclosure occurs only when and to the extent that the debtor intends to solicit votes from previously dissenting creditors or when the modification materially and adversely impacts parties who previously voted for the plan.").

132.     Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

### R.     Good Cause Exists to Waive the Stay of the Confirmation Order.

133.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory

contract or unexpired lease under section 365(f) of the Bankruptcy Code. Each rule also permits modification of the imposed stay upon court order.

134. The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.[132] As noted above, these Chapter 11 Cases and the related Plan transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information. Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.

135. For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions related to the creating of the Liquidating Trust so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date. Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## III. The Unresolved Objections Should Be Overruled.

136. The Debtors received three formal objections and one informal objection to Confirmation of the Plan and are working with the objecting parties to resolve, or at least narrow the open issues in advance of the Confirmation Hearing.

---

[132] *See, e.g.*, *In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del, Feb. 20, 2015) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re GSE Envtl., Inc.*, No. 13-11126 (MFW) (Bankr. D. Del. July 25, 2014) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same); *In re Gatehouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Geokinetics Inc.*, No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) (same).

158913310v4

## A. The U.S. Trustee's Objection [Docket No. 474].

137. The U.S. Trustee's objection focuses primarily on the Plan's third-party release provisions. The Debtors are hopeful they will resolve U.S. Trustee's objection in advance of confirmation but, to the extent they are unable to, these provisions are reasonable, appropriate, consistent with precedent in this jurisdiction, and should be approved.

138. The U.S. Trustee generally objects to the Third-Party Release provision in the Plan. As set forth above, the Debtors contend the Third-Party Releases are appropriate under the specific facts and circumstances of these Chapter 11 Cases and should be approved. The Debtors assert the provisions related to Third-Party Releases in the Plan are reasonable and appropriate under the specific facts and circumstances of these Chapter 11 Cases as described above and therefore, the provision of those releases is consistent with precedent in this jurisdiction and should be approved.

## B. Dakota Plains Objection [Docket No. 470].

139. On September 27, 2023, Dakota Plains Feed and Grain, LLC ("Dakota Plains") filed its objection to the Plan. In its objection, Dakota Plains asserts that it is the only general unsecured creditor of Debtor Canwin Farms, LLC ("Canwin") and that although the Liquidation Analysis shows Canwin holding $357,000 of unencumbered cash, the Plan effectively substantively consolidates the Debtors by estimating that general unsecured creditors of Canwin will receive $0 on their claims. Thus, Dakota Plains argues that the Plan fails to comply with section 1129(a)(7) of the Bankruptcy Code by failing to provide Dakota Plains with value at least equal to what it would have received in a chapter 7 liquidation.

140. While the Debtors disagree with Dakota Plains' characterization of the Plan as effectively substantively consolidating the Debtors, the Debtors assert that Dakota Plains should not be entitled to a disproportionate share of unsecured creditor recoveries in any event. The Global Settlement was negotiated and implemented for the purpose of effecting a common result, and

60

maximizing value, for all creditors.  If the Prepetition Secured Parties had not agreed to waive their entitlement to Class 4 distributions pursuant to the Global Settlement, the unsecured claims of the Prepetition Secured Parties would have swamped the Canwin unsecured creditor pool, and Dakota Plains' recovery, if any, would have been even more minimal. Accordingly, Dakota Plains is certainly not receiving less value than it would receive in a chapter 7 liquidation.

141.     The Debtors acknowledge and agree that Dakota Plains shall be entitled to any appropriate distribution under the Plan as an unsecured creditor of Canwin, subject in all respects to the rights of the Debtors and/or the Liquidating Trustee or other party in interest, as applicable, to object to any aspect of Dakota Plains' claim.

### C.     The Fire Group's Objection [Docket No. 478].

142.     On September 28, 2023, The Fire Group, Inc. ("Fire Group") filed its limited objection to the Plan. The Fire Group assets that it is a secured creditor of the Debtors by virtue of a mechanic's lien filing and objects to the Plan to the extent it attempts to reclassify its claim as unsecured or valued at $0 for purposes of distribution.

143.     The Debtors and Fire Group have resolved the Fire Group's limited objection. Nothing in the Plan or this Order shall reclassify, or be deemed to reclassify, The Fire Group Inc.'s asserted secured claim [Claim No. 92] as a Class 4 General Unsecured Claim; provided, however, that for the avoidance of doubt, such claim shall remain subject to the claim objection procedures and reservations of rights set forth in the Plan, including with respect to the classification of claims.

### D.     Informal Comments from the Texas Comptroller.

144.     The Debtors received informal comments regarding the Plan from the Texas Comptroller of Public Accounts, Revenue Accounting Division. The Debtors are agreeable to the language proposed by the Texas Comptroller and will include it in the  proposed Confirmation Order.

145. The Debtors continue endeavoring to resolve any remaining objections to the Plan in advance of the Confirmation Hearing.

## **CONCLUSION**

146. For all of the reasons set forth herein, in the record in these proceedings, and in the Lazaruk Declaration, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling any remaining objections, and granting such other and further relief as is just and proper.

Dated: October 2, 2023
    Wilmington, Delaware

Jerry L. Hall (admitted *pro hac vice*)
Michael E. Comerford (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
50 Rockefeller Plaza
New York, NY 10020
Telephone: (212) 940-8800
Facsimile: (212) 940-8776
Email: jerry.hall@katten.com
        michael.comerford@katten.com

Allison E. Yager (admitted *pro hac vice*)
Kenneth N. Hebeisen (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 902-1061
Email: allison.yager@katten.com
        ken.hebeisen@katten.com

Respectfully submitted,

*/s/ L. Katherine Good*
Jeremy W. Ryan (No. 4057)
L. Katherine Good (No. 5101)
R. Stephen McNeill (No. 5210)
Maria Kotsiras (No. 6840)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: jryan@potteranderson.com
        kgood@potteranderson.com
        rmcneill@potteranderson.com
        mkotsiras@potteranderson.com

Yelena E. Archiyan (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
2121 N. Pearl Street, Suite 1100
Dallas, TX 75201
Telephone: (214) 765-3600
Facsimile: (214) 765-3602
Email: yelena.archiyan@katten.com

*Counsel to Debtors*
*and Debtors in Possession*

158913310v4