1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                          :

5                                     :    Chapter 11

6    TRITEK INTERNATIONAL INC.,       :    Case No. 23-10520 (TMH)

7    et al.,                          :    (Jointly Administered)

8            Debtors.                 :

9    _____:

10

11                               United States Bankruptcy Court

12                               824 North Market Street

13                               Wilmington, Delaware

14                               October 5, 2023

15                               11:03 a.m. - 1:20 p.m.

16

17

18

19

20

21   B E F O R E :

22   HON THOMAS M. HORAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  JERMAINE COOPER

1    HEARING re Debtors' Objection to the Proof of Claim of

2    Headwaters Development, LLC [Docket No. 365 – filed August

3    17, 2023]

4

5    HEARING re Motion of Headwaters Development, LLC Pursuant to

6    Bankruptcy Rule 3018(a) for Estimation and Temporary

7    Allowance of Claims for Purposes of Voting to Accept or

8    Reject the Plan [Docket No. 450– filed September 13, 2023]

9

10   HEARING re Motion of Debtors for Entry of an Order (I)

11   Approving the Combined Disclosure Statement and Joint

12   Chapter 11 Plan on an Interim Basis for Solicitation

13   Purposes Only; (II) Establishing the Solicitation and

14   Tabulation Procedures; (III) Approving the Form of Ballots

15   and Solicitation Materials; (IV) Establishing the Plan

16   Confirmation Schedule; and (V) Granting Related Relief

17   [Docket No. 297 – filed July 20, 2023]

18

19   HEARING re Debtors' Motion for Entry of an Order Authorizing

20   the Debtors to Exceed the Page Limit Requirement for the

21   Debtors' Memorandum of Law in Support of an Order Confirming

22   the Second Amended Joint Plan of Debtors Under Chapter 11 of

23   the Bankruptcy Code [Docket No. 483 – filed October 2, 2023]

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    POTTER ANDERSON & CORROON LLP

4        Attorneys for the Debtors

5

6    BY:  MARIA KOTSIRAS

7        L. KATHERINE GOOD

8

9    KATTEN MUCHIN ROSENMAN

10        Attorneys for the Debtors

11

12   BY:  JERRY HALL

13        MICHAEL COMERFORD

14        ALLISON YAGER

15

16   UNITED STATES DEPARTMENT OF JUSTICE

17        Attorneys for the U.S. Trustee

18

19   BY:  JULIET M. SARKESSIAN

20

21   SAUL EWING LLP

22        Attorneys for Committee

23

24   BY:  LUCIAN BORDERS MURLEY

25

1    DECHERT LLP

2        Attorneys for Committee

3

4    BY:  DOUGLAS MANNAL

5

6    STINSON LLP

7        Attorneys for Compeer Financial

8

9    BY:  ANDREW J. GLASNOVICH

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 P R O C E E D I N G S

2     CLERK: All rise.

3     THE COURT: Please be seated. Hello, Ms. Good.

4     MS. GOOD: Good morning, Your Honor. Katie Good,

5 Potter Anderson & Corroon, on behalf of Tritek International

6 and its affiliated debtors and debtors in possession. We

7 are here today with one item going forward on our agenda,

8 Item Number 3, Confirmation of the Debtor's Combined

9 Disclosure Statement and Plan of Liquidation.

10     I'm joined in the courtroom today by my co-counsel

11 Jerry Hall, Michael Comerford and Allison Yager of Katten

12 Muchin & Rosenman, our witness, Brian Koluch,

13 PricewaterhouseCoopers, and my colleague Maria Kotsiras.

14     We know Your Honor was on the bench all day

15 yesterday and into the evening. So, without stealing too

16 much of Mr. Hall's thunder, I am pleased to report that we

17 have narrowed the issues significantly -- very significantly

18 from the last time we were before Your Honor on the

19 disclosure statement hearing in August, and even more since

20 the filings that we made on Monday. I believe we really

21 only have one remaining contested item.

22     So, with that, I'll turn the podium over to Mr.

23 Hall to give the Court a further update on the settlements

24 that we've reached, the remaining open issues and walk

25 through the initial presentation.

1           THE COURT:  Great.  Thank you, Ms. Good.  Mr.

2    Hall, good to see you.  Good morning.

3           MR. HALL:  Good morning, Your Honor.  Jerry Hall,

4    Katten Muchin Rosenman, for the debtors.  As Ms. Good said,

5    we're here today seeking confirmation of the plan and final

6    approval of the disclosure statement, for which the Court

7    gave provisional approval back in August.  And also, as Ms.

8    Good said, we are pleased to be here seeking confirmation of

9    a nearly fully consensual -- there is one outstanding issue

10   that will be argued in actions -- Good will argue it for the

11   debtors, and that is the third party release issue, which I

12   mentioned Your Honor anticipated.  But every other matter

13   outstanding, all objections have been resolved.  I'm just

14   going to walk very quickly through that.

15          We're, again, super-happy that this happened.  We

16   basically have two significant settlements to report in

17   addition to the resolution of sort of one-off objections.

18   The two significant settlements, one of which already

19   happened, was the settlement that Your Honor approved back

20   in August between the committee, Compeer and the debtors,

21   Compeer being the secured lender in this case.  That sort of

22   set up the foundation for us to move forward to a plan.

23          The second settlement which really has come

24   together fully and finally in the past, say, ten minutes,

25   but as a practical matter came together last Friday, and

1    that settlement has sort of three interdependent components.

2    The first is the committee is now supporting the plan.  They

3    have not filed an objection and they are not going to

4    object.  They are actually supporting the plan including the

5    debtor's release of claims against the directors and

6    officers.  In exchange, the committee is going to receive

7    $500,000 for the benefit of general unsecured creditors and

8    a professional fee concession, all of which is already

9    reflected in the plan.  The professional fee concession is

10   among Dechert, Katten and PWC.  And this is just a way of

11   ensuring that we remain under the professional fee cap,

12   which was part of the Compeer creditor committee stipulation

13   back in August.

14           Additionally, the committee's going to be the

15   beneficiary of the Strobel settlement, which, when the time

16   comes, Your Honor, I'm going to ask to introduce the Strobel

17   settlement into evidence along with the declarations that we

18   filed thus far.  And that settlement creates significant

19   value to the estate and it involves contributions from non-

20   debtors, specifically, High Life, which is sort of a

21   grandparent of the debtors, is going to be paying Strobel

22   approximately $730,000.  And just to be clear, I'm

23   approximating.  I don't want my words to be misinterpreted.

24   The documents will govern.

25           But Strobel will also be pursuing a PASA claim,

1   which they had previously filed.  In exchange, Strobel is

2   supporting the plan by changing its vote from reject to

3   accept.  They are opting into, if you will, the third-party

4   releases.  And perhaps most significantly for the committee

5   deal that we struck, they've agreed to waive distribution

6   participation.  And because of the collective deal of all

7   the parties, we estimate that Strobel's waiver will be worth

8   something in the neighborhood of $850,000, maybe $900,000,

9   in actual distributed funds to the remaining creditors.

10         And then, finally, the debtors and Headwaters had

11   been engaged in some motions and objections practice.  We

12   have resolved all of that.  The most significant upside to

13   that result is probably avoiding spending substantial

14   professional fees litigating, and taking evidence, and

15   discovery and what have you over those issues.

16         And so, again, we're super-pleased.  This is a

17   great result for the case.  That's not to say that people

18   aren't disappointed.  This is by no means a full-pay case.

19   but that being said, 11-14 percent, which is what we're

20   projecting for general unsecured creditors is a far cry

21   better than the outcomes that we would've faced if we had to

22   finish our discovery with the committee, pursue a contested

23   plan -- assuming that would even get confirmed, the

24   distributions would be much lower.  And, for what it's

25   worth, obviously, in our view, much better than a

1    liquidation, which the liquidation analysis that we've

2    already filed as a claim supplement supports.

3            So, again, largely uncontested relief.  I want to

4    thank the lenders, and the committee, and everyone else that

5    was involved in getting us here.  It was a lot of

6    creativity, very constructive engagements even when people

7    were at their most stressed and maybe short tethers.

8            As we noted in the agenda, we did receive a formal

9    objection from the United States Trustee's Office.  That

10   remains unresolved as to the one piece, which is the third

11   party it releases.  It is resolved as to exculpation and the

12   debtors, the estate releases.  We also received a formal

13   objection from creditor Dakota Plains.  That is also

14   resolved.  They will not be pressing that objection.

15           We received an objection from the Fire Group,

16   which we resolved by adding language to the plan, which is

17   already on file.  And then we also received informal

18   comments from the Texas controller and we incorporated

19   language into the plan.  And my colleague, Mr. Comerford,

20   will walk through the plan and the confirmation order,

21   specifically the changes, to bring Your Honor more fully up

22   to speed.  I'm just giving you the overview.  All these

23   modifications were of negligible impact on other parties.

24   Specifically, no financial -- direct financial impact on

25   creditors.

1            So, with that, Your Honor, I'd like to move

2    admission of a couple of declarations, five of them exactly,

3    and the Strobel settlement document, which was signed

4    yesterday, I believe.

5            THE COURT:  Okay.

6            MR. HALL:  So, as to the declarations, we have two

7    declarations of Brian Koluch of PWC and those were filed at

8    Dockets 486 and 495, and those were in support of the plan.

9            THE COURT:  Okay, you're moving those in?  Okay.

10            MR. HALL:  Please, Your Honor.

11            THE COURT:  Okay, okay.  Does anybody objection to

12    the admission of Mr. Koluch's declarations?  Okay, I hear no

13    response.  Does anybody wish to cross-examine Mr. Koluch?

14            MS. SARKESSIAN:  Your Honor, if I may just make a

15    statement?

16            THE COURT:  Yes, of course.  Good morning, Ms.

17    Sarkessian.

18            MS. SARKESSIAN:  Good morning, Your Honor.  How

19    are you this morning?

20            THE COURT:  Very well.  Thank you.

21            MS. SARKESSIAN:  I think this is the first time

22    I'm before Your Honor.  It's a pleasure.

23            THE COURT:  It is.  It's good to see you.

24            MS. SARKESSIAN:  It may be the last because I'm

25    retiring soon.

1          THE COURT:  So I hear.

2          MS. SARKESSIAN:  And hopefully we'll make this a

3   good one.  I rise just to state that we have resolved the

4   issue of the debtor releases, which is what I view these

5   declarations to be -- it's not the only thing, of course,

6   but as far as the items that the U.S. Trustee objected to.

7   There's more towards the debtor releases.  I understand from

8   debtor's counsel that if Your Honor determines that the

9   third party releases in this case are not consensual, that

10  they are not going to argue that they meet the requirements

11  of continental and can be approved in that manner.

12          And I bring that up because if they were going to

13  pursue that, there may be some information in these

14  declarations that would be relevant to that issue.  But I

15  don't believe there's anything in the declarations that are

16  relevant to whether or not these releases are consensual.

17  It's really a legal argument.  So, for that reason I'm not -

18  - won't be cross-examining the witness.  But if for some

19  reason the debtors change their mind and they're going to

20  pursue non-consensual third-party releases, then of course I

21  would reserve my right to cross-examine the witness at that

22  time.

23          THE COURT:  Understood.  And that's just fine.  I

24  appreciate that.

25          MS. SARKESSIAN:  Okay, thank you, Your Honor.

1          THE COURT:  Okay, well, with that, Mr. Koluch's

2    declarations are admitted.

3          (Mr. Koluch's Declarations Admitted into Evidence)

4          MR. HALL:  Thank you, Your Honor.  Mr. Mannal will

5    tell you I change my mind all the time but not on this.  We

6    are not going to be coming back to make the argument that

7    Ms. Sarkessian raised.

8          THE COURT:  Okay.

9          MR. HALL:  I'd also like to introduce Mr.

10   Lazaruk's declaration.  That's at Docket Number 480 also in

11   support of the plan.

12          THE COURT:  Does anybody object to the admission

13   of Mr. Lazaruk's declaration?

14          MR. HALL:  It'll be the same circumstances for the

15   U.S. Trustee, I believe, and we will acknowledge we're not

16   going to be arguing that.  We satisfy nonconsensual

17   standards.

18          MS. SARKESSIAN:  That actually wasn't a point.

19          MR. HALL:  Oh, sorry, sorry.  That's right.  He is

20   not present today to be cross-examined.  He's actually up in

21   Winnipeg.  But I understand that nobody intends to cross-

22   examine him so hopefully that won't be an issue.

23          THE COURT:  Okay.  I'll ask the question again.

24   Does anybody object to the admission of Mr. Lazaruk's

25   declaration?  Okay, I hear no response.  It is admitted.

1              (Mr. Lazaruk's Declaration Admitted into Evidence)

2              THE COURT:  Does anybody wish to cross-examine Mr.

3       Lazaruk?  Okay.  No response, which is good news.

4              MR. HALL:  And then, lastly, Your Honor, we have

5       John Burlacu -- and I may be mispronouncing the last name --

6       of Donlin Recano.  He has two declarations, one of which was

7       the original for voting tabulation purposes and the other

8       was to disclose nonvoting parties who also opted out of the

9       releases.  That was at the request of the U.S. Trustee.

10      Those are at Docket Numbers 479 and 490.

11             THE COURT:  Okay.  Does anybody object to the

12      admission of Mr. Burlacu's declarations?  Okay, I hear no

13      response.  The declarations are admitted.

14             (Mr. Burlacu's Declarations Admitted into

15      Evidence)

16             THE COURT:  Does anybody wish to cross-examine Mr.

17      Burlacu?  Okay, there's no response.

18             MR. HALL:  Okay.  And then, lastly, from an

19      evidentiary standpoint, Your Honor, I have copies of the

20      settlement that the debtors and others reached with Strobel

21      parties. And if I may, I will bring one up for the law clerk

22      and for yourself and then distribute to whoever else wants

23      them.

24             THE COURT:  Okay.  My law clerk is actually

25      sitting in the gallery so I'm just going to ask him to go up

1    to the rail and grab a copy of that for me, please.

2              MR. HALL:  Thank you.  And, Your Honor, if I may

3    approach?

4              THE COURT:  Yes, please do.

5              MR. HALL:  And, Your Honor, relevant for our

6    purposes today, or at least primarily relevant, are

7    Paragraphs 9 and 10 on Page 7 of the Strobel document. But

8    in any event, Your Honor, I'd like to offer this into

9    admission.  It is a piece -- it is, you know, the formal

10   piece of support for the plan overall and the settlement

11   that we reached with the committee that enables us to go

12   forward on this basis.  And there are a couple left over if

13   anybody wants.  But these reflect that the Strobel parties

14   are agreeing to support the plan, change their vote to yes

15   and waive distribution in the Class 4 General Unsecured

16   Class.

17             THE COURT:  Okay.  Does anybody object to the

18   admission of the document entitled Cash Settlement Agreement

19   and Mutual Global Release Among the Strobel Parties, the

20   High Life Parties and Patrick (indiscernible)?  Okay, I hear

21   no response, it is admitted.

22             (Cash Settlement Agreement Admitted into Evidence)

23             MR. HALL:  Thank you, Your Honor.  I think to

24   round out the record, Your Honor, we filed a plan

25   supplement, two iterations, one at Docket Number 458 and one

1    at Docket Number 481.  This provides, among other things,

2    the liquidating trust agreement.  It designates Matthew

3    Dundin as liquidating trustee and sets forth retained causes

4    of action and the wind-down budget.  The liquidation

5    analysis that we included with the plan shows that the plan

6    satisfies the Best Interest of Creditors Test.  It's also

7    supported by Mr. Koluch's two declarations.  The global

8    settlement, also described in the Koluch declaration, and

9    the fourth amended plan provides the funding necessary to

10   satisfy funding and feasibility under the plan.  There would

11   be no obligation for the level of funding provided in the

12   plan if such claims were asserted in connection with a

13   Chapter 7 liquidation.

14           As reflected in the voting declaration, now

15   submitted into evidence, Donlin Recano sent solicitation

16   packages and ballots in accordance with the Court's order.

17   Pursuant to the Court's order, the voting deadline and

18   deadline to object were set at September 28th.  And as Your

19   Honor has probably seen in the voting declaration, the

20   impaired classes that were entitled to vote, which are

21   Classes 3 and 4, overwhelmingly voted to accept the plan.

22           And I'm happy to walk through, Your Honor, if you

23   would like, the 1123-1129 factors.  But given that there's

24   no issue concerning them, no objections related to them and

25   the briefing and declarations fully and obviously support

1   them, I would propose to the Court that I not do that and

2   spare everybody, including the Court, the time it would take

3   to do so.

4           THE COURT:  Yeah, I think those issues were

5   adequately briefed. I just do have one question for you.

6           MR. HALL:  Yes, Your Honor?

7           THE COURT:  The Dakota Plains objection did raise

8   the 1129(a)(7) issue but you say that that's been resolved?

9           MR. HALL:  That is correct, Your Honor.

10          THE COURT:  Are you able to share what the nature

11  of the resolution was?

12          MR. HALL:  Oh, absolutely, Your Honor.  They are

13  standing down from the objection.  There was no

14  accommodation.  Basically, we explained to them what our

15  argument would be and that, in our view -- and I think Mr.

16  Comerford did this persuasively -- that they would actually

17  be worse off if they were to press the objection and

18  prevail.  So, they took that back internally and caucused

19  and determined that they agreed with it and are, for that

20  reason, standing down.

21          THE COURT:  Fine.  That's great.  Thank you.  So,

22  yes, no need to go through argument on those two Code

23  sections.

24          MR. HALL:  Perfect, Your Honor.  Then with that,

25  what I would say is we have maybe two sort of sections left,

1    neither of which is going to be.  The first is the argument

2    on third party releases.  And what I would propose is allow

3    the U.S. Trustee to argue first since the issues have

4    already been briefed and the Court understands these issues

5    very, very well.  So, instead of having three rounds of

6    argument, just two.  The U.S. Trustee can have the first

7    word, we'll take the last.  And then after that, Mr.

8    Comerford will walk the Court through both the plan and the

9    confirmation order so that Your Honor has all of the current

10   changes, some of which are not reflected on the docket

11   already.

12            THE COURT:  Okay.  Thank you, Mr.  Hall.

13            MR. HALL:  Thank you, Your Honor.

14            MS. SARKESSIAN:  Again, Your Honor, for the

15   record, Juliet Sarkessian on behalf of the U.S. Trustee.

16   Your Honor, just so you know, this is water, not coffee.  I

17   say that because I think it would be rude for me to be

18   drinking coffee up here but I do need to occasionally sip

19   some water.

20            So, Your Honor, so there were three items.  There

21   are a few provisions in the plan that the U.S. Trustee had

22   objected to:  Third party releases, which is releases by

23   non-debtors in favor of other non-debtors; there's the

24   debtor releases and the exculpations.  The debtors have made

25   changes to the plan that resolve our issue with respect to

1   the debtor releases and the same with respect to

2   exculpation.  There's one additional small change -- cleanup

3   change, I guess, that needs to be made.  I understand that

4   will be done before it's submitted.

5           MR. HALL:  It will, Your Honor.

6           THE COURT:  Okay.

7           MS. SARKESSIAN:  So, those two issues are resolved

8   and we are left with the third party release issue.  So, the

9   plan extinguishes direct claims that creditors and

10  administrative claimants hold against non-debtor parties

11  without the affirmative consent of the party supposedly

12  giving the release.  These are not derivative claims.  Any

13  claims that a creditor holds against non-debtor parties that

14  are derivative of the debtors are already being released

15  through the debtor release provision.  So, you don't need a

16  third party release for that.  The third party release

17  really covers -- I mean, yes, it also covers derivative

18  claims but that's already being separately released by the

19  debtors.  So, it's really only relevant to direct claims

20  they may have against the numerous non-debtor parties.

21          And the released parties here are -- it does

22  include the debtors and the estates.  That's one for the

23  released parties.  The prepetition agent and the prepetition

24  lenders, the DIP lender, the committee and each of its

25  members, the liquidating trustee, who is not yet appointed,

1   and then all of the related parties of all of those parties

2   that I just mentioned.

3              And I think it's worth noting that the claims

4   against the -- the claims that any creditors would hold

5   against the prepetition lenders are governed by the DIP

6   financing order.  And somebody can correct me if I'm wrong

7   but I believe the period to object to those claims has

8   expired.  So, again, I don't know that any further release

9   is needed in that regard.

10             With respect to the liquidating trustee being a

11  released party, the release only goes through the effective

12  date of the plan.  So, they're not even appointed until the

13  effective date, so that release to me seems to be

14  meaningless.  With respect to the release of the committee,

15  and their members, and their professionals, well, they're

16  all getting exculpations so -- in which the Third Circuit in

17  PWS said that's what they're entitled to.  And then, of

18  course, you have related parties that would include, for

19  example, the professionals of the debtors who, again, are

20  already entitled to exculpation and that is the only thing

21  they're entitled to.

22             A release of claims is a significant action.

23  Outside of the world of bankruptcy, releases are almost

24  always documented in writing that is signed by the person or

25  entity that's giving the release.  Releases are not implied

1  by silence in response to something sent by mail that may or

2  may not have reached the destination, may or may not have

3  gotten to them on time, for which the recipient may or may

4  not have understood.  And as far as understanding the

5  releases, Your Honor, if you look at the third party

6  release, it's comprised of two paragraphs:  Each paragraph

7  is one very long sentence.  The first paragraph is one

8  sentence that's 17 lines and the second paragraph is one

9  sentence that's 12 lines.  It is dense legalese even for

10  lawyers to read through it, even for bankruptcy lawyers to

11  read through it.

12          And then embedded in those provisions, those two

13  paragraphs, are numerous defined terms including the defined

14  term of releasing party, which is actually quite

15  complicated, and the defined term of released parties.  And

16  then those defined terms, in turn, embed other defined terms

17  such as related parties.  So, it's sort of a set of

18  interlocking boxes that, you know -- frankly, if you have a

19  creditor who is an individual person, who's not a lawyer, or

20  it's a small business, understanding these complicated

21  provisions would not be easy and they may not have the means

22  to pay a lawyer to read this and explain it to them.

23          And while creditors I think -- as a general

24  proposition, people in the United States understand that

25  hey, if a company files for bankruptcy or a person files for

1　　bankruptcy and they owe you money, you're going to get maybe

2　　something less than what you're owed at some point in time

3　　and then after that, you're not going to be able to sue that

4　　person or entity anymore because they're going to get a

5　　discharge or some other similar relief through the

6　　bankruptcy.

7　　　　　　What I think most people would never think of is

8　　that through that bankruptcy process their direct claims

9　　against others that have not filed for bankruptcy are

10　　somehow going to be released.  That is not what people --

11　　you know, when you think about bankruptcy, that's not the

12　　purpose of bankruptcy, right?  The purpose of bankruptcy is

13　　for the debtor to get a discharge.  And I mean, this is

14　　assuming you understand anything about bankruptcy at all.

15　　　　　　So, the idea that if a ballot does not get

16　　returned -- you know, a ballot is sent out, a solicitation

17　　is sent out in a package to a general unsecured creditor,

18　　it's not returned, that that somehow means that they have

19　　consented.  That they got the package, that they got it

20　　timely, that they read it, that they understood it or they

21　　had the means to pay a lawyer to explain it to them and they

22　　therefore could say, oh, you know what?  I'm either going to

23　　vote or not vote and I'm going to check the opt out box and

24　　send it back and make sure that, you know, I send it by

25　　FedEx so that it gets to the claims agent (indiscernible)

1    with no chance that on the way back in the mail it somehow

2    gets delayed.  You know, that is not possibly the reality

3    for many people.

4              Now, if you look at the balloting report, the

5    balloting agent received 34 ballots from the general

6    unsecured creditors.  I understand from committee counsel

7    that there are approximately 400 general unsecured creditors

8    in these cases.  Now, the balloting report did show that 12

9    of these solicitation packages came back as undeliverable.

10   So, if you subtract that out and you subtract out the 34

11   ballots that received it, that means there's 354 general

12   unsecured creditors that did not send in a ballot.  And

13   under the opt out process that's being proposed in the plan,

14   they have all consented -- they were deemed to consent to

15   release direct claims against non-debtor parties.

16             Now, the other group of creditors that are

17   affected are unimpaired -- you have unimpaired creditors in

18   Classes 1 and 2.  So, you have classified unimpaired

19   creditors, which are secured creditors other -- Class 1 I

20   think is secured creditors other than the prepetition

21   lenders; Class 2 is nontax priority claims.  So, they too

22   would have their direct claims against non-debtors stripped

23   from the plan. And these claims that are covered by the

24   release are far broader than the claim on which they are

25   unimpaired and going to be paid in full.

1           Then you also have unimpaired claimants who are

2    unclassified, so the admins and the priority tax.  We have

3    all the same issues with them but with the additional issue

4    that they did not get any way to opt out.  So, the -- I'm

5    sorry, I should've mentioned the classified Classes 1 and 2

6    creditors, when they received their notice, it did have a

7    box they could check to opt out and send it back.  But that

8    was -- and I got confirmation from the debtors -- that was

9    not sent to admin creditors or priority tax, so they didn't

10   even have that ability to do that.

11          And, by the way, I mean, as we all know, the Code

12   provides that in order to get a plan confirmed,

13   administrative creditors and priority tax have to be paid in

14   full.  So, it's not like they're getting any additional

15   consideration for giving these releases to non-debtors.  By

16   being paid in full, they have to be paid in full or there's

17   no plan to confirm.  So, it's not like they're getting an

18   extra gift of any kind.

19          THE COURT:  But if the releases that they're

20   proposing to grant are releases only in connection with the

21   Chapter 11 cases and they've been paid in full, then what

22   other additional damages might they have?

23          MS. SARKESSIAN:  So, it's not -- it's any claim

24   that has any connection to the debtor.  And the way that

25   it's written is, you know, any claim that has any connection

1    to the debtor, comma, the Chapter 11 cases, comma, the plan

2    process, comma.  You start -- stop at connection to the

3    debtor, that is a full phrase.  So, the example that we gave

4    in the objection was -- so you have a taxing authority,

5    okay?  And you could have a situation in which they go after

6    a released -- a party that is released under the pan, and

7    they had income that they derived from transactions with the

8    debtor.  Well, they could -- I mean, technically, under the

9    way that the plan is written, they could argue taxing

10   authority, you have released us from any claims that had any

11   connection to the debtor.  And this has a connection to the

12   debtor.  We got income, we did business, we got money from

13   the debtor.  This is a release from anything up through the

14   effective date.

15            Another example would be an employee.  An employee

16   who says -- because employees of the debtor are released

17   parties as well -- I don't have to pay tax on my salary from

18   the debtor, I got a release.  You could have a secured

19   creditor who is unimpaired because they're -- now we're

20   going to classified route -- a secured creditor who's

21   unimpaired because they're getting their collateral back.

22   But say they have a deficiency claim, and say they have a

23   guarantee from a non-debtor affiliate to pay the full

24   amount.  They're releasing that.

25            So, again, because it's so broad -- if it was

1  limited to you're releasing any claims against the released

2  parties for the claim upon which you're being paid in full,

3  that'd be another story.  But that's not it.  It's very,

4  very broad.  It just has to have any connection whatsoever

5  to the debtor, and that's the issue with the unimpaired

6  creditors.

7          And, in addition, with respect to the admin

8  creditors and the priority tax, they don't even get the form

9  where they can check a box or return it.  Now, the debtors

10  say well, they can "opt out by filing an objection."  In

11  this district that's not what opt out means.  Opt out means

12  you get a form, it's relatively -- you have to understand

13  it, but if you understand it, you check a box and you mail

14  it back.  That's a lot different than retaining counsel,

15  paying counsel, they have to file an objection, they have to

16  show up in court to argue the objection.  But that's not --

17  the right to object is not an -- I'm using air quotes here -

18  - opt out.  It's not.  So that was -- at the very least they

19  should've gotten that but, of course, again, the U.S.

20  Trustee's position is that everything should be an opt in

21  when you're talking about releasing non-debtor parties.

22          In the brief that the debtors filed, they talked

23  about the mail rule.  The mail, M-A-I-L.  That if something

24  is sent in the mail that it's reasonable to expect that it

25  gets to the intended recipient and I guess does so timely.

1    Although I think the timely element when COVID started,

2    started to get a little bit different than what it was prior

3    to COVID and that continues to potentially be a problem.

4    But one of the things they argue is that well, if somebody

5    later on -- if it turns out that in at some point in the

6    future -- and, by the way, this is likely how it would

7    happen.  You would have a party who's defined as a releasing

8    party who sues one of the non-debtor parties who's a

9    released party, and that party -- they'll be in state court

10   or in federal court, non-bankruptcy court, right, because

11   it's a claim of a non-debtor against a non-debtor.  And that

12   non-debtor says -- picks up the plan, you released me.  And

13   then the response would be I never got that solicitation

14   package.  It never came to me.

15            So, the debtor's view is well, that's their burden

16   to prove that they'd never received the package.  Well, I

17   don't know how you prove a negative.  And that's a pretty

18   high burden of proof to avoid a non-debtor giving a release

19   of their direct claims against another on-debtor.  I mean,

20   to have to prove -- I don't know how you prove that.

21            And, by the way, even if you did prove it, the

22   plan doesn't even make that an exception.  I mean, it

23   doesn't say, but if the person can prove they didn't receive

24   it, then they didn't give a release.  But I don't know how

25   you prove that.

1          Now, it is true that the definition of releasing

2    party does have an objection if a solicitation package was

3    sent out and it was returned to the debtor or their agent

4    and it said, you know, wrong address -- we ask for them to

5    do that at the disclosure statement stage.  They did do that

6    and we are thankful.  That's a good first step.  But that

7    doesn't cover every way that -- that doesn't cover every

8    situation.

9          So, I'll give you an example.  This morning, I

10   left my house.  On my porch, the table on my porch is

11   sitting a package.  It is not addressed to me and the

12   address is not my address; it's my next door neighbor's

13   address, so that's not too bad.  I'll take that -- I didn't

14   do it this morning -- I'll take that package over to her.

15   I've gotten mail from people who live further down the

16   street, blocks away.  I'm like, why is this even being

17   delivered to me?  And, by the way, I love my postal -- she's

18   wonderful but something gets caught in the bottom of another

19   letter or whatever, who knows why?  I get things all the

20   time.  And I say to myself -- I mean, that's not something -

21   - that's not going to be returned to them.  It may very well

22   have been addressed correctly, it's just not my address.  It

23   was delivered incorrectly.

24          And I say, I'm going to go take that.  The next

25   time I go down the street, I'll drop that up.  And then more

1    mail comes in and it goes on top, and maybe I do and maybe I

2    don't.  When that happens at a business, I don't know what

3    happens.  When a business gets mail that's addressed to

4    someplace else with a different address, there's no way --

5    there's so many unknowns.  So, just because a package

6    doesn't get returned back does not mean that it actually got

7    to the intended recipient or that it got to the intended

8    recipient timely.  And that's the beautiful of affirmative

9    consent, is you know they got it, they saw it, they

10   understood and they're agreeing to it.

11          Now, talking a minute about the case law, from the

12   -- when you look at the Third Circuit, there's actually no

13   case from the Third Circuit that addresses what constitutes

14   consent.  We have Continental, we have Millennial Labs, we

15   have Global Industries Tech from the Third Circuit that talk

16   about situations where there was no opt in, no opt out,

17   nothing.  It was -- you know, I think everybody would agree

18   -- a nonconsensual release.  Continental actually doesn't

19   say that that would ever be okay but it gives examples of

20   well, this might be okay if there's consideration or if it's

21   fair, etc.  So, there's no guidance from the Third Circuit,

22   as Your Honor knows.

23          In our district, as I'm sure Your Honor's also

24   aware, Judge Walrath and Judge Owens require affirmative

25   consent for the release of direct claims against non-

1    debtors.  We are hoping to persuade you to join their view.

2    We do understand that that is a minority view I this

3    district.  There are also, of course, cases which we cited

4    from other districts that take the same view.  And of course

5    there's Judge Walrath's Washington Mutual decision where she

6    makes it clear, you know, affirmative consent, that is not

7    just opting out.  Opting out of a third party, but that does

8    not show whether or not somebody consents.  And she says,

9    "Opt out mechanism is not sufficient to support the third

10   party releases, particularly with respect to parties who do

11   not return a ballot or who are not entitled to vote in the

12   first place," which are the two situations that we are

13   addressing here.

14          And Judge Walrath's ruling since then has been

15   consistent with that view of acquiring affirmative consent.

16   The exception she makes is if you vote in favor of the plan,

17   then it's okay to make it an opt out -- for that be to an

18   opt out.  Though I think she recently said, it would be

19   better if it was an opt in.  I think she's open to that.

20          Now, of course, Judge Owens' decision in Emerge,

21   the Court ruled similarly that a consented third party

22   release, "cannot be inferred by the failure of a creditor or

23   equity-holder to return a ballot or an opt out form."  And

24   she reached this conclusion even though the Court

25   acknowledged that the opt out forms provided conspicuous

1    notice of how to opt out and the consequences of not doing

2    so.  But the Court rejected the debtor's argument that

3    inferring consent from silence should be approved as

4    typical, customary or routine.

5            And Judge Owens said that failure to return an opt

6    out notice or a ballot could be due to "carelessness,

7    inattentiveness or mistake" rather than constituting a

8    manifestation of intent to give a third party release.  And

9    then, of course, it could also be caused by the examples I

10   gave:  Not getting the solicitation package or the opt out

11   form; not getting it on time; getting it, not understanding

12   it and not having the means to retain counsel.

13           Now, the debtors point out that Judge Owens has,

14   in some more recent cases, allowed opt outs to be used but

15   that has only been with respect to those who actually return

16   a ballot.  So, the issue was if somebody votes to reject the

17   plan, do they also have to check the opt out box?  And I

18   believe she does have a few rulings, bench rulings, that

19   allowed that.  But they did not allow saying, oh, if you

20   don't get a ballot -- if a ballot doesn't come in at all,

21   we're going to assume that person consents.  And also, same

22   thing for unimpaired parties.  If they're unimpaired, they

23   don't get a ballot.  She has not changed her view on that,

24   to my knowledge, and I try to track these decisions very

25   closely.

1           And, in fact, in the case of Ketner, which is 20-

2    12366, the judge, Judge Owens' rule on February 15, 2022

3    that there it was -- specifically she addressed unimpaired

4    creditors and said that releases cannot be imposed on them

5    without their affirmative consent.  That is -- transcript is

6    at Docket 298, Pages 50-54.

7           I also want to mention, Your Honor, that the issue

8    about those who vote to reject whether them checking -- they

9    can be required to check an opt out box, that's actually not

10   an issue here because of the way that it's written.  If you

11   reject the plan, you're not getting third party releases,

12   which we appreciate.  This is -- I mean, you know, there

13   were a lot of changes made at the disclosure statement stage

14   that made this better than -- this is not the worst by far

15   that we've seen at this point.  I mean, they definitely

16   tried to make some accommodations but you still have, again,

17   those two groups, especially those who are not returning

18   ballots at all, that were still deemed to be consenting to

19   releases.

20           Another -- I'm not sure that I'd say this was an

21   argument in the brief but the debtors referenced Section

22   1141 of the Code and I did want to address that 1141(a) of

23   the Code, which states that the provisions of a confirmed

24   plan bind the debtors any entity acquiring property under

25   the plan, any creditor, equity security holder or general

1    partner of the debtors. This provision does not address what

2    can be included in a plan; it addresses the effect of a plan

3    being concerned.  The debtor -- and I bring this up, Your

4    Honor, because I've heard this sort of argument before -- is

5    well, a debtor put something in the plan.  If it's

6    confirmed, that's it.  A debtor can't just put anything in a

7    plan and say, oh, 1141, if it gets confirmed it's

8    enforceable.

9          And an example of that, which the Third Circuit

10   dealt with, was a plan cannot be enforced if, for example,

11   it treats property that does not belong to the debtor as

12   property of the estate.  And that was the situation the

13   Third Circuit addressed in First Fidelity Bank v. McAteer,

14   985 F.2d, 114 from 1993.  I did not cite that in our

15   objection.  In fact, the debtor cited it and I thank the

16   debtor for citing that case in their objection.  They cited

17   it as supporting the following proposition:  "Other courts

18   have held that for a release to be consensual, the creditor

19   must have unambiguously manifested consent to the release

20   for the non-debtor from liability on its debt."

21          Now, that was a quote from another case.  Arrow?

22   Arrow something.  But they then cited that First Fidelity

23   Bank is supporting that view.  So, I'm going to talk a

24   little bit about that case because I did not address it.  I

25   will be doing so in future objections but I did not address

1  that.  That was a Chapter 13 case.  So, the debtor purchased

2  a truck through an installment contract that was assigned to

3  a bank.  And then the debtor purchased an insurance policy

4  naming the bank as the primary beneficiary.  And then the

5  debtors -- his estate -- this is before filing for

6  bankruptcy -- the estate as secondary.  And then the policy

7  provided that if the debtor died, the insurance company

8  would pay the bank back any amount remaining on this

9  installment car loan.

10          Then this individual and his wife filed for

11  Chapter 13.  And then the bank's claim was crammed down to

12  the fair market value of the collateral plus 20 percent of

13  the unsecured balance.  And the bank did not object to the

14  plan.

15          After the plan was confirmed, the debtor -- the

16  husband died.  The insurance company paid the bank the

17  amount that was due under the policy and then the wife moved

18  in the Bankruptcy Court to compel the bank to turn over to

19  the estate the insurance proceeds in excess of the amount

20  that was due to the bank under the confirmed plan.  The

21  Bankruptcy Court granted the request.  The District Court

22  affirmed, the Third Circuit reversed.

23          The Court indicated that to support its position,

24  the debtor relies on 11 USC 1337(a) which provides that "the

25  provisions of a confirmed plan bind the debtor and each

1   creditor."  I quote this because this language is quite

2   similar to 1141(a).  The Third Circuit then went on to say,

3   "While it is true that the Bankruptcy Court's confirmation

4   of the plan binds the debtor and all creditors vis-à-vis the

5   debtor, it does not follow that a discharge in bankruptcy

6   alters the rights of a creditor to collect from third

7   parties.  Section 524(e) specifically limits the effect of a

8   discharge.  It provides that discharge of a debt -- of the

9   debtor does not affect the liability of any other entity on,

10  or the property of any other entity for such debtor."

11          At the end of the opinion, the Third Circuit

12  summed up its ruling, and this is a quote but I'm going to

13  substitute like, the bank and the debtor instead of the

14  proper names.  "The bank's interest in the proceeds of a

15  life insurance policy is not the property of the debtor's

16  estate and thus cannot be altered by confirmation of the

17  Chapter 13 plan.  The confirmation of the debtor's Chapter

18  13 plan did not work to erase or alter the bank's rights as

19  a third party beneficiary to collect from the insurance

20  company."

21          So, that's all to say you can't just put something

22  in the plan and say 1141, got you.  It's got to be

23  consistent with the Code and the bankruptcy rules.  And I

24  think also relevant is the Third Circuit's opinion in PWS

25  Holdings, 228 F.3d, 224 from 2000.  "Section 524(e) makes it

1  clear that a discharge in bankruptcy does not extinguish

2  claims by third parties against guarantors or directors and

3  officers of the debtor for the debt discharged in

4  bankruptcy."

5        And you can take that a step farther and say,

6  well, if it doesn't let you do it for the debt discharged in

7  bankruptcy, surely it doesn't allow you to extinguish claims

8  that weren't addressed in the bankruptcy -- claims that had

9  any connection to the debtor.  So this, you know -- the plan

10  goes further than what the Court's talking about here to

11  extinguish claims that were not even -- potentially not even

12  addressed at all in the Bankruptcy Court because of the very

13  wide definition of what is a released claim.

14        So, Your Honor, since the debtors have indicated

15  that they are not going to make an argument that if Your

16  Honor finds that the releases are nonconsensual, the plan

17  should not be confirmed under the continental standard, if

18  Your Honor determines that the -- or any portion of the non-

19  debtor releases are not consensual, then the plan cannot be

20  confirmed unless those releases are omitted or somebody

21  wants to reserve parties with an opt in.  Of course, that's

22  always a possibility.

23        That's why we always bring this issue up, Your

24  Honor, at the disclosure statement stage, because we want to

25  make it clear we want to give -- you know, be on notice if

1   they want to change their minds and say, you know what,

2   let's do it as an opt in, they have that ability because, of

3   course, nobody wants to have to resolicit anything.  But

4   here, again, given who is among the released parties, again,

5   prepetition lenders already got a release respectively

6   through the DIP financing order, the committee, their

7   members, the related parties -- the professionals of the

8   committee and the debtor, they're all getting exculpations.

9   So, release is a sort of extra icing on the top, I guess I

10  would say.

11          THE COURT:  Well, is it duplicative?  Is it the

12  same thing, effectively, or is it something additional?

13          MS. SARKESSIAN:  So, the only -- I think the only

14  thing that's different is that, of course, exculpations make

15  exceptions for fraud, intentional misconduct, gross

16  negligence.  Now, up until last night, the way I read the

17  third party release, there was an exception for known and

18  unknown claims in the third party release of fraud,

19  intentional misconduct, gross negligence or claims that

20  would come out of like, a criminal act.  But last night, I

21  realized that it wasn't known and unknown; it's only unknown

22  claims.  So, there's an exception for unknown claims but any

23  known -- I made that mistake, I can't even imagine what some

24  creditor would...  I mean, I looked at it but sometimes

25  you're so used to seeing known and unknown, your brain puts

1    it there when it's not there.

2              So, what would be released would be any known

3    claims of fraud, intentional misconduct, gross negligence or

4    claims arising out of criminal acts of exculpated parties

5    because they're, I think, all or almost all of them would

6    also be a released party.  So, that would be the extra.

7    And, again, those are things that exculpated parties are not

8    entitled to under PWS.

9              So, I think, Your Honor, in summary, the consent

10   of a non-debtor to release their direct claims against other

11   non-debtors needs something more than silence.  It needs an

12   affirmative act like an opt in rather than an opt out.  And

13   the U.S. Trustee would respectfully request this court to

14   join the view of Judge Walrath and Judge Owens in ruling

15   that affirmative consent is needed in that regard.

16             Your Honor, unless you have any further questions,

17   my argument is concluded.

18             THE COURT:  No.  I appreciate the argument.  I

19   don't have any questions at this point.

20             MS. SARKESSIAN:  Thank you.

21             THE COURT:  Thank you.

22             MS. GOOD:  Good afternoon, Your Honor.  For the

23   record, Katie Good, Potter Anderson & Corroon.  Just to

24   respond briefly to the U.S. Trustee's argument, I know we

25   briefed this issue extensively.  The debtor's view is that

1    these releases are consensual based on precedent in this

2    jurisdiction from Judge Shannon, Indianapolis Downs, Judge

3    Goldblatt in Arsenal Intermediate Holdings, Judge Kerry in

4    Scansion, Judge Dorsey in Mallinckrodt and numerous other

5    eventual links that we cited in our memorandum.

6             We do acknowledge that there is a split of

7    authority on whether consent can be inferred from the

8    failure to act.  One side of that split looks at contract

9    law and says you cannot infer silence to mean consent unless

10   there is a duty to act.  That means you can't send a letter

11   out that says, hi, third party, you're going to buy my car

12   for this price unless you get back to me by this date -- if

13   I don't hear from you, I'll assume we have a good contract.

14            That's not what we're doing here.  That's not the

15   factual situation that we're in.  We are in the other -- the

16   factual system that the other side of the split notes.

17   We're in an adversarial system of justice of justice in

18   which the judge's primary role is to resolve disputes

19   presented by the parties.  In that adversarial system,

20   parties can be bound by their inaction when they receive

21   notice and they fail to act.

22            As Judge Dorsey noted in Mallinckrodt, there is a

23   duty to speak in the context of court proceedings.  In his

24   opinion in Arsenal Intermediate Holdings, Judge Goldblatt

25   started his analysis with the premises (sic) that the

1    functioning of the bankruptcy system generally depends on

2    requiring parties to object to the relief proposed in the

3    plan and come to court and raise their objections.  He goes

4    on to highlight several other situations in bankruptcy

5    proceedings where the failure to act has consequences.

6    Those include default judgments, cure claims, bar dates,

7    consent to entry of final orders by Bankruptcy Courts and

8    there are others outside of the bankruptcy context.  Class

9    actions.  The failure to raise arguments at a certain point

10   in a proceeding or to plead certain claims at various points

11   in litigation.

12          So, we would urge the Court to side with the

13   majority here and conclude that where the notice is

14   prominent and conspicuous and parties have a fair

15   opportunity to opt out, that it is fair to have that release

16   be consensual, using the definition of consensual that Judge

17   Goldblatt notes in Arsenal Intermedia Holding, which is it's

18   consensual because no party has objected and no party has

19   opted out.

20          The U.S. Trustee raises the issue of parties not

21   receiving their mail because it's maybe been mis-delivered.

22   We did eliminate from the releasing parties at the

23   disclosure statement phase, our solicitation procedures

24   hearing phase, any party whose mailing was returned as

25   undeliverable.  But the rest of her argument would entirely

1    gut longstanding precedent of the mailbox rule and undermine

2    the federal rules of procedure, which expressly permit

3    service by mail in many situations.  If there are problems

4    with service by mail, those are problems that rulemaking

5    bodies will need to address, not problems that can be solved

6    in the context of this type of dispute.

7              With respect to the unimpaired claims, those

8    claims who are administrative and priority tax claims did

9    receive a confirmation hearing notice that expressly set

10   forth all of the relevant provisions regarding the releases,

11   including defined terms.  It provided a pace where those

12   creditors could go and receive the plan free of charge on

13   the claim's agent website or a number where they could call

14   and receive it if they wanted to review that further.  And

15   it told them the procedure that they needed to follow in

16   order to elect not to be a releasing party, and that was to

17   object.

18             The parties who were unimpaired and who were

19   classified did receive a notice of nonvoting status.  Those

20   parties had the ability on that notice to check an opt out

21   box and send it back, and our supplemental voting

22   declaration identifies the parties who did.

23             I think the example that the U.S. Trustee gives

24   with respect to some of the tax claims that an employee, for

25   example, would not have to pay income tax on wages received

1    from the debtors stretches the language in the plan a little

2    far.  You know, and those taxing authorities regularly

3    receive notices in bankruptcy cases.  They follow the

4    docket, they show up at the DIP hearing.  We regularly put

5    language in DIP orders to preserve their rights, in sale

6    orders -- we get comments sometimes in the context of

7    confirmation and those parties are not here today.  We have

8    not received any objections from them.

9            We made clear -- I know the U.S. Trustee noted

10   that these are dense documents but we tried to make them as

11   clear as possible.  We put the language in bold, we added

12   language to each of the notices and the ballots saying that

13   a failure to -- or that an opt out would not impact a

14   distribution.  So, we tried to make this easier to

15   understand for parties.  I don't agree with her position

16   that if a creditor -- that a creditor may understand that

17   claims against the debtor are impacted but they may not

18   think about third party claims.  This has certainly been an

19   item that is, A, existing, under precedent in this

20   jurisdiction, and has been a topic of news and debate in the

21   larger community, even outside of the bankruptcy community.

22   It's gotten a lot of attention due to numerous mass tort

23   cases.

24           We also did everything that we could to make

25   returning these opt out forms as easy as possible for

1    creditors.  We made balloting online so creditors could

2    return those ballots online.  All the creditors received

3    envelopes that were stamped and ready to go back.  So, and I

4    Just want to note before I conclude here that I think Cutter

5    is an entirely different case.  That plan did not include a

6    third party release.  If it had, that could've been a very

7    different ruling.  But because it did not include that, it's

8    very distinguishable from the factual situation that we have

9    here today.

10          And Judge Goldblatt noted in his decision in

11   Arsenal that if you start with the proposition that the

12   implication of the Third Circuit's suggestion that

13   nonconsensual releases may be authorized in exceptional

14   cases, that consensual third party releases then ought to be

15   noncontroversial. So, here we have made -- we have followed

16   the majority precedent.  We have done our best to make these

17   releases clear and conspicuous to creditors and we would

18   urge the Court to follow the majority here and find that the

19   failure to respond and check an opt out box should be

20   implied consent to these releases.

21          THE COURT:  Okay, I do have a question for you,

22   Ms. Good.

23          MS. GOOD:  Yes?

24          THE COURT:  Ms. Sarkessian raised the issue about

25   -- in the third party releases, the scope, and that there is

1    the exception for gross negligence, willful misconduct,

2    fraud, criminal acts, but only to the extent that those

3    claims are unknown.  Why does it not extend to known claim

4    as well?

5              MS. GOOD:  Your Honor, our view is that if

6    creditors know that they have these claims, they should opt

7    out and they should assert them.  But if Your Honor were to

8    request that we make that change, we would certainly do so.

9              THE COURT:  Okay.  Thank you, MS. Good.  Ms.

10   Sarkessian?

11             MS. SARKESSIAN:  Your Honor, can I ask Ms. Good a

12   question?

13             THE COURT:  Sure.  Yeah, take a moment.

14             MS. GOOD:  Yes, I think I referred to the wrong

15   case.  I said Ketner and I was referring to First Fidelity

16   v. McAtter.

17             THE COURT:  Okay.

18             MS. GOOD:  My bad.

19             THE COURT:  Understood, understood.

20             MS. GOOD:  That was my poor notetaking.

21   Apologies.

22             THE COURT:  That's okay.

23             MS. GOOD:  Thank you.

24             THE COURT:  Thank you for clarifying that for me.

25             MS. SARKESSIAN:  Just one point that -- again, for

 1  the record, Juliet Sarkessian for the U.S. Trustee.

 2  Debtor's counsel mentioned there being some discussion in

 3  the news about the idea that a bankruptcy case could result

 4  in releasing non-debtors.  She may be talking about the

 5  Purdue case, which, of course, is before the Supreme Court.

 6  And as she mentioned, it's a mass tort case.  This is not a

 7  mass tort case.  I think this situation is different.  I

 8  think people are starting to hear in mass tort cases that

 9  these types of things might happen.  After the Supreme Court

10  rules, it might be different, but this is not a mass tort

11  case.  And that's really my only comment.

12          THE COURT:  Okay, okay.  Anything else from the

13  debtors?  Good afternoon.

14          MR. COMERFORD:  Good afternoon, Your Honor.

15  Michael Comerford with Katten Muchin & Rosenman.  I mean,

16  unless Your Honor would like to go in a different direction,

17  we could walk through the plan and the confirmation order

18  changes at this point obviously subject to however you'd

19  like to proceed.

20          THE COURT:  Yeah, let's walk through the changes,

21  please.

22          MR. COMERFORD:  Okay.  So, I have tabbed copies

23  for you, if I can approach?

24          THE COURT:  Okay.  That's perfect.  Yeah, thanks.

25  Got you, thank you.

1          MR. COMERFORD:  So, I'll say it on the record.

2   So, what I handed up to you, Your Honor, is a redline of the

3   plan and this is on file.  It's Docket Number 494.  The

4   confirmation order that I'm going to walk you through is

5   marked against what we filed as proposed confirmation order

6   but this version has not been filed yet.  If other people

7   would like a copy of it -- if you have copies that we can

8   hand out while I walk through this?

9          THE COURT:  Okay, can we just make sure that Mr.

10  Coleman, my law clerk, has a copy?  Thank you.

11         MR. COMERFORD:  Is it all right with Your Honor if

12  we go through the plan first?  Is that --

13         THE COURT:  Yeah, let's go through the plan first,

14  please, Mr. Comerford.

15         MR. COMERFORD:  Okay.  I've marked every page that

16  has a change but I'm going to try to focus on the more

17  substantive changes, if that's okay?

18         THE COURT:  Yeah, let's do that.  Yeah.

19         MR. COMERFORD:  So, that would take me to Page 6

20  of the redline where we inserted a new definition entitled

21  Contributing Directors and Officers.  This goes to what my

22  colleague Mr. Hall was describing earlier where we now have

23  two different paragraphs for the debtor releases.  So, we

24  have contributing directors and officers as part of that

25  paragraph where they are receiving the entirety of the

1    debtor release versus other parties that are getting the

2    debtor release with a carve out.

3             THE COURT:  Okay.

4             MR. COMERFORD:  Page 8, the Definition of the

5    Exculpated Parties.  This is negotiated language with the

6    United States Trustee's Office that we reached agreement on.

7    But I will note that we are going to have to revise the plan

8    to address some of what Mr. Hall was discussing earlier in

9    terms of the resolution between the committee and Compeer.

10    We're also going to make a change here which was intended to

11    be made but just was an oversight.  At the end here where it

12    says, and F, with respect to the foregoing clauses A and B,

13    each of their respective related parties...  That's actually

14    not going to be part of the definition.  That's going to

15    come out.

16             THE COURT:  Okay.

17             MR. COMERFORD:  Page 11.  This Deletion of Letter

18    of Credit.  That's going to go back into the plan as well as

19    part of the resolution reached between the committee and

20    Compeer.  Page 12.  Again, a new definition, Other Released

21    Parties.  This was what we discussed and negotiated with the

22    United States Trustee's Office and goes back to the debtor

23    release changes that we made.

24             Pages 15 -- Page 15.  This really starts on 14, I

25    apologize.  So, the Definition of Related Parties.  And then

1    the Definition of Released Parties and Releasing Parties.

2    These changes predominantly were from our discussion with

3    the United States Trustee's Office, and then we also had a

4    few clarifying changes just to fix a couple of typos that

5    were in there.

6              THE COURT:  Okay.

7              MR. COMERFORD:  Page 16.  The definition at the

8    bottom is actually going to be reinserted.  Similarly, on

9    Page 17, the Workers' Compensation Deductible Funds, that's

10   going to be reinserted into the plan.  Page 18.  At the

11   bottom, in Section 2.1, this speaks to the -- this is part

12   of the resolution, the global resolution with the creditors

13   committee in terms of how distributions will be made in

14   connection with general unsecured claims.  There'll be the

15   one distribution for all -- all general unsecured claims

16   that were filed in the cases.  Moving to -- Yeah?

17             THE COURT:  We're introducing substantive

18   consolidation at the 11th hour.  Should I have any concerns

19   that creditors haven't had an opportunity to weigh in on the

20   issue of substantive consolidation when the plan initially

21   stated we're not substantively consolidating the debtor's

22   estates?

23             MR. COMERFORD:  I don't think so, Your Honor,

24   because I think it was something that was contemplated in

25   the context of the committee's settlement in terms of how

1    distributions would be made.  And I think that the overall

2    impact from doing this is to the benefit of unsecured

3    creditors, to ensure that they get the highest and best

4    distribution that can be made available to them.  And I

5    think, at the end of the day, what this is really doing is

6    just making this streamlined since all of this is being done

7    in connection with establishing a liquidating trust and

8    having a liquidating trustee oversee the pool of money

9    that's being set aside for the benefit of general unsecured

10   creditors.

11          And so that's ultimately what the impact is going

12   to be, and I think will benefit unsecured creditors.  And,

13   obviously, if Mr. Mannal would like to speak to this, I'm

14   obviously happy to step aside for that.

15          THE COURT:  Yeah, sure thing.

16          MR. MANNAL:  Your Honor, Doug Mannal from Dechert

17   on behalf of the unsecured creditors committee.  Your Honor,

18   it's substantive consolidation for distribution purposes

19   exclusively.  And, as Mr. Comerford in advance of the

20   hearing in his conversations with the one objecting party

21   informed them, that they're better off with the substantive

22   consolidation for distribution purposes.  Because the way

23   the settlement with Compeer works is a waiver of a

24   significant $70-plus million deficiency claim.  And so what

25   this is premised on is a single distribution for unsecured

1    creditors.

2           And had that claim been asserted, the distribution

3    percentages to unsecured creditors being much less.  So, I

4    think substantive consolidation for distribution purposes is

5    very appropriate here, as Mr. Comerford was able to convince

6    the one creditor an issue.  So, by withdrawing that

7    objection I think it's evidence that this is the best way to

8    proceed.

9           THE COURT:  Thank you.

10           MR. COMERFORD:  Anything else on that, Your Honor?

11           THE COURT:  Nothing else on that.  Thank you, Mr.

12    Comerford.

13           MR. COMERFORD:  You're welcome.  This will take us

14    to Page 20 and 21 of the redline, which is really just -- it

15    states exactly what we were just talking about in terms of

16    how the distributions will work and states what the range of

17    recoveries will be for general unsecured creditors and a

18    revised claim amount for general unsecured claims, which

19    reflects the settlements that we've reached leading up to

20    confirmation with Strobel and other creditors.

21           THE COURT:  Okay.

22           MR. COMERFORD:  Page 32 of the line.  That's non-

23    substantive changes.  It's really just addressing when the

24    committee's professionals were put in place.  Page 35 of the

25    line.  The paragraph entitled Committee Settlement.  I think

1   these changes are, by in large, from the committee just to

2   clarify how the settlements that they've reached are being

3   implemented and the benefit that's being received by general

4   unsecured creditors from those settlements.

5           I am going to move to Page 48 of the redline.  At

6   the top paragraph, it's really -- again, it's restating the

7   point about how distributions will be made in connection

8   with the limited consolidation for purposes of distribution.

9   Page 49 is a deletion with respect to avoidance actions was

10  included in the treatment section and it was taken out that

11  that's a committee comment, I believe.

12          Page 51 of the redline, Section 9.1.  Again, this

13  is just reaffirming what we were just talking about in terms

14  of the consolidation for purposes of distributions by the

15  liquidating trust.  Page 60 and 61 of the redline.  This is

16  Section 9.10 entitled Distributions by Liquidating Trustee.

17  There was a paragraph that we took out here related to

18  Workers' Compensation.  This actually is going to go back

19  into the plan.  This is what was being discussed in the 30-

20  45 minutes before the hearing.

21          THE COURT:  Okay.

22          MR. COMERFORD:  And that takes us to Page 69 and

23  70, which I believe these are the last changes to bring to

24  Your Honor's attention, but they go straight to what we were

25  talking about earlier with respect to the United States

1  Trustee's discussions with us and how we changed the

2  language in connection with exculpation and the releases by

3  the debtors.  I'm happy to discuss that further if you'd

4  like, but otherwise, that was --

5          THE COURT:  Yeah, I had the opportunity to read it

6  and I'm satisfied.

7          MR. COMERFORD:  Okay.

8          THE COURT:  Yeah, thank you.

9          MR. COMERFORD:  So, that's the plan.

10          THE COURT:  Okay.

11          MR. COMERFORD:  Then I'll move to our confirmation

12  order.  Do you have that in front of you, Your Honor?

13          THE COURT:  I do.

14          MR. COMERFORD:  Okay.  So, on Page 2, we updated a

15  few things in terms of the additional declarations that we

16  filed and that were introduced into evidence earlier in this

17  hearing.  I'll try to focus on the more substantive changes.

18  Page 8, there's a paragraph with respect to the plan

19  settlements that have been incorporated really just -- it's

20  language speaking to the reasonableness, the probability of

21  success and the good faith comprises that were reached in

22  connection with implementing them.

23          Page 10 of the redline.  This is language again

24  that speaks to the limited consolidation for distribution

25  purposes.  Page 11, Paragraph U, this relates to releases,

1  exculpation and injunction.  This is language that was

2  negotiated with the United States Trustee just to be more

3  specific or artful as to what exactly each of the release

4  provisions is doing and the basis for it.

5           MS. SARKESSIAN:  Your Honor, if I could just put

6  on the record -- Juliet Sarkessian for the U.S. Trustee.

7  This was with -- these changes were made with the idea that

8  if Your Honor ruled in favor of the third party releases.

9  Of course, we don't necessarily agree with the findings that

10  are here.

11           THE COURT:  Yeah, I understand.

12           MS. SARKESSIAN:  Thank you.

13           THE COURT:  Thank you very much, Ms. Sarkessian.

14           MR. COMERFORD:  Yes.  We understand that, Your

15  Honor.

16           THE COURT:  Great.

17           MR. COMERFORD:  Page 13, just some language that

18  was deleted in the middle of the page there.  That was a

19  comment from the United States Trustee's Office.  Page 20,

20  Paragraph 7.  This is just additional language that was put

21  in at the committee's request just to reflect what needs to

22  happen in terms of making the plan effective if it is

23  confirmed.  Page 21.  Again, this is a paragraph that was

24  inserted just with respect to approval of the settlements

25  that are contemplated in connection with the plan.

1          Page 22.  We added a couple of sentences at the

2   committee's request with respect to the establishment of the

3   liquidating trust and Matthew Dundin, who will be the

4   liquidating trustee, and his compensation is set forth I the

5   liquidating trust agreement.  And that speaks to approving

6   the terms of the liquidating trust agreement that was filed

7   as a plan supplement, and also the rights and powers that he

8   will have in connection with that agreement.

9          I'm going to move to Page 25 and 26.  This is some

10   clarifying language that we added at the United States

11   Trustee's request, I believe, in terms of any contracts or

12   leases that are rejected in connection with the plan and

13   making sure that such parties receive information on how to

14   file their proof of claim properly.

15          And then moving to Page 27.  This is 27, 28 and

16   29.  This was the United States Trustee's request that since

17   we have the releases and exculpation already set forth in

18   the plan, in order to avoid confusion, since it's already

19   set forth in one place, not to have it in both places.  So,

20   we agreed to do that.  So, we just have a restatement that

21   they're -- where they're contained in the plan and that

22   they're approved.

23          And that would take us to Page 30, which is a

24   paragraph, Paragraph 27, that speaks to the dissolution of

25   the committee and the limited go-forward purposes that they

1  would have post-effective date.  Page 32.  There was a

2  Paragraph 32, Payment of Statutory Fees, that the United

3  States Trustee asked us to take out because it was either

4  duplicative or slightly inconsistent with what was already

5  in the plan.  So, we agreed to take that out and just rely

6  on what's in the plan.

7          And then moving to Page 33.  This is -- in

8  Paragraph 36, this is some language that we received from

9  the Texas comptroller with respect to some -- an issue they

10 had to ensure that the tax claim that they filed, which is I

11 think approximately $2,600, is addressed pursuant to the

12 plan and, if not, what they can do.  And the last page of

13 the redline, Page 37, is a paragraph added -- in connection

14 with authorizing the debtor to consummate the plan subject

15 to the satisfaction of the conditions preceding in the plan.

16         THE COURT:  Okay, thank you.

17         MR. COMERFORD:  That's it for those two documents,

18 Your Honor.

19         THE COURT:  Okay.

20         MR. COMERFORD:  Absent any questions, that's all I

21 have.

22         THE COURT:  I think Mr. Hall has a suggestion for

23 you.

24         MR. COMERFORD:  Ah, yes.  So, I still am done but

25 one other thing we thought would be helpful is to have the

1   creditors committee walk through a few changes that they

2   negotiated with the United States Trustee on the liquidating

3   trust agreement.

4                THE COURT:  Sure.

5                MR. COMERFORD:  This all happened since we filed

6   it.  Thank you.

7                MR. MURLEY:  Good afternoon, Your Honor.  Luke

8   Murley of Saul Ewing, counsel to the committee. I have a

9   redline of the ADS file, if I can approach, Your Honor?

10               THE COURT:  Yes, please.  Thank you.

11               MR. MURLEY:  Tabbed with our two changes.

12               THE COURT:  You got it.  Thank you very much, Mr.

13   Murley.

14               MR. MURLEY:  Your Honor, the marked version you're

15   looking at shows changes that we agreed to with the U.S.

16   Trustee shown against the ADS file version and they both

17   related to the limitation of liability for a committee --

18   the oversight committee member as it relates to exculpation.

19   In 4.6, the U.S. Trustee asked us to delete the first

20   paragraph, which we agreed to.  And in the second sentence,

21   Your Honor, the qualification for not being sued in taking

22   action in connection with the plan -- the agreement, is that

23   the member is in good faith.

24               THE COURT:  Yes.

25               MR. MURLEY:  The next change, Your Honor, is in

1    the next tab on the Standard of Care in 7.1, and there we

2    accepted the U.S. Trustee's language wholesale.

3                  THE COURT:  Okay.

4                  MR. MURLEY:  So, with that, Your Honor, those

5    changes the U.S. Trustee and the committee are resolved as

6    to the form of the liquidating trust agreement.

7                  THE COURT:  Very good.  Thank you.

8                  MR. MURLEY:  Thank you.

9                  MS. SARKESSIAN:  Your Honor, could I just make a

10   short statement on the record?

11                 THE COURT:  Of course you can.

12                 MS. SARKESSIAN:  Again, for the record, Juliet

13   Sarkessian on behalf of the U.S. Trustee.  We certainly

14   appreciate the committee making the changes we requested to

15   the litigation trust agreement.  I stand to make the point

16   that the first time the litigation trust agreement -- am I

17   saying it right?  Is it litigation trust or liquidating

18   trust?

19                 MR. MURLEY:  Liquidating.

20                 MS. SARKESSIAN:  Liquidating, liquidating trust

21   agreement was filed was October the 2nd, earlier this week,

22   which is after the voting deadline.  As Your Honor is aware,

23   local rules require a plan supplement to be filed seven days

24   before the voting deadline.  Just filed.  It doesn't even

25   get served on the creditors that are voting on the plan, but

1      at least the notice tells them hopefully to look for the

2      plan supplement.

3              Honestly, from the U.S. Trustee's point, they

4      should be attached to the plan.  But if it's going to be in

5      the plan supplement, it's got to be in the plan supplement

6      seven days before.  They also did not identify who the

7      liquidating trustee was.  But this is an important document

8      and getting it after the voting deadline, it's obviously not

9      available for anybody to look at in connection with the

10     voting.  So, that is why I stand up to make that statement.

11     We really, really encourage parties to file a complete plan

12     supplement, at least with all the major documents, from the

13     date that it has to be filed under the rules.

14             THE COURT:  You know, without saying too much

15     about it, one thing that I'm learning is that attention to

16     deadlines is -- it's scattered, in general.  And, you know,

17     particularly with a plan where you're asking creditors to

18     effectively enter into a contract, they need the

19     information.  I appreciate you very much rising to point out

20     the issue.  But just in general, we need people to do a

21     little better with observing these sorts of deadlines.

22     They're very, very important.

23             MS. SARKESSIAN:  Something we absolutely agree on.

24     Thank you.

25             THE COURT:  Yeah.  Okay.

1        MR. HALL:  Your Honor, if I may?  This is not

2    something that was in the plan.  It is something that we

3    will figure out whether it goes in the plan or some other

4    document.  But I just wanted to put on the record -- and I

5    think Mr. Mannal will be able to confirm -- that this is --

6    that I've got it right.  But in connection with one of the

7    changes that Mr. Comerford took you through at Section 9.10,

8    Page 60 of the plan redline, it was the language relating to

9    holding Workers' Compensation money.

10        THE COURT:  Yes.

11        MR. HALL:  Okay.  That was an issue I think that

12    Mr. Comerford mentioned was the last issue that we were

13    discussing in resolving just before the hearing commenced

14    and why we had asked for the additional 15 minutes.

15    Essentially, what happened there is there was a disagreement

16    between the committee and Compeer as to an aspect of the

17    stipulation that the Court had entered into in August, and

18    the way that we determined to resolve that was to yield to

19    Compeer's interpretation of the stipulation and reinsert the

20    language in 9.10.

21        But the consequence of that would be that the

22    committee and its constituent creditors would be out

23    approximately $200,000 as a result.  And the way we're going

24    to solve for that is to defer $200,000 of professional fees

25    and that's going to be shared ratably 50K each by Dechert,

1   Katten, Potter Anderson and PWC.  And we'll defer that

2   pending the outcome of what happens with that Workers' Comp

3   holdback that is reflected in 9.10.  And if it works out

4   that that money gets completely consumed, those $200,000

5   will go to the benefit of the general unsecured creditors

6   and will never be collected by the professionals.  If it

7   turns out that less than $384,000 of that money is consumed,

8   then the creditors would have the benefit of the $200,000

9   from -- if you will, from 9.10, and the professionals will

10  be paid their fees.

11           THE COURT:  Okay.

12           MR. HALL:  But I just wanted that to be clear for

13  the record.  It's not something that's in any document

14  anywhere.  It's not on the docket and what have you.  It

15  literally happened within an hour or so before the hearing.

16  And subject to Mr. Manal's confirmation, I believe I've

17  articulated it correctly.

18           Oh, and I would say one more thing.  That that

19  $200,000 in deferred fees is for the benefit of general

20  unsecured creditors, and Compeer has agreed to both that and

21  has acknowledged that under the budget, as we have it today,

22  they will be contributing the full amount of their -- I

23  think it's called the guaranteed amount in the stipulation

24  but it's the full amount of the $750,000 holdback.

25           THE COURT:  Okay, thank you.

1          MR. MANNAL:  Your Honor, Doug Mannal from Dechert

2     on behalf of the committee. Your Honor, I just want to take

3     this time to maybe take a step backwards.  And as Mr. Hall

4     at the outset of the hearing said, the committee does not

5     oppose entry of the confirmation order today.  This was not

6     an easy decision.  This is a very difficult case.  A

7     difficult case for all stakeholders.  Compeer, the secured

8     creditor here is getting a 30-cent recovery.  I think

9     they've lost upwards of $70 million in their investment.

10          But it's particularly difficult for unsecured

11     creditors and a lot of the smaller creditors that exist in

12     this case that we're working hard to obtain recoveries for

13     and increase their recoveries. When we started this case, I

14     think they were set to get about 2 cents, 2 or 3 cents.  And

15     we've increased that to an 11-cent, an 11-14 cent recovery,

16     as advertised in the disclosure statement.  That wasn't

17     easy.  It's comprised of a lot of different buckets.  It's

18     $1.9 million from remaining assets, it's a $750,000

19     contribution by Compeer that's currently being held in

20     escrow, and it's a settlement with insiders.  And that

21     equates to a little over $3 million for distribution to

22     unsecured creditors that will go to the trust and be

23     distributed.

24          I do want to just confirm, however, that one of

25     the key ingredients to that settlement is the $750,000

1  contribution by Compeer that's being held in escrow.  There

2  was a dispute, as Mr. Hall said, this morning about cash

3  that would otherwise be available for unsecured creditors.

4  We have agreed to put back the language in the plan that the

5  stipulation does not supersede that language in the plan.

6  But with the agreement that that 750 is available.

7            And, as Mr. Hall said, the fourth way we're going

8  to get back to the $3.15 million that was agreed to on

9  Friday is by the professionals who ranted it for

10  compensation.  So, I just that Compeer confirm on the record

11  that that $750,000 is going to be released into escrow for

12  the benefit of unsecured creditors.  Thank you, Your Honor.

13            THE COURT:  Thank you.

14            MR. GLASNOVICH:  Good afternoon, Your Honor.  Drew

15  Glasnovich from Stinson, here on behalf of Compeer

16  Financial.

17            THE COURT:  It's good to see you, Mr. Glasnovich.

18            MR. GLASNOVICH:  Good to see you as well.

19            THE COURT:  Thank you.

20            MR. GLASNOVICH:  This case has been really hard

21  fought and the deals that we have have been very

22  complicated, and I appreciate the parties this morning

23  coming together to make sure that we can move forward today.

24  I did confirm with Mr. Hall in writing and copied the

25  committee on Compeer's agreement that the way the budget

1   stands today, and that budget I think has been circulated to

2   the parties, Compeer acknowledges that under that budget it

3   will be providing the full $750,000 that it had agreed to.

4          If Your Honor recalls, that number could go one

5   way or the other depending on certain budget outcomes.  We

6   understand based on the current budget that that will

7   require Compeer to put in the full 750.  That said, the

8   language in I think it's 910 that was taken out this morning

9   will go back in, and the Work Comp fund language will go

10  back in.  And we appreciate the professionals putting in the

11  $200,000 to kind of make that work for everybody.

12          THE COURT:  Thank you.  Thank you.  Yeah, I

13  appreciate the comments from the committee and from Compeer.

14  There has been a lot of pain in this case and I wouldn't

15  want to forget about the employees.  I understand that the

16  job losses were in excess of a thousand employees.  But I

17  thank the -- I want to recognize the efforts of everybody

18  involved to increase the distribution to creditors and the

19  sacrifices that some of the parties are making.  Is the

20  argument closed on the plan?

21          MR. HALL:  Your Honor, yes, the debtors have

22  nothing further.

23          THE COURT:  Okay.  And does the U.S. Trustee have

24  anything further?

25          MS. SARKESSIAN:  No, Your Honor.

1          THE COURT:  Okay.  I want to take a few moments to

2     gather my notes and why don't we come back on the record at

3     1:15, unless the parties would like a longer break to go to

4     lunch or anything of that sort.

5          MR. HALL:  From our perspective, Your Honor, we

6     defer the Court.

7          THE COURT:  Yeah, okay.  Well, let's push it

8     through then.  We'll recess until 1:15.

9          (Recess)

10          THE COURT:  Okay, I'm prepared to rule on the

11     plan.  I want to start by noting that I appreciate the work

12     of the parties and the cooperation that went into it to

13     narrow the issues and come to resolutions on many important

14     issues.  And I note that when the plan was solicited, the

15     committee had a statement that said that they urged the

16     creditors to vote against the plan.  And I think it's really

17     significant that the committee is here today supporting the

18     plan.  And through the work of the parties, the projected

19     recovers to unsecured creditors have increased meaningfully.

20     The projections have increased meaningfully.  So, I

21     appreciate that.

22          I'm going to grant final approval of the

23     disclosure statement, and I am going to confirm the fourth-

24     amended plan.  The opt out versus opt in issue and the

25     question of what constitutes consent are questions that, as

1    we know, are not uncontroversial.  But, in my view, if a

2    party receives notice of proposed releases and doesn't

3    object, that party has consented to the releases.  As in

4    many other respects, when it comes to bankruptcy, parties

5    are required to be vigilant and defend their rights, and

6    such is the case here.  In this case, I find that the opt

7    out, it was conspicuous and some creditors did opt out,

8    which evidences to me that the procedures were effective.

9              The UST raises a number of concerns that I take

10   very seriously and I'm grateful for the outstanding argument

11   from the UST and appreciate the positions that the office

12   takes.  The UST raises concerns about the possibility of

13   mail errors preventing parties from receiving notice.  But I

14   note that the federal rules of bankruptcy procedure and

15   civil procedure call for mail notice, and there is a

16   rebuttal presumption of receipt when a piece of mail is sent

17   to an addressee.  And I think it's the system that we have

18   and it's the one that we have to live with.

19              As for unimpaired creditors, the evidence before

20   me shows that they received notice identifying the release

21   provisions of the plan, directing them on how to receive

22   copies of the full plan if they wished, free of cost, and

23   identified procedures for objecting to being a releasing

24   party.  And I find this to be adequate and also find that

25   any unimpaired creditor who received such notice and did not

1    object has consented to the release that they are granting.

2         I find the scope of the third party releases to

3    generally be appropriate but I raise an issue about third

4    party releases only extending to unknown claims, and I

5    believe it should extend to known claims as well.

6         Also, to the extent there are parties receiving

7    releases that are, in effect, illusory because they already

8    benefit from exculpation, or in the case of a liquidating

9    trustee, there can be no pre-effective date claims to

10   release, the drafting may be overzealous.  And I won't fault

11   anybody for that, but there is no harm.

12        So, on those grounds, I am confirming the plan.

13   There is the one revision I identified and I think there may

14   be others coming, but I would ask the parties to submit the

15   -- well, to file a further amended plan if that's what we're

16   doing and also to submit the proposed form of order as

17   revised under certification of counsel so that it appears on

18   the docket.  And I have had a chance to review it and I will

19   enter the order.  But, again, I do want to emphasize my

20   appreciation to the Office of the United States Trustee for

21   their argument.  It is a very important issue and one that I

22   take very, very seriously.  And I think it's my first time

23   ruling on the issue.

24        MR. HALL:  Your Honor, if I may, just to make sure

25   I understand?  We will add known in addition to unknown in

1      the third party releases.  Are we to alter any of the

2      parties that are included in the third party releases?

3                    THE COURT:  No.

4                    MR. HALL:  Thank you, Your Honor.  Appreciate it.

5                    THE COURT:  Okay.  Is there anything else for

6      today?

7                    MS. GOOD:  No, Your Honor, nothing else for today.

8      Thank you for your ruling.  We will incorporate those

9      changes, file the further amended plan and the confirmation

10     order under certification of counsel and have that

11     (indiscernible)...

12                    THE COURT:  Okay, thank you.  I appreciate the

13     extremely well-briefed and argued issues that were before me

14     today.  It's great.  Very helpful to the Court.  So, I

15     appreciate it all.  And with that, I wish everybody a good

16     day and we are adjourned.

17                    MS. GOOD:  Thank you, Your Honor.

18                    MR. HALL:  Thank you, Your Honor.

19

20                              * * * * *

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  October 9, 2023